Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEIBEI CAI, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> VISA INC, RYAN MCINERNEY, CHRIS SUH, VASANT PRABHU, ALFRED F. KELLY, JR., PETER ANDRESKI, OLIVER JENKYN, and JACK FORESTELL, <br><br> Defendants. | Case No. 5:24-cv-08220-NW <br><br> AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> JURY TRIAL DEMANDED |

AMENDED CLASS ACTION COMPLAINT                     No. 5:24-cv-08220-NW

## <u>TABLE OF CONTENTS</u>

NATURE OF THE ACTION ......................................................................................... 1

JURISDICTION AND VENUE .................................................................................... 5

PARTIES ......................................................................................................................... 5

SUBSTANTIVE ALLEGATIONS ............................................................................... 7

    A.   **Visa Dominates the U.S. Debit Market, Making Gargantuan Profits** ......................... 7

    B.   **How Debit Transactions Work.** ................................................................ 8

    C.   **The Origin of U.S. Debit Networks and How Visa Came to Dominate the U.S. Market.** ............................................................................................... 9

    D.   **To Try to Break Visa's Dominance, Congress Passed the Durbin Amendment, Which Required Each Debit Card to Support at Least Two Unaffiliated Networks.** .......... 10

    E.   **Despite the Durbin Amendment, the Regulation II Clarification, and the PIN Networks Having Lower Network Fees, Visa Continues to Dominate Debit Transactions.** ....................................................................................... 11

    F.   **During the Class Period, Defendants Repeatedly Stated that the Regulation II Clarification Would Not or Had Not Impacted Visa's Debit Volume Because the Value of Certain Features of Visa's Network Outweighed the Lower Cost of Alternative Networks.** ...................................................................... 11

    G.   **Defendants McInerney and Prabhu Stated During Investor Conferences that Technology Companies Had Not Developed Products that Completed with Visa Because Visa Had Helped Those Companies Achieve Their Objectives.** ................... 12

    H.   **Visa's Public Filings During the Class Period Stated that Visa's Financial Institution Clients and Merchants Could "Reassess Their Commitment" to Visa at "Any Time or Develop their Own Competitive Services."** ............................................. 13

    I.   **What the DOJ Discovered During its Investigation of Visa Shows that Defendants' Statements Were False and Misleading When Made.** ...................................... 13

       1)   **The DOJ Found That Visa Had Thwarted the Durbin Amendment and Regulation II Clarification by Using the Threat of High Costs for Non-Contestable Transactions to Pressure Merchants, Acquirers, and Issuers into Restrictive Debit Routing Contracts.** ....................................................................... 13

AMENDED CLASS ACTION COMPLAINT            No. 5:24-cv-08220-NW

a)     Visa Uses the Threat of High Fees on Non-Contestable Transactions to Force Merchants and Acquirers to Route Nearly All Eligible Debit Transactions Through Visa. ................................................................................................ 14

b)     Visa Also Prevented the Durbin Amendment and the Regulation II Clarification from Having an Impact by Pressuring Issuers to Make it Difficult to Use Networks Other Than Visa. ................................................................................. 16

c)     The DOJ Found That Visa's Strategy of Pressuring Merchants and Acquirers into De Facto Exclusive Contracts was a Direct Response to the Durbin Amendment and the Regulation II Clarification. .................................................. 19

2)     A Former Visa Senior Contract Analyst Corroborated the DOJ's Findings About the Terms of Visa's Contracts with Acquiring and Issuing Banks. ........................ 20

3)     The DOJ Found that Visa Used its Power to Squash Fintech Alternatives to its Debit Network. ............................................................................................................. 20

a)     Visa Threatened PayPal, Square, and Other Fintechs With High Fees on Visa Debit Transactions to Prevent Them From Cutting Visa Out of Other Transactions. ............................................................................................................... 20

b)     Visa Paid Apple Hundreds of Millions of Dollars on the Condition that Apple Would Not Develop a Competing Product. ............................................................. 23

J.     Visa's Motion to Dismiss the DOJ Complaint was Denied. ........................................ 24

MATERIALLY FALSE AND MISLEADING STATEMENTS ........................................... 24

A.     Earnings Call and Investor Conference Misstatements About the Regulation II Clarification. .................................................................................................................... 24

B.     Investor Conference Misstatements About Fintech ...................................................... 40

C.     Misstatements in Visa's Public Filings ........................................................................... 42

LOSS CAUSATION .................................................................................................................. 43

ADDITIONAL SCIENTER ALLEGATIONS ........................................................................ 44

A.     The Specificity of the Misstatements of Defendants McInerney, Suh, Prabhu, Jenkyn, and Forestell Supports the Inference that They Made Them With Scienter ................................................................................................................................ 44

1)     Defendant McInerney ......................................................................................................... 44

– ii –

2)    **Defendant Suh** ......................................................................... **45**

3)    **Defendant Prabhu** ................................................................... **46**

4)    **Defendant Jenkyn** ................................................................... **46**

5)    **Defendant Forestell** ................................................................ **47**

B.    **It Supports the Inference of Scienter that Visa's Strategy of Using Cliff Pricing to Lock Merchant and Acquirers into De Facto Exclusive Contracts Was a Direct Response to the Durbin Amendment and Regulation II Clarification.** ................... **48**

C.    **Debit Transactions are a Core Operation of Visa, Which Supports the Inference of Scienter** ...................................................................................................... **50**

D.    **Defendants Were Motivated to Make Misstatements Because DOJ was Investigating Visa** ................................................................................................................... **52**

E.    **There is a Strong Inference Visa Acted With Scienter** ................................. **52**

**PLAINTIFF'S CLASS ACTION ALLEGATIONS** .................................................. **53**

**COUNT I** ................................................................................................................... **55**

**COUNT II** .................................................................................................................. **57**

**PRAYER FOR RELIEF** ............................................................................................ **58**

**DEMAND FOR TRIAL BY JURY** ........................................................................... **59**

– iii –

AMENDED CLASS ACTION COMPLAINT                              No. 5:24-cv-08220-NW

Plaintiff Beibei Cai ("**Lead Plaintiff**" or "**Plaintiff**"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, announcements, United States Securities and Exchange Commission ("**SEC**") filings, wire and press releases published by and regarding Visa, Inc. ("**Visa**" or the "**Company**"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Visa securities between March 2, 2023 and September 23, 2024, inclusive (the "**Class Period**"), and were damaged thereby (the "**Class**"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "**Exchange Act**").

2.    Visa's network processes 60% of all debit transactions in the United States, including more than 65% of the transactions where the card is not present because the customer is using a debit credential online or over the phone (referred to as a "**Card-Not-Present Transaction**").

3.    Visa earns more from its U.S. debit business than its U.S. credit business and it earns more from its debit business in the U.S. than its debit business from any other region in the world.

4.    Although Visa runs the nation's largest debit network, it does not issue debit cards. Instead, it and other debit networks contract with card issuing banks ("**Issuing Banks**" or "**Issuers**") that issue cards that use their networks. Debit networks also contract with the banks of merchants (the "**Acquiring Bank**" or "**Acquirer**"), so that merchants can accept debit cards that use their network.

5.      Visa and other debit networks make money on each debit transaction by charging a network fee.

6.      Visa became dominant in the debit market in the 1990s by establishing exclusive relationships with Issuing Banks and requiring merchants to accept their debit cards if they accepted their credit cards. Visa was forced to end both practices because of litigation, but at that point their position was entrenched.

7.      Customers were left with a situation where the debit market was dominated by Visa and the much smaller Mastercard, which control almost the entire market for front of the card debit card branding, referred to the "**Front-of-Card Network**." (Visa controls 70% and Mastercard approximately 25% of the market). Additionally, Issuing Banks often only allowed routing over one debit network for their cards, the Front-of-Card Network.

8.      To combat this situation, Congress passed the "**Durbin Amendment**" as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. "**Regulation II**" is the Federal Reserve rule that implemented the Durbin Amendment. The Durbin Amendment required Issuers of debit cards to enable at least two unaffiliated networks on all cards. In other words, debit card Issuers had to enable at least one unaffiliated network as a competitor to the Front-of-Card Network. These alternative networks unaffiliated with the Front-of-Card Network generally appear on the back of the card and are referred to as "**Back-of-Card Networks**."

9.      In October 2022, Federal Reserve adopted the "**Regulation II Clarification**," which clarified that an unaffiliated Back-of-Card Network must also be enabled for Card-Not-Present transactions. The Regulation II Clarification went into effect on July 1, 2023.

10.     These regulatory changes have had little effect on Visa' s debit processing volume even though alternative debit networks often have lower network fees than Visa.

11.     Throughout the Class Period, Defendants were asked repeatedly by investment analysts about the impact of the Regulation II Clarification on Visa's debit processing volume. Defendants answered repeatedly that the effect would be or was non-existent or modest, and explained that the effect was small since merchants and Acquirers chose to route their debit transactions through Visa because the value of certain features of Visa's network outweighed the

– 2 –

lower cost of alternative networks.

12. Defendants McInerney and Prabhu were also asked about the risk of technology companies building their own payment networks and cutting out Visa. They responded that Visa had dulled any threat those companies posed by helping them achieve their objectives.

13. Additionally, Visa's public filings during the Class Period stated that "[o]ur financial institution clients and merchants can reassess their commitments to us at any time or develop their own competitive services."

14. The Department of Justice (the "**DOJ**") began investigating Visa's debit practices in March 2021. After more than three years of investigation, the DOJ filed a complaint against Visa in the Southern District of New York, which detailed its findings and alleged violations of the Sherman Antitrust Act.

15. The DOJ's investigation showed that Defendants' statements were false and misleading. The DOJ found that the cornerstone of Visa's response to the Durbin Amendment and the Regulation II Clarification was to exploit the fact that, even after the regulatory changes, around half the time a customer uses a debit card with Visa on the front, it cannot be processed with the unaffiliated Back-of-Card Network. These are called "**Non-Contestable Transactions**."

16. Visa prevents merchants and Acquirers from routing transactions through unaffiliated Back-of-Card Networks by charging them artificially high "**Rack Rates**" for non-contestable transactions unless they route all or nearly all eligible debit transactions through Visa. These volume requirements are structured as "**Cliff Pricing**," which grants the merchant or Acquirer a lower price for every transaction routed to Visa as long as its total volume of transactions exceeds a certain threshold.

17. This leaves the merchants and Acquirers with two options — (1) agree to exclusivity with Visa or (2) try to route its "**Contestable Transactions**" (transactions that can be routed through Visa or an alternative network) to Back-of-Card Networks and be forced to pay Visa's exorbitant Rack Rates for Non-Contestable Transactions. This makes it uneconomical for merchants and Acquirers to route Contestable Transactions over networks other than Visa because even if those alternative networks are lower cost for the Contestable Transactions, the

total cost to the merchants and Acquirers is higher due to Visa's Cliff Pricing tactics concerning Non-Contestable Transactions.

18.     Visa uses similar volume requirements to discourage debit card Issuers from enabling more than one Back-of-Card Network and to incentivize the Issuers to make it as difficult as possible for merchants and Acquirers to route transactions over Back-of-Card Networks.

19.     By the end of 2022, Visa had used its Cliff Pricing tactics to enter *de facto* exclusive routing contracts with over 180 of its largest merchants and Acquirers — they cover over 75% of Visa's debit volume (including 80% for Card-Not-Present) and at least 45% of total U.S. debit volume.

20.     A former Senior Contract Analyst at Visa confirmed that it was routine practice for Visa to structure contracts with Acquirers and Issuers in the way that the DOJ described.

21.     Since an important part Visa's response to the Durbin Amendment and Regulation II Clarification was to use Cliff Pricing and related tactics to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks, it was false and misleading for Defendants to repeatedly represent that the Regulation II Clarification was having little impact on Visa's routing volume because the value that merchants and Acquires put on certain features of Visa's debit network outweighed the price advantage of alternative networks.

22.     Additionally, in contrast to Defendants' upbeat claims that they dulled any threat that technology companies posed by helping them achieve their objectives, the DOJ's investigation showed that Visa used its playbook of threatening high fees for transactions that those companies needed Visa to process to prevent them from developing alternatives to Visa. Visa also paid Apple hundreds of millions of dollars in 2023 on the condition that it did not produce competing technology.

23.     When the truth was revealed, the price of Visa's stock fell $15.85 per share, or approximately 5.5%, from $288.63 per share when the market closed on September 23, 2024 to $272.78 per share when the market closed on September 24, 2024. On September 25, 2024, Visa's

– 4 –

stock fell another $3.15 per share to close at $269.63 for a total two-day loss of approximately 6.6% that harmed investors.

24.     As a result of Defendants' knowing and/or reckless false and misleading statements and omissions, the value and price of Visa's stock was artificially inflated during the Class Period. When the truth was revealed, Visa's share price declined, and Plaintiff and other class members suffered significant losses and damages.

## JURISDICTION AND VENUE

25.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

26.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

27.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district. Further, the Company maintains its principal executive offices in San Francisco County.

28.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## PARTIES

29.     Lead Plaintiff, as set forth in his previously filed certification, incorporated by reference herein, purchased the Company's common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

30.     Defendant Visa is a Delaware corporation with its principal executive offices at P.O. Box 8999, San Francisco, California. Visa's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "V."

31.    Defendant Ryan McInerney ("McInerney") has served as the Company's Chief Executive Officer ("CEO") since February 1, 2023. Prior to McInerney's appointment as CEO, he had served as Visa's President since June 2013.

32.    Defendant Chris Suh ("Suh") has served as the Company's Chief Financial Officer ("CFO") since August 1, 2023.

33.    Defendant Vasant Prabhu ("Prabhu") served as the Company's Vice Chairman & CFO from February 2015 to September 2023.

34.    Defendant Alfred F. Kelly, Jr. ("Kelly") served as the Company's CEO from 2016 to February 2023 and the Chairman of its Board of Directors from 2019 to January 23, 2024.

35.    Defendant Peter Andreski ("Andreski") has served as the Company's Global Corporate Controller and Chief Accounting Officer since July 1, 2022. Prior to that, Defendant Andreski served as Senior Vice President, Global Head of Revenue Operations of the Company from June 2019 to July 2022.

36.    Defendant Oliver Jenkyn ("Jenkyn") has served as the Company's Group President since February 2023. Prior to that, he was the Company's Group President & President, North America from 2020 to 2023 and Regional President, North America from 2011 to 2020.

37.    Defendant Jack Forestell ("Forestell") has served as the Company's Chief Product and Strategy Officer from February 2023 to present. Prior to that he served as the Company's Chief Product Officer from March 2018 to February 2023, Global Head of Merchant and Acquiring from 2016 to 2018, and Global Head of Product from August 2014 to September 2016.

38.    Defendants McInerney, Suh, Prabhu, Kelly, Andreski, Jenkyn, and Forestell are sometimes referred to herein as the "Individual Defendants."

39.    The Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    were directly involved in the day-to-day operations of the Company at the highest levels;

(c)    were privy to confidential proprietary information concerning the Company and its business and operations;

(d)     were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     were directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

40.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

41.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

42.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**A. Visa Dominates the U.S. Debit Market, Making Gargantuan Profits**

43.     Visa processes and facilitates debit and credit card transactions. Both businesses and consumers utilize its services.

44.     Visa is one of the most profitable companies in the United States. It had an operating income of $18.8 billion and $21 billion in 2022 and 2023, respectively, and an operating margin of 64% in both years. Visa's North America business, its most profitable debit region, sports a whopping 83% operating margin.

45.     Over 60% of U.S. debit transactions, including over 65% of Card-Not-Present debit transactions, are processed over Visa's network. That share has hardly changed for years despite regulatory changes and a dramatic increase in e-commerce and mobile payments.

46.     Visa has parlayed its dominance of the payment processing business into gargantuan profits; it takes in over $7 billion in network fees annually just on U.S. debit volume alone, earning Visa $5.6 billion in net revenue.

47.    In 2022, Visa earned more than its U.S. Debit business than its U.S. credit business and it earned more from its debit business in the U.S. than its debit business from any other region in the world.

48.    Visa's incremental cost from each additional transaction on its network is close to zero. Visa also bears no financial risk from fraud from debit card transactions — depending on the circumstances either the card Issuer or the merchant where the card is used bears the financial risk, but never Visa.

**B.  How Debit Transactions Work.**

49.    A debit transaction is a type of financial transaction where funds are drawn directly from a consumer's bank account to pay a merchant for a good or service.

50.    Debit transactions are made possible by debit networks, the communications infrastructure that facilitates secure, real-time payment between businesses and consumers' bank accounts.

51.    Although Visa runs the nation's largest debit network, it does not issue debit cards. Instead, the most common way that consumers make debit purchases is by using a debit card issued by their banks. Debit networks like Visa generally contract with the consumer's bank (the "**Issuing Bank**" or "**Issuer**") to issue debit cards that use their network. Debit networks also contract with the banks of merchants (the "**Acquiring bank**" or "**Acquirer**"), so that the merchant can accept debit cards that use their network.

52.    To facilitate transactions, the debit network issues a debit credential or other account identifier unique to the consumer that can be accepted by all merchants that participate in the debit network. The debit network also guarantees payment for the merchant, allows the consumer to dispute and chargeback the transaction, provides fraud protection for all parties, and provides the "**Rail**," the method by which the consumer and merchants' bank communicate with each other to transfer the funds and complete the transaction.

53.    Using a debit card in person at a merchant is referred to as a "**Card-Present Transaction**." If a customer uses a debit credential on a website, in an app, or over the phone, it

is referred to as a "**Card-Not-Present Transaction.**" Today, Card-Not-Present debit transactions make up approximately half of all debit spending.

54.    After a debit transaction is authorized, the Issuer places a hold on the consumer's funds and sends the authorization for the purchaser back over the debit network to the Acquirer, minus the "**Interchange Fee,**" a fee paid by the Acquirer to the Issuer in every debit transaction.

55.    To make money, debit networks like Visa charge a "**Network Fee**" on both the Issuer and Acquirer for every debit transaction. Additionally, starting in 2012, Visa began charging each merchant's Acquirer a fixed monthly fee, referred to as the "**Fixed Acquirer Network Fee**" or **"FANF,"** which it based on factors like the number of locations operated by the merchant and the volume of the merchant's Card-Not-Present Transactions.

**C.  The Origin of U.S. Debit Networks and How Visa Came to Dominate the U.S. Market.**

56.    The use of debit cards to make purchases from retailers grew out of banks' issuance of cards to customers that allowed them to enter a 4-digit number, known as a "**PIN,**" to withdraw money from Automated Teller Machines ("**ATMs**").

57.    Merchants, because they preferred debit to checks, started installing PIN pads so that their customers could use their ATM cards to make purchases. As more and more merchants enabled began to accept ATM cards for purchases, the ATM networks, including STAR, NYCE, and Pulse, evolved to become debit "**PIN Networks.**"

58.    Visa began to dominate the debit market in the 1990s. At that time, Visa and Mastercard were each joint ventures owned and controlled exclusively by their member banks, which comprised almost all U.S. banks. Accordingly, Visa was quickly able to scale up among its member banks, which issued debit cards with the Visa logo on the front.

59.    Unlike the PIN Networks, which processed debit transactions over Rails designed for ATM networks, Visa processed debit purchases over Visa's existing credit card Rails. Since Visa's network rules initially required merchants to accept both its credit and debit cards, Visa's debit cards gained widespread acceptance.

60.    Visa and Mastercard's relationships with their Issuing Banks were exclusive until the Second Circuit found that those restrictions were illegal in 2003. Visa and Mastercard also

– 9 –

settled private litigation shortly thereafter and agreed to allow merchants to accept their credit card without accepting their debit cards, and vice versa. But Visa had already become dominant at that point.

61.     After Visa and Mastercard became independent public corporations in 2008 and 2006, respectively, banks were technically free to issue a mix of debit cards featuring different networks, but most banks chose to exclusively issue debit cards with either the Visa or Mastercard brand on the front.

62.     This led to an uncompetitive environment because it was very challenging for Visa or Mastercard to displace the other as the network that banks chose to appear on the front of the card (referred to as the "**Front-of-Card Network**"), due to the expense and difficulty of issuing new cards to all account holders. It was also rare for any other networks to challenge Visa and Mastercard for Front-of-Card Network placement because they did not have the same scale of merchant acceptance as Visa and Mastercard. Furthermore, banks often chose to feature only one network on their cards, the Front-of-Card Network — meaning that the merchant had no choice but to use the Front-of-Card Network to route a transaction using that card.

**D.  To Try to Break Visa's Dominance, Congress Passed the Durbin Amendment, Which Required Each Debit Card to Support at Least Two Unaffiliated Networks.**

63.     In 2010, Congress passed the "**Durbin Amendment**" as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. "**Regulation II**" is the Federal Reserve Rule that implemented the Durbin Amendment, which went into effect in October 2011, and required issuers of debit cards enable at least two unaffiliated networks on all cards. In other words, debit card issuers had to enable at least one unaffiliated network as a competitor to the Front-of-Card Network, which is almost always Visa (over 70% of the market) or Mastercard (approximately 25% of the market).

64.     The additional unaffiliated networks appear on the back of debit cards and are colloquially referred to as "**Back-of-Card Networks.**" Cards that feature Visa as the Front-of-Card Network often also include Interlink, Visa's Back-of-Card Network along with the required additional unaffiliated Back-of-Card Network. The unaffiliated Back-of-Card Network for Visa cards are typically either Mastercard's Maestro or one of the PIN Networks discussed above.

– 10 –

65.     In October 2022, Federal adopted the "**Regulation II Clarification**," which clarified that an unaffiliated back-of-card network must also be enabled for Card-Not-Present Transactions. Regulation II went into effect on July 1, 2023.

**E.  Despite the Durbin Amendment, the Regulation II Clarification, and the PIN Networks Having Lower Network Fees, Visa Continues to Dominate Debit Transactions.**

66.     Despite their smaller size, the PIN Networks have continued to innovate. Although they are still referred to as PIN Networks in the debit industry, they have developed the ability to process debit transactions without requiring a consumer to enter a PIN for both in-person and Card-Not-Present Transactions — these transactions are referred to as "**PINless**" debit transactions.

67.     For most transactions, Visa's Network Fees are significantly higher than those of the PIN Networks. For example, according to Optimized Payments, a Fintech firm devoted to unlocking value in the payments system, by routing debit transactions through the PINless system, business can save up to 7 basis points per transaction compared to Visa (for example, the fees would be .10% for PINless vs. .17% for Visa).

68.     Despite the Durbin Amendment, the Regulation II Clarification, and the PIN Networks' lower prices, Visa continues to process over 60% of all debit transactions and over 65% of all Card-Not-Present debit transactions.

**F.  During the Class Period, Defendants Repeatedly Stated that the Regulation II Clarification Would Not or Had Not Impacted Visa's Debit Volume Because the Value of Certain Features of Visa's Network Outweighed the Lower Cost of Alternative Networks.**

69.     Throughout the Class Period Defendants McInerney, Prabhu, Suh, Jenkyn, and Forestell were asked repeatedly about the impact of the Regulation II Clarification on Visa's debit processing volume during Visa's quarterly earnings calls and at other conferences aimed at investors. These Defendants repeatedly answered that the effect would be, or was, non-existent or modest, explaining that the effect was small because merchants and Acquirers still chose to route their debit transaction through Visa because of certain superior features of Visa's network, such as its fraud protections and capacity to send two messages for one transaction (referred to as "dual message"), whose value outweighed the lower cost of alternative networks.

70. The full language of all the statements of Defendants concerning the Regulation II Clarification and explanations of why each one was false and misleading are below in Paragraphs[1] 127 to 166.

**G. Defendants McInerney and Prabhu Stated During Investor Conferences that Technology Companies Had Not Developed Products that Completed with Visa Because Visa Had Helped Those Companies Achieve Their Objectives.**

71. At the Bernstein Strategic Decisions Conference held on May 31, 2023, an analyst asked Defendant Prabhu what he thought about the "risk and opportunity" to Visa from "big tech." In response, Prabhu downplayed the threat from technology companies, stating "I think sometimes sort of an assumption is made that somebody has a community, therefore, they should be able to do payments, too. It's not as easy as that, right?" He further explained that companies were stymied by the need to build their own network, including issuing credentials and creating a network of merchants who accepted payment. He went on to specifically discuss Apple, which he described as "riding [Visa's] network" with Apple Pay because Visa had "help[ed] them achieve their objective, which is to make that device a more valuable device because it can be used for payments, and we can do it with economics that are attractive to them, which they are…."

72. On May 30, 2024, at the following year's Bernstein Decisions Conference, an analyst asked a similar question to Defendant McInerney about the opportunity and risk of big tech to Visa. McInerney responded by saying: "If you go back 10 years ago, I think the narrative that was emerging as you started to see big tech enter into the financial services and commerce and payment space and you started to see fintech really start to rise up, the narrative was that a lot of these companies were going to disintermediate Visa." By "disintermediate," McInerney meant that they would create their own networks and cut Visa out of the payment process. McInerney further explained that Visa had stopped disintermediation by "open[ing] up our network" and by "help[ing] them achieve their objectives for their user base."

73. The full language of these statements and explanations of why each one was false and misleading are below in Paragraphs 163-166.

---

[1] All "Paragraph" references are references to Paragraphs in this Amended Complaint.

**H.  Visa's Public Filings During the Class Period Stated that Visa's Financial Institution Clients and Merchants Could "Reassess Their Commitment" to Visa at "Any Time or Develop their Own Competitive Services."**

74.     Visa's Form 10-K for the fiscal year ended September 30, 2023 (the "2023 10-K"), filed September 30, 2023, stated that "[o]ur financial institution clients and merchants can reassess their commitments to us at any time or develop their own competitive services." Visa's quarterly reports for its 2024 fiscal year all incorporated this statement.

75.     The full language of these statements and explanations of why each one was false and misleading are below in Paragraphs 167-175.

**I.  What the DOJ Discovered During its Investigation of Visa Shows that Defendants' Statements Were False and Misleading When Made.**

76.     The DOJ opened an investigation into Visa's debit practices in March 2021.

77.     The *New York Times* DealBook Newsletter reported, in a September 24, 2024, newsletter written by Andrew Ross Sorkin and others that the DOJ "conducted hundreds of interviews with parties, including retailers, grocery stores and banks" and "[i]nvestigators looked at the negotiations, contracts and ways in which the penalties were structured."

78.     On September 24, 2024, after more than three years of investigation, the DOJ filed a complaint against Visa in the Southern District of New York that detailed the finding of its investigation and alleged four separate violations of the Sherman Antitrust Act. *United States of America v. Visa Inc.*, 1:24-CV-07214, ECF No. 1 (the "**DOJ Complaint**"). The DOJ Complaint is hereby incorporated by reference into this Amended Complaint.

1)  <u>The DOJ Found That Visa Had Thwarted the Durbin Amendment and Regulation II Clarification by Using the Threat of High Costs for Non-Contestable Transactions to Pressure Merchants, Acquirers, and Issuers into Restrictive Debit Routing Contracts.</u>

79.     The DOJ's investigation into Visa showed Defendants' repeated statements that the effect of the Regulation II Clarification would be, or was, at most, modest because the value of certain superior features that Visa's network provided outweigh the lower cost of alternative networks were false and misleading at the time they were made.

80.     In contrast to Defendants' public statements, the DOJ found that the cornerstone of Visa's response to the Durbin Amendment and later the Regulation II Clarification was to exploit the fact that, despite Congress's best effort, there are still many transactions that must be

routed to Visa because they cannot be processed with the unaffiliated back-of-the-card network. These transactions are called "**Non-Contestable Transactions**."[2] According to the DOJ, Visa has estimated that roughly 45% of Visa Card-Present Transactions are Non-Contestable and the percentage is higher for Card-Not-Present Transactions.

81.    Visa's ability to threaten to impose high costs on Non-Constable Transactions enabled it to pressure merchants, Acquirers, and Issuers into debit routing contracts that prevented transactions from being routed over the cheaper PIN Networks.

*a) Visa Uses the Threat of High Fees on Non-Contestable Transactions to Force Merchants and Acquirers to Route Nearly All Eligible Debit Transactions Through Visa.*

82.    The DOJ's investigation found that Visa prevents merchants and Acquirers from routing transactions through unaffiliated Back-of-Card Networks by charging them artificially high "**Rack Rates**" for Non-Contestable Transactions unless they route all or nearly all eligible debit transactions through Visa.

83.    Visa's debit transaction volume requirements are structured as "**Cliff Pricing**." Cliff Pricing grants the merchant or Acquirer a lower price for every transaction routed to Visa as long as its total volume of transactions exceeds a certain threshold. If the merchant or Acquirer does not meet that threshold, Visa will impose its high Rack Rate on all transactions routed through Visa, ***including Non-Contestable Transactions***.

84.    Accordingly, merchants and Acquirers are forced to accept *de facto* exclusive agreements with Visa because they have a substantial number of Non-Contestable debit transactions that they cannot route to any other network. The merchants and Acquirers have only two options — (1) agree to exclusivity with Visa or (2) try to route its "**Contestable Transactions**" (transactions that can be routed through Visa or an alternative network) to Back-

---

[2] A transaction may be Non-Contestable for a variety of reasons, including that the transaction is over a certain dollar amount or does not meet a particular encryption criterion. A Card-Present Transaction may also be Non-Contestable if the issuer does not allow the network to process Card-Present PINless transactions and the merchant did not prompt the customer to enter a PIN. Acquirers also may not enable smaller PIN networks at all. A Card-Not-Present Transaction may be Non-Contestable if they are tokenized, in certain mobile apps, or with a digital wallet.

– 14 –

of-Card Networks and be forced to pay Visa's exorbitant Rack Rates for Non-Contestable Transactions. If merchants or Acquirers want to avoid Visa's Rack Rates, they typically need to route all or almost all their Visa-eligible debit volume over Visa Rails since most Visa volume commitments have a minimum threshold of 90-100% of the merchant or Acquirer's debit volume that Visa can process. Another, similar, structure that Visa employs is Visa charges the Rack Rate for transactions on its network unless a merchant grants Visa the number one position or other high placement on its routing table (a ranked list that determines which network each debit transaction should be routed to given the options on the card).

85.   The DOJ also found that Visa would waive other fees in exchange for exclusivity, including the fixed monthly FANF fee that it introduced in 2012, shortly after the Durbin amendment went into effect.

86.   The threat of Visa's exorbitant Rack Rates has been highly effective at forcing merchants and Acquirers to sign exclusive contracts with Visa. The DOJ found that dozens of merchants, representing hundreds of billions of dollars of 2023 debit payment volume, signed contracts to route 100% of their eligible debit volume to Visa.  The DOJ further found that while Visa's contracts with merchants and Acquirers included varying pricing terms, they almost universally included significant volume commitments.

87.   According to the DOJ's investigation, absent qualification under limited safe harbors, any shortfall, even as small as 0.01% of a merchant's volume, would give Visa the right to impose significant monetary penalties on all the merchant's Visa debit transactions, not just the marginal transactions.

88.   Furthermore, in many routing contracts, failure to comply with Visa's volume requirements allows Visa to terminate the entire contract early and claw back incentives that Visa had previously paid the merchant as early termination fees. Furthermore, terminating the routing contract may impact all of the merchants and Acquirers' Visa's payment volume, including credit transactions. Visa would also sometimes use credit incentives, including interchange discounts, to win debit routing. For example, the DOJ found that Visa offered Google credit incentives, among other things to win debit routing and protect against PINless enablement. Visa also offered

credit incentives to win debit routing from a health food supermarket chain.

89.     Remarkably, DOJ found that the threat of Visa charging high prices for Non-Contestable Transactions is so powerful that some Acquirer processors *that operate rival PIN Networks*, have agreed to exclusive routing deals with Visa.

90.     The DOJ Complaint quotes a Visa executive as confirming that Visa used the strategy of leveraging the pricing of Non-Contestable Transactions. When discussing the possibility of lower debit prices, the Visa executive advised against it, noting that Visa had such a large number of "uncontested" transactions that "P&L [Profit and Loss] would be hammered…And if you lower the price, there is nothing to put in a routing deal, merchant gets it by default with no commitment." The DOJ stated that this meant that "[r]ather than competing on the merits, Visa chose to keep its penalty prices high so it could insulate its supracompetitive profits by creating a web of deals to foreclose rivals."

91.     The DOJ Complaint also quotes another Visa employee explaining how Visa used credit incentives to force merchants to use their network for debit transactions. The employee wrote: "We continue to believe that we made a very strong offer that they cannot replicate with our competitors. While they could recover some (but not all) of the value they receive from us for the debit routing, they will lose all credit value. Walking away would not be a commercially reasonable decision for them."

   *b) Visa Also Prevented the Durbin Amendment and the Regulation II Clarification from Having an Impact by Pressuring Issuers to Make it Difficult to Use Networks Other Than Visa.*

92.     Debit card Issuers choose the number and identity of debit networks on their cards. Visa has blunted the effect of the Durbin Amendment and the Regulation II Clarification by using its power to pressure Issuers into meeting only the bare minimum of those laws — enablement of only a single unaffiliated Back-of-Card Network. Furthermore, Visa also uses incentives to push issuers to make unaffiliated Back-of-Card Networks on Visa branded debit cards difficult to use.

93.     For example, the DOJ found that Visa's contract with card Issuer JPMorgan Chase provides that only one unaffiliated PIN Network can be enabled on 90% of Chase-issued Visa branded debit cards. Similarly, in 2023 Visa entered into an agreement with one of its largest

– 16 –

fintech debit issuing customers that limits enablement to single non-Visa network for all debit cards issued through that fintech entity's partner issuing banks.

94.   The DOJ also found that Visa had nearly 1,000 card Issuer contracts that have significant volume incentives. These contracts generally contain volume provisions that require the Issuer to maintain its annual growth of Visa debit transactions in line with Visa's overall debit growth in the United States — this ensures that Visa's share of the Issuer's transactions does not decrease.

95.   Visa's contracts with Issuers have a similar Cliff Pricing structure to their contracts with merchants and Acquirers. As with the merchants and Acquirers contracts, under its Issuer contracts, Visa has a right to impose significant monetary penalties across all Visa debit transactions, not just the marginal ones that led Issuers not to meet the volume requirement. If Issuers do not meet their volume requirements, Visa may be able to require that they pay an early termination fee that is a percentage of the benefits already earned plus a multi-million-dollar fixed fee. The DOJ found that the risk of this sort of penalty was especially high if the failure to meet the volume requirements was attributable to any affirmative action by the Issuer, including enablement of any additional PIN Networks.

96.   These volume requirements deter the Issuer from putting more debit networks on the back of the card and incentivize them not to enable the existing networks for additional transaction types, such as PINless routing. Putting additional debit networks on the back of the card and enabling additional transaction types might take volume away from Visa that is necessary to meet the Issuers' contracts.

97.   According to the DOJ Complaint, Visa employees understood that an important purpose of these Issuer volume requirements was to prevent Issuers from enabling PINless transactions. A 2020 issuing contract that included a minimum volume requirement was designed to "mitigate a shift to PINless, RTP [Real Time Payment], etc." The language in the contract was considered "'good enough'" by senior Visa executives to "'protect for PINless' because the only way the issuer could protect its volume was to 'dump[] their debit network (Shazam) if it starts shifting volume.'" The DOJ further found that Visa "'signed incremental debit incentive deals'

with a number of large issuers and, as a result, Visa thought they were 'unlikely to enable PINless on F2F [face-to-face] transactions.'"

98.    Many smaller debit card Issuers also rely on larger Issuer Processors to make network selections, and DOJ found that Visa enters into agreements with those processors "designed to '[p]rotect and grow existing [payment volume] from small issuers and discourage PINless enablement.'"

99.    The DOJ's investigation further found that Visa executives specifically discouraged debit card Issuers from enabling PINless transactions because they knew that it would cause fewer merchants to take the time to enable them. The DOJ Complaint states that "[i]n Spring 2023, one Visa executive observed that less than half of the debit volume in the United States was enabled by issuers to be processed as a card-present PINless transaction, and '[a]s a result, many merchants have not enabled CP [card-present] PINless.'" The DOJ Complaint further stated: "Visa feared that a large U.S. issuer enabling card-present PINless could 'create a tipping point . . . for more [acquirer] processors and merchants enabling and routing CP [card-present] PINless.'"

100.    For example, the DOJ found that, in 2023, JPMorgan Chase asked Visa to waive its contractual requirement that Visa debit card have only one unaffiliated network for certain Visa debit cards with Mastercard's Maestro as the unaffiliated Back-of-Card Network. Chase wanted to add Discover's Pulse network to those cards to comply with the Regulation II Clarification since Pulse offered both Card-Present and Card-Not-Present PINless functionality and, at that time, Maestro did not. "Visa executives feared that if Chase enabled Pulse…, 'more than 60% of the [Card-Not-Present] volume will be priced lower than Visa by the unaffiliated networks. As that happens, more merchants [] will adopt PINless, resulting in lower transaction win rates for Visa, as well as a decline in effective transaction clearing price.'" The DOJ further found that "Visa executives were concerned that if Chase enabled Pulse's PINless functionality, it could create a tipping point for more processors and merchants to enable and route to PINless, driving an 'additional 5-10% in merchant volume to be enabled for PINless.'" Because of this fear, Visa granted only a short-term waiver of its Back-of-Card Network restriction clause to

allow Chase to add Pulse but required Chase to enter a debit routing agreement with Visa.

101.    Finally, similar to how Visa leverages discounts on other products to secure debit volume from merchants and Acquirers, Visa also leverages discounts on other products, such its Debit Processing Service ("**DPS**") to win issuer routing volume.

       *c)  The DOJ Found That Visa's Strategy of Pressuring Merchants and Acquirers into De Facto Exclusive Contracts was a Direct Response to the Durbin Amendment and the Regulation II Clarification.*

102.    The DOJ found that "[i]n the years immediately following the passage of the Durbin Amendment, Visa recognized that PIN networks, 'outspoken merchants,' and other industry participants would use the legislation to shift share away from Visa [and] [a]ccording to its internal documents, Visa knew it needed to act 'quic[k]ly and decisively.'"

103.    Accordingly, in response to the Durbin Amendment, "Visa has engaged in a relentless strategy of locking up the entities that control routing decisions and has now entered *de facto* exclusive routing contracts with over 180 of its largest merchants and acquirers. Visa's merchant and acquirer contracts cover[ed] over 75% of Visa's debit volume and result[ed] in the foreclosure of at least 45% of total U.S. debit volume" by the end of 2022. At 80%, the percentage of Visa's Card-Not-Present Transaction volume locked up by contracts was even higher. The DOJ further found that "Visa's contracts with issuers magnify this problem. Visa uses its contracts with issuers to incentivize the issuers to make decisions—like choosing to disable card-present PINless or choosing not to enable it—that may make more transactions noncontestable, providing Visa with additional leverage over merchants and acquirers." According to the DOJ, Visa told its Board of Directors that the routing deals with the largest Issuers and Acquirers "allow Visa 'to stabilize [its] volume.'"

104.    The DOJ further found that "***Visa deployed a similar response strategy in reaction to the Federal Reserve's October 2022 clarification of the rules implementing the Durbin Amendment, referred to as Regulation II***. In anticipation of the Regulation II clarification going into effect, Visa strategized to secure more volume under routing deals, to target merchant and acquirer deals with early termination fees for longer, firmer commitments of routing volume as well as to renew issuing agreements. Visa then took steps to ensure volume was locked up prior

to the regulation going into effect." (emphasis added).

**2) A Former Visa Senior Contract Analyst Corroborated the DOJ's Findings About the Terms of Visa's Contracts with Acquiring and Issuing Banks.**

105.    Former Employee 1 ("**FE-1**") served as a Senior Contract Analyst at Visa from August 2021 to July 2023. FE-1 drafted contracts for banking customers who used Visa's debit network to process debit transactions. FE-1 believed that he worked on contracts for both Acquirer and Issuer banks.

106.    According to FE-1, as the DOJ found, Visa's contracts included exclusivity and volume incentives for banks to use Visa's debit network. FE-1 recalled that the exclusivity incentives called for the customer to steer all of a certain type of transaction, such as debit, to the Visa network. FE-1 also confirmed Visa's use of Cliff Pricing, stating that the contracts were structured so that "if you hit this mark, this is your rate." He said that there were incentives for both greater growth and additional volume. FE-1 also recalled that some of Visa's contracts with banks included a significant payout to the customer for a specific volume of transactions processed on Visa's network.

107.    FE-1 also confirmed DOJ's finding that Visa's contracts with bank customers included provisions that allowed Visa to "claw back" incentives it provided to the customer. FE-1 believed that they allowed Visa to take back incentives or money it paid to customers if the customer did not hit the usage targets on transactions.

108.    FE-1 further stated that all the incentive structures that he described were included in contract templates that he and his co-workers used. He stated: "It was all templates. They had templates for the various types of agreements." FE-1's managers signed off on the contracts and the higher the value of the contract, the higher level of approval that was needed.

**3) The DOJ Found that Visa Used its Power to Squash Fintech Alternatives to its Debit Network.**

*a) Visa Threatened PayPal, Square, and Other Fintechs With High Fees on Visa Debit Transactions to Prevent Them From Cutting Visa Out of Other Transactions.*

109.    According to the DOJ, Visa has been concerned that fintech debit networks would displace Visa as an intermediary between both sides of debit transactions since at least 2013. In contrast to Defendant McInerney's statement that fintechs did not disintermediate Visa because

– 20 –

they "help[ed] them achieve their objectives," the DOJ found that Visa stopped them by using its standard playbook of threatening high fees for the transactions that the fintechs needed Visa's rails to process.

110.    An example of this strategy that the DOJ identified was Visa's treatment of PayPal. In the 2000s and early 2010s many merchants started accepting PayPal as payment as they started expanding into e-commerce. Since some people used Visa debit cards to pay for transactions conducted through PayPal, which brought incremental payment volume to Visa, Visa initially supported the use of PayPal. But when, in 2015, PayPal spun-off from its parent company, eBay, Visa's view changed because it "viewed the new company as an 'innovative competitor that will be more aggressive as standalone entity.'"

111.    Visa was concerned because PayPal offered a "Staged Digital Wallet"[3] that allowed PayPal users the ability to load funds directly into it using credentials from their bank accounts. This completely bypassed Visa because it used the Automated Clearing House ("**ACH**") network to move the money from the customer's bank account. ACH transactions from PayPal's wallet included many of the same features as debit, such as fraud detection, fund guarantees, and the ability to dispute a transaction.

112.    The DOJ found that "Visa wanted to discourage staged digital wallets, such as PayPal, because it viewed them as an 'increased disintermediation risk for issuers and Visa' which came with a 'cannibalization risk.'" "A Visa executive viewed having a commercial relationship with a company supporting a staged wallet model as a 'line that must never be crossed.'"

113.    Visa, however, had significant leverage over PayPal because even though PayPal encouraged consumers to pay directly with their bank accounts, a significant number of customers continued to make payments through PayPal using their Visa-branded debit cards. As with the merchants, Acquirers, and Issues discussed above, Visa used the threat of exorbitant wallet fees and high Rack Rates of PayPal's Visa transactions to force PayPal to enter into a new, expansive routing contract with Visa. Since PayPal risked losing customers who used Visa debit cards in

---

[3] "Staged digital wallets" also known as "stored value wallets" enable consumers to pay for goods and with funds either preloaded or from a linked bank account.

their digital wallets, it had little choice but to take the deal.

114.    As part of the deal, Visa imposed restrictions on how people could use PayPal for in-store purchases, which made sure Visa was not disintermediated. Visa required that when a PayPal customer had an existing Visa-branded card in their PayPal wallet, the Visa card had to fund the transaction, not ACH. Visa relaxed this requirement in 2021, but still only allows PayPal to use ACH funding for in-store transactions if a customer goes to the trouble of scanning a merchant's QR code.

115.    In 2022, PayPal and Visa entered into a new 10-year contract that includes a debit routing commitment of 100% Visa-eligible volume from years four through ten. Additionally, the contract includes penalties for failing to convert its co-branded debit cards to Visa and preservation of most of Visa's "customer choice" provisions, which preferences Visa payment methods over other competitive alternatives.

116.    Visa threatened the company Square in a similar way. In 2013, Square launched Square Cash (its name was later changed to Cash App), which enabled person-to-person payments. Visa worried that if they did not sign a contract with Square, it would build a bank account credential-based ACH option that would threaten Visa's debit payment volume.

117.    Visa agreed not to charge Square high Rack Rates for transactions using Visa's debit network but required that it had the right to terminate the agreement if Square started to compete with Visa. According to the DOJ, "Visa believed it got two main benefits from the deal: (1) the debit routing commitment; and (2) 'non-disintermediation, of which the major concern is ACH.'"

118.    In 2016, Square put Visa to the test when it announced a new product called "Cash Drawer" that allowed people to store funds in their Square Cash account. DOJ's investigation found that "Visa was concerned that the product was a 'greater disintermediation threat' that had the potential to disrupt its (and its issuer clients') profitable debit rails." Then, in response, "Visa sent a letter of intent to terminate its contract with Square, reporting to Square that Cash Drawer was a 'huge deal for us' and a 'third rail' issue as 'a staged wallet model was antithetical [to] what we worked so hard to develop together with Square Cash.'" Because of the risk of paying higher

fees and other penalties on Visa debit transactions, Square removed the feature and Visa did not terminate the contract.

119.    In 2021, Square launched Cash App Pay, which allowed people to use Cash App to make purchases from merchants. According to the DOJ, one Visa executive noted after the launch of Cash App Pay, "Square's approach is predictable and follows the disintermediation playbook to the letter." But since this new product would trigger Visa's burdensome Staged Digital Wallet fees, "Visa…recognized [it had] 'a significant lever in negotiation.'"

120.    In 2023, Visa used the leverage of threatened Staged Digital Wallet fees to obtain commitments from Square that it would route 97% of its Cash App Pay transactions over Visa's rail, would preference Visa in Cash App Pay Signup flow and default settings, and would not steer customers to ACH in Cash App Pay.

121.    The DOJ found that since 2016, Visa had threatened to impose the Staged Digital Wallet fees on other entities, but all of them have signed deals with Visa instead of paying it. "Visa views the fee as 'a behavioral fee to reflect the propensity of SDWOs [staged digital wallet operators] to disintermediate Visa,' and waives the fee if the wallets behave as Visa demands."

*b)    Visa Paid Apple Hundreds of Millions of Dollars on the Condition that Apple Would Not Develop a Competing Product.*

122.    Visa was also very concerned about being disintermediated by Apple even though Apple Pay (unlike PayPal) uses a pass-through digital wallet which cannot store value. Instead, it transmits a consumer's payment credentials (such as a debit card account number) directly to the merchant's Acquirer, which then processes the payment in a similar way to a traditional debit card transaction. The DOJ found that, in 2022, "Visa worried that its relationship with Apple was at a 'tipping point,' as Apple created new inroads into the additional debit and credit ecosystems" and that Apple was "an 'existential threat' that could negatively affect both Visa's yields and its transaction volumes."

123.    The DOJ further found that because of Visa's concerns about being disintermediated by Apple, it allows Apple to pay reduced merchant fees in exchange for a "commitment not to 'build, support, or introduce payment technologies that disintermediate Visa' or steer customers to third party payment methods such as ACH." Apple is also "barred from

providing incentives 'with the intent of disintermediating Visa or inciting customers to cease using Visa Cards.'" Visa payments to Apple were hundreds of millions of dollars in 2023.

**J. Visa's Motion to Dismiss the DOJ Complaint was Denied.**

124.    On June 23, 2025, the Honorable John G. Koeltl of the Southern District of New York denied Visa's motion to dismiss the DOJ Complaint, holding that it plausibly alleged violations of the Sherman Act.

125.    Judge Koeltl held that the DOJ Complaint plausibility alleged that Visa's contracts that "included cliff pricing, clawback provisions, and other penalties…in effect, took away the ability of customers to terminate the agreements" and that "Visa's loyalty program prevented Visa's customers from routing to PIN networks even when PIN networks offered lower per-transaction prices than Visa."

126.    Judge Koeltl further held that the "allegations suggest plausibly that Visa's contracts work to suppress competition from fintech rivals and to prevent entry by potential competitors."

## MATERIALLY FALSE AND MISLEADING STATEMENTS

**A. Earnings Call and Investor Conference Misstatements About the Regulation II Clarification.**

127.    On March 2, 2023, Defendant Jenkyn gave a presentation at the Evercore ISI Payment & Fintech Innovators Forum. During the presentation, David Togut of Evercore Partners asked Defendant Jenkyn:

> On July 1, the US Federal Reserve will enforce two unaffiliated networks throughout every online debit transaction. How do you assess the potential impact on Visa given your leading market share of US debit?

Defendant Jenkyn responded in relevant part:

> So the recent fed ruling clarifies that all issuers, must enable two unaffiliated networks for card-not-present transactions. I would say that that clarification is consistent with our expectations. I'd also sort of make clear that here that most of these issues comply with this already, some issuers will need to take action to ensure that their unaffiliated network which exists on their credentials, which is making sure that it's capable of processing card-not-present end list, some folks will have to do some work on that, that's it. ***So we expect minimal impact and FY '23***. In the medium term and longer term we'll see, it's definitely unclear to - in terms of how this will unfold.

What I would say though is ***when a merchant or acquirer of payment facilitators, making a payment decision for routing or for any other (inaudible) there are a lot of factors they need to take into consideration. This is especially true in the e-commerce space, the card-not-present space, where the merchant bears the liability and where specific functionality is required, where if you authorize a basket of goods you can only actually charge for them once they've been shipped and that requires specific capabilities.*** So there's a whole bunch of other examples like that. ***And so when a merchant or acquirer is making a decision, there's a lot of things they have to take into consideration***.

***And we at Visa very much believe, that the capabilities and the functionality of our network coupled with the fact that we spend all our time talking to these merchants and payment facilitators and acquirers. We feel that across our fraud mitigation capabilities and protections, our dual message capabilities, our security and reliability, dispute resolution, trust, brand protections et cetera. We feel that we are very well in this world, as we did when Durbin amendment first came out over a decade ago***....

128.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because it failed to disclose that an important part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described in Paragraphs 79 to 108 to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions. Therefore, it was false and misleading to portray "the capabilities and the functionality" of Visa's network as why the Regulation II Clarification was unlikely to cause merchants and Acquirers to route transactions through other networks.

129.    On April 25, 2023, the Company announced its financial results for the second quarter of its fiscal year 2023. On that day, Visa held a conference call (the "**2Q 2023 Earnings Call**") that Defendants McInerney and Prabhu participated in.

130.    During the 2Q 2023 Earnings Call Will Nance, an analyst from Goldman Sachs, asked:

...I just wanted to maybe get an update on your thoughts around some of the recent regulations in the US based on conversations with acquirers, merchants, and issuers, are there any updated thoughts or expectations around the potential impact of new regulations that are implemented over the next few several months?

Defendant McInerney responded:

> …The changes that the Fed put in place were consistent with our expectations. No changes to the card-present side of things. Obviously, in the e-commerce side of things, it requires issuers to enable to one affiliated networks for e-comm [sic]. Most Visa issuers were already in compliance. Those that aren't will be. ***We've said and continue to believe that there'll be minimum impact in fiscal year '23*** and beyond that, it's yet to be determined. We'll kind of see how the marketplace plays out. ***We continue to believe that merchants are going to want to choose to route transactions to Visa for a number of reasons. One is, in the e-comm space the merchants bear the liability for fraud in e-commerce. So the ability to save a couple of basis points in cost have to be weighed against the risk that comes from the liability of fraud in the e-commerce space.*** We believe that our tools, capabilities, and platforms to help reduce fraud are second to none. We've got advanced fraud and risk processing capabilities that help both issuers, acquirers, and sellers reduce fraud. And we've also got a product that has dual messaging functionality that, in a number of different use cases whether it's airlines or hotels or rental cars or the retail space, where they are ordering multiple products that are shipped at different times. ***The enhanced dual messaging functionality is really required. So, as always, we're going to – we're going to continue to compete vigorously. We're going to continue to invest in our products, our capabilities, our services. The market is very competitive today. It's going to get more competitive, but we like our chances to continue to win.***

131.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because it failed to disclose that an important part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described in Paragraphs 79 to 108 to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions. Therefore, it was false and misleading to portray the fraud and dual messaging features of Visa's network as why the Regulation II Clarification was unlikely to cause merchants and Acquirers to route transactions through other networks.

132.    On May 23, 2023, Defendant Forestell gave a presentation at the JP Morgan Global Technology, Media & Communications Conference. During the presentation, Tien-Tsin Huang, an analyst from J.P. Morgan, told Defendant Forestell that he would "love to hear your thoughts on Reg II, but maybe just a bigger picture on regulation first." Defendant Forestell responded:

> Yeah. And certainly, we've gotten some more clarity on regulation here in the U.S., that's actually helpful to us. And it's always difficult from a product development

standpoint when there's any degree of uncertainty at all. And so the Reg II clarification, at least from my perspective was helpful all in -- just to dig into that one for a second. The Reg II clarification basically said, all issuers must enable two unaffiliated networks on every debit card for the purposes of ecommerce transactions. That was very consistent with our understanding and our thinking, it was kind of our expectation and the direction of travel, most issuers in the U.S. already do it.

And we do well, I mean, e-commerce transaction routing, so it was consistent. We're going to see some more issuers coming to compliance in the coming months. But if you think about, put yourself in the shoes of the merchant…that run the merchant business. So I know what that's like. ***The decision about routing a transaction is a multivariate decision. It's certainly about the price in any small price differentials that might exist. But it's also really about the quality of the transaction, it's about the likelihood of success of the transaction and it's about the risk that's inherent in the transaction.***

***And if you think about the capabilities that we deliver through tokenization, our real-time fraud scoring capabilities or authentication capabilities, we really like our capability set and we think it's part of the reason why we do so well in transaction routing in the e-commerce space. So where we anticipated it, we are set-up for it, we don't see any near-term impacts from it***, but obviously, we're going to keep an eye on it and stay very, very close to it.

133.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because it failed to disclose that an important part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described in Paragraphs 79 to 108 to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions. Therefore, it was false and misleading to portray the "capability set" of Visa's network as why the Regulation II Clarification was unlikely to cause merchants and Acquirers to route transactions through other networks.

134.    On May 31, 2023, Defendant Prabhu gave a presentation at the Bernstein Strategic Decisions Conference. During the Presentation an analyst asked Defendant Prabhu:

So Vasant, can you also talk about online debit routing (inaudible), right? I know you've talked about no material impact in 2023 and without kind of like wait-and-see [ph] for 2024 and beyond [for Reg II]. But taking a step back, can you highlight why a merchant prefers Visa for routing, even when they have a choice of routing? And why that becomes more important, especially in an online context?

Defendant Prabhu responded:

AMENDED CLASS ACTION COMPLAINT                    No. 5:24-cv-08220-NW

Yes. I mean, like it was what we had thought would happen. So we're not surprised. Many of our issuers are already enabling multiple networks online. Some who are not compliant will be compliant. We have dealt with multiple networks on cards for a long time. So we have a way of dealing with it. ***In the end, you want to win the transaction based on the value you create.***

***There are certain things we do that other networks don't that cause merchants today to use us, even though some may think we're more expensive because it's a total cost of use, right? If you want to use another network, but fraud is going to be higher, you may be better off using our network.*** If on the other network, your consumer can't get rewards, then -- and again, in debit, rewards is not as big an issue. It would be an issue if it was credit. ***Then there's the dual messaging capability, dispute resolution capabilities.***

***So you want to have a service that is differentiated from the alternative. So the merchant can look at it objectively and say, yes, I mean, the price they charge may be different, but the value is still greater here. And that's the game you want to win.***

135.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because it failed to disclose that an important part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described in Paragraphs 79 to 108 to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions. Therefore, it was false and misleading to portray "certain things we do that other networks don't" as why the Regulation II Clarification was unlikely to cause merchants and Acquirers to route transactions through other networks. Similarly, it was false and misleading to suggest that Visa was competing solely based on the "value" it "create[d]" because Visa's tactics cause merchants and acquirers to have higher total costs if they route Contestable Transactions through alternative networks.

136.    On July 25, 2023, the Company announced its financial results for the third quarter of its fiscal year 2023. On that day, Visa held a conference call (the "**3Q 2023 Earnings Call**") that Defendant McInerney and Prabhu participated in.

137.    During the 3Q 2023 Earnings Call, Visa's CFO, Vasant Prabhu, stated:

Through the first three weeks of July, U.S. payments volume was up 6%, with debit up 6% and credit up 6%. Compared to four years ago, they are up 56%, 65% and 47%, respectively. ***Reg II has not measurably impacted volumes so far.***

– 28 –

138.    Later on the 3Q 2023 Earnings Call, Ramsey El-Assal, an analyst from Barclays, followed up on Prabhu's statement:

I wanted to ask for a follow-up on Reg II. You mentioned not seeing any impact yet. I'm just wondering from your vantage point whether you're now seeing that routing choice more broadly available to kind of all merchants or are we still in the midst of an implementation and rollout?

Defendant McInerney stepped in to answer the question, stating:

Why don't I -- I'll take the first part and let Vasant take the second part. It's early days with Reg II. There's been a lot of work that happened ahead of the July l date, but there's also work still happening.

As it relates to our views on our ability to compete in the space, where we continue to be very excited and confident about our ability to compete. *We think that many merchants are going to still choose to route to Visa. As you all know, merchants bear liability for fraud in the e-commerce space. So when they're making decisions, it's not just a cost-based decision. And we bring a lot to merchants in terms of the way we help them with managed risk. We have advanced fraud tools, advanced risk scoring capabilities. And as you know, we also have the product functionality enabled by dual messaging to enable a lot of use cases that are key in the e-commerce space.*

*So, we are -- we feel very good about our ability to compete*….

139.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because it failed to disclose that an important part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described in Paragraphs 79 to 108 to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions. Therefore, it was false and misleading to portray Visa's "fraud tools" and "product functionality" as why the Regulation II Clarification had not caused merchants and Acquirers to route transactions through other networks.

140.    On September 5, 2023, Defendant McInerney gave a presentation at the Goldman Sachs Communications & Technology Conference. During the presentation, Will Nance, an analyst from Goldman Sachs, asked Defendant McInerney:

AMENDED CLASS ACTION COMPLAINT                    No. 5:24-cv-08220-NW

Could you provide an update on REG II implementation? There's been a decent amount of noise on the market about the number of issuers who are enabling debit cards for card-not present use cases. It's unclear how much implementation there's been on the merchant front. What are you seeing in the market and what retention strategies do you have to showcase the value of routing over Visa Net versus an alternative network?

Defendant McInerney responded:

… So far, we've not seen a measurable impact. But there's a lot to go forward from here. We believe that all of our issuers are in compliance. When we're having conversations with merchants on this front, which we're doing regularly, our teams are doing regularly. What we're finding is, the conversations tend to gravitate to a couple things.

One is the liability shift in e-commerce is different than the card presence space. So our merchant partners look at this in a very different way than they would in the card presence space. Because they own the liability for most of the transactions in e-commerce, they're looking at not just the cost of these transactions, they're looking at the reliability, the security, and the performance of these transactions. So that's kind of an important part of the discussion that we're having with our merchant partners.

The conversations also gravitate to the capabilities that we're able to offer to our merchant partners in this space. And there's primarily two different sets of things that really resonate with our merchant partners. The first is we provide dual message capabilities.

Many e-commerce transactions require that. You may have things that are shipping at different dates. You may be making an airline or a hotel transaction, which they don't know exactly what the price is going to be until you check out and those types of things. Our products enable all those different types of use cases for merchants which, as you'd expect, they increasingly value when they're looking at alternatives.

The second set of things comes back to what I was mentioning earlier, which is just our fraud management capabilities. These advanced authorization, tokenization, a lot of the different fraud prevention capabilities which are helping our partners not just reduce fraud, but increase authorization. ***So if you're an e-commerce merchant and you're looking at your options and you're looking at Visa products and solutions that can help you drive more sales, more transactions, lower fraud, and enable the types of capabilities that your users increasingly need when they're buying things, we feel good about our ability to compete and continue to serve our partners.***

AMENDED CLASS ACTION COMPLAINT                    No. 5:24-cv-08220-NW

141.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because it failed to disclose that an important part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described in Paragraphs 79 to 108 to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions. Therefore, it was false and misleading to portray the capabilities of Visa's network as why the Regulation II Clarification had not caused merchants and Acquirers to route transactions through other networks.

142.    On October 24, 2023, the Company announced its financial results for the fourth quarter and full year of its fiscal year 2023. On that day, Visa held a conference call (the "**4Q 2023 Earnings Call**") that Defendant McInerney and Suh participated in.

143.    During the 4Q 2023 Earnings Call, Visa's CFO, Defendant Suh, stated: "U.S. payments volume was up 5% with debit and credit, both up 5%.... ***REG II has not meaningfully impacted volumes so far***."

144.    Later on the 4Q 2023 Earnings Call, Sanjay Sakhrani, an analyst from Barclays, followed up on Suh's statement:

> I have a question on REG II. Chris, you mentioned no impact yet and also sort of caveat at the outlook, I'm just wondering, is there anything that gives you pause there? ***And then, Ryan, anything you guys are doing proactively to get in front of any adverse impact?***

In response to the question, Defendant McInerney stated:

> Why don't I talk just conceptually about REG II and then you can answer anything else on Sanjay's question. So two things going on obviously with REG II, let's just talk about on both. One is the change that was made last summer that went into effect with regards to routing in the e-comm space. As we mentioned in our prepared remarks there, ***we haven't seen any meaningful impact***. Having said that, there's a lot of work happening around the ecosystem and, you know, ***we're out there talking to clients and partners about our products and our value propositions, making sure they understand the benefits of a Visa transaction, especially in the e-commerce space where often the merchant holds the fraud liability. So our sales teams are in with merchant clients and acquire clients day-in and day-out, explaining the value of our products, showing them the value of our products, and going forward, you know, we feel good about our ability to compete***….

145.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because it failed to disclose that an important part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described in Paragraphs 79 to 108 to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions. Therefore, it was false and misleading to portray the capabilities of Visa's network as why the Regulation II Clarification had not caused merchants and Acquirers to route transactions through other networks.

146.    On November 28, 2023, Defendant Suh spoke at the UBS Global Technology Conference. Timothy E. Chiodo, an analyst from UBS, asked Defendant Suh:

> …Okay, let's move on to another topic that is definitely top of mind for investors, given it's kind of something happening/evolving as we speak, which is Reg II for U.S. online debit routing. I think, in general, the investment community is comfortable with the notion that there are sort of two sides to this story, right? There's the direct aspect, which is the interchange and networking fees associated with some of the secondary networks, but there's also, compared to Visa's offering, there's relative levels of fraud to consider, and also features. Maybe you could expand upon all of that really?

Defendant Suh responded:

> It's, again, another very sort of timely topic. The first place I'd start is acknowledging that we've operated in a regulated debit environment for a long period of time and we've done it, I would say successfully for a decade or more. And from that context, we've built that muscle and we'll continue to operate, and manage ourselves and as regulations continue to evolve.

> What is Reg II? For those that aren't familiar, it's basically regulations that in the U.S. issuers are required to have two unaffiliated debit networks on cards that are issued in the U.S., which again gives merchants or acquirers the option to route those transactions or those debit transactions to -- for -- in -- and again, this is card not present, sorry, just to be clear, give the ability to route those transactions to a second network.

> **As I said in October on earnings call, we've not yet seen meaningful impact of this and we'll continue to keep you all updated in the event that we do see impact of it. But I think the important point is the one you brought up, which is cost is a variable. It is a factor. But there's many other considerations. You pointed to features and liability, and I think that's the same ones that I would anchor on.**

From a feature perspective, if you think about the capabilities that Visa offers, which are really unmatched, one example is Visa is a dual -- it supports dual messaging, whereas traditional PIN-based debit networks are single message.

And what does that mean? Well, it's a scenario, like, think of the scenario where the initial amount varies from the actual amount. So maybe a hotel bill or a car rental bill or a tipping scenario, where those things are different. Those aren't supported by single message networks, whereas, again, the capabilities in our network are more advanced.

And then the third one, which is really important, is liability and fraud. ***In an e-commerce world, merchants bear the liability for fraud, and Visa has invested significantly in fraud detection, authorization, tokenization, like all the things that give us a material step function advantage in that particular space to minimize the liability that merchants may incur. And hence, when you sort of look at the totality of things, we're confident that Visa's value prop is very good.***

147.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because it failed to disclose that an important part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described in Paragraphs 79 to 108 to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions. Therefore, it was false and misleading to portray the capabilities of Visa's network as why the Regulation II Clarification had not caused merchants and Acquirers to route transactions through other networks.

148.    On January 25, 2024, the Company announced its financial results for the first quarter of its fiscal year 2024. On that day, Visa held a conference call (the "**1Q 2024 Earnings Call**") that Defendants McInerney and Suh participated in.

149.    On the 1Q 2024 Earnings Call, Craig Maurer, an analyst from FT Partners, asked for more detailed comments about the impact of Reg II on Visa. Defendant McInerney responded to Maurer's question by stating:

… [L]et me talk a little bit about the business aspect of Reg II. And then, Chris, you can hit both of those specific questions, the Reg II and the one-time items. I think it's important at this point to just observe, you know, we're six months in now since Reg II in the US. And we've had a chance to really engage with our clients and partners on the merchant side of what we do. And we're having really good discussions, really good dialogues. ***It's been a great opportunity for us to highlight our products, our services and especially the various different things that***

AMENDED CLASS ACTION COMPLAINT                    No. 5:24-cv-08220-NW

*differentiate a Visa debit transaction from other alternatives*. And to be honest, we're getting a chance to have conversations at more senior levels in the organization about the details of our products than we've ever had before, which is great. *And so far we're having great success. You know, the sales conversations have been positive. The results client by client that we're finding as we're able to talk to them about the features and benefits of Visa Direct are great so far and, you know, feel really good about our results six months into this so far.*…

150.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because it failed to disclose that an important part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described in Paragraphs 79 to 108 to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions. Therefore, it was false and misleading to portray the capabilities of Visa's network as why the Regulation II Clarification had not caused merchants and Acquirers to route transactions through other networks.

151.    On February 27, 2024, Defendant Suh spoke at the KBW Fintech & Payments Conference. Sanjay Sakhrani, an analyst from KBW, asked Defendant Suh:

Reg II seemed like you had some modest impact, but you guys don't expect it to be a material one on a go-forward basis?

Defendant Suh responded in relevant part:

Well, let me add a -- there's nuance to that answer. What -- the first place I'll start is maybe just reiterating what Ryan Mcinerney, our CEO, said in the last earnings, which is since the implementation of Reg II last summer, it's actually given us an opportunity to engage with partners, clients on the merchant side and really highlighting what differentiates Visa and that's been constructive and positive.

*But ultimately, like, merchants have to make a choice and their choices are -- there's sort of multiple factors. People think cost is the predominant, but there are other factors. There's actual sort of functionality, there's security and you think about there's a big difference between what we do and what sort of the pin-based debit networks can do. On the functionality side, dual messaging versus single messaging, it's an important distinction.*

Dual messaging is when the actual final price differs from the initial price, think tipping as an example, or -- and sort of traditional pin-based networks are single message, they can't support that. In the e-commerce world, when you can't build

– 34 –

till after the goods are shipped, again, in a single message world, you have to wait till sort of all parts of that order are shipped as opposed to being able to bill in increments.

***And so there are important differences in functionality. Also from a liability standpoint in an ecommerce world, merchants bear the liability of that. And Visa has invested more in disputes and charge backs and all the things that make the network more robust. And so from that standpoint, we've continued to have this sort of positive engagement with the merchant side on how we differentiate Visa.***

152.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because it failed to disclose that an important part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described in Paragraphs 79 to 108 to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions. Therefore, it was false and misleading to portray the "functionality" of Visa's network as why the Regulation II Clarification had only had a modest impact on whether merchants and Acquirers route transactions through Visa's network. Similarly, it was false and misleading to suggest that cost was not the "predominate" factor in routing decisions when, if fact, Visa's tactics cause merchants and acquirers to have higher total costs if they route contestable transactions through alternative networks.

153.    On February 28, 2024, Defendant Suh gave a presentation at the Evercore ISI Payment & Fintech Innovators Forum. During the presentation, David Togut of Evercore Partners asked Defendant Suh about Reg II. Defendant Suh responded:

Reg II is regulation that came into effect about six months ago in the summertime. For those not close to it, it basically is a regulation that requires issuers to have a second unaffiliated network associated on debit for card-not-present transactions. That went into effect in the summertime in July. So we've had two quarters of experience on it. ***The way we've characterized it over the first two quarters is basically some range of not meaningful to modest impact in the last quarter.*** And we saw a little bit of impact that started at the beginning of the quarter and stayed stable throughout the quarter.

The thing that I would emphasize is actually the statement that Ryan made, Ryan, our CEO, Ryan Mcinerney, made on our earnings call in the first quarter, which is with the implementation of Reg II, it's actually given us an opportunity to engage with clients, with partners on the merchant side and to really highlight how we

differentiate ourselves, how Visa's capabilities, how our value proposition is differentiated from others in the market.

What are some of those differentiators? You think of **merchants, ultimately, will have a choice under Reg II. And that choice comes down to not only cost, but to capabilities and liability. And so from a capability standpoint, there's two that I would highlight.** One is around this notion of dual message support versus single message. And so Visa supports dual message. Many of the -- most of the pin debit networks, which are the alternative networks that many times are on the back of the card are single message.

And what is dual message and single message? Well, dual message supports transactions where the final price is different from the initial price, so think about restaurants and tipping or hotels. Also applicable scenarios is in e-commerce where you can't -- where a merchant can't bill till the products are shipped. And so if you have to ship in multiple packages, it really inhibits your ability to bill in multiple pieces. Liability is another really important one for our clients. In the e-commerce world, merchants bear the cost of that liability. **And we've invested for decades in advanced fraud detection and tokenization efforts and things that really add a lot of value to that transaction.**

**And so we feel good about Reg II. We feel good about our ability to operate in that regulatory environment. Remember, we've been operating under sort of Durbin 1 since 2011. It's been over a decade and we've learned how to navigate in that environment.**

154.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because it failed to disclose that an important part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described in Paragraphs 79 to 108 to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions. Therefore, it was false and misleading to portray the capabilities of Visa's network and fraud liability as why the Regulation II Clarification had only had a modest impact on whether merchants and Acquirers route transactions through Visa's network. Similarly, it was false and misleading to say that "merchants…will have a choice under Reg II" and that "choice comes down to not only cost, but to capabilities and liability" because Visa's tactics cause merchants and Acquirers to have higher total costs if they route contestable transactions through alternative networks.

AMENDED CLASS ACTION COMPLAINT                    No. 5:24-cv-08220-NW

155.    On March 14, 2024, Defendant Suh gave a presentation at the Wolfe Research Fintech Forum. During the presentation, Darrin Peller of Wolfe Research asked Defendant Suh about Reg II:

> …And then just last question is just on the regulatory front. I mean, I think you mentioned noticing a modest impact in fiscal for your first quarter to U.S. debit volumes from the Reg II. Maybe just comment on that. I mean, what gives you confidence in Visa's differentiated product relative to the regional networks that obviously are trying to make some headway on the back of Reg II?

Defendant Suh responded:

> Yes. Exactly right. Again, to reiterate, Reg II went to effect in the summertime, so you've essentially had two quarters of experience. In the first quarter we said the impact was not meaningful. In the second quarter, ***I think I characterized the impact as modest, as you put it***. But it was modest and it was stable since the beginning of the quarter. So that's a little bit of a fact pattern, just to reiterate. I think the thing that I go back to is the thing that Ryan talked about this in our last earnings call. He said, hey, listen, since the implementation of Reg II, it's given us an opportunity to really meaningfully engage with all of our clients and really highlight what we think is the value proposition of Visa and processing on our network relative to what might be competitive choices out there.
>
> And it's just given us a chance to engage with clients and have a very productive conversation in that manner. And that's been, I think, helpful in the grand scheme of things. ***At the end of the day, merchants have choices. Cost is one of them. But they also understand capability differences between us and what is historically a pin-based debit network.*** Dual message versus single message is a capability, as an example, that pin-based debit networks don't typically support--dual message, where Visa does. And dual message, for those that are unaware is when the final transaction may be different from the initial ones, so think about tipping or hotels or things like this. And in an e-commerce world, it's very applicable because you can't bill until you ship. And so if you have to ship in multiple packages, then again dual message is very supportive of that versus single message.
>
> ***And so there are very much capability differences, there's liability differences, we've invested in tokenization and authorization. We've invested a lot in fraud protection in our network. And so we continue to think our value proposition is differentiated and we'll continue to share our view with clients around the world.***

156.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because it failed to disclose that an important part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described in Paragraphs 79 to 108 to pressure merchants, Acquirers, and Issuers to use Visa's network by

– 37 –

making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions. Therefore, it was false and misleading to portray the "capability differences" and "liability differences" of Visa's network as why the Regulation II Clarification had only had a modest impact on whether merchants and Acquirers route transactions through Visa's network. Similarly, it was false and misleading to suggest that "merchants have choices" and that they can choose other networks based on cost because Visa's tactics cause merchants and Acquirers to have higher total costs if they route contestable transactions through alternative networks.

157.     On May 15, 2024, Defendant Suh gave a presentation at the Barclays Emerging Payments and FinTech Forum. During the presentation, an analyst asked Defendant Suh about Reg II:

> Maybe you could comment on a topic that folks ask about even though it doesn't seem to be having a massive impact on the business, but Reg II, and that -- what's the updated thinking there? I know you just commented on the quarter, but how should we think through this – that dynamic?

Defendant Suh responded:

> …So Reg II has been in market, implemented, I guess, now since last summer. And so we've had kind of three quarters of experience with it. The first quarter, we labeled or we described the impact as not meaningful. **_In the last two quarters, I've described it as modest._** And that's -- just to level set, that's the -- when you look at what we've said for the second half of the year, that's the expectation.
>
> The modest level of impact is what we have embedded, assumed, in that guidance. Two things I'd say about our experience so far. So one is, since the implementation of Reg II, we've had an opportunity to engage many of our clients, again, and have this conversation and **_really articulate what we think is the value proposition, the differentiation of the Visa network relative to alternative pin-based debit networks that may be -- that clients may be considering._**
>
> **_And I think, what's become evident is that clients think about cost, of course, but they also think about capabilities, and they think about liability._** And so from a capability standpoint, we've invested a ton in our network and our network capabilities. One example is, single message versus dual message, and pin-based debit networks are typically single message, and Visa's debit network supports dual message. What that means is, in a transaction where the initial cost and the final cost may vary, so think in face-to-face world, the tipping scenario where you have the cost of the food, and then the incremental tip, or in an e-commerce world where you -where a vendor might ship in multiple shipments where you have to

– 38 –

then wait for a final, you can only bill once, whereas, vendors may want to bill in multiple parts. That capability is unique to a network like Visa's.

And then in the liability side, of course, in an e-commerce world, merchants bear the liability of that transaction, and Visa's invested more than any other company in terms of authorization, tokenization, fraud detection, and prevention. ***And so we do continue to believe that we have incredibly differentiated value. And then the last thing I'd say is, again, as we look forward, we've operated, in a regulated debit environment for a very long time. Reg II isn't new from that standpoint as a way that management can think about how we operate within that. And so I'm confident that we continue to be able to navigate.***

158.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because it failed to disclose that an important part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described in Paragraphs 79 to 108 to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions. Therefore, it was false and misleading to portray the "differentiated value" of Visa's network from its "capabilities" and how it handles "liability" as why the Regulation II Clarification had only had a modest impact on whether merchants and Acquirers route transactions through Visa's network. Similarly, it was false and misleading to suggest that Visa's customers are not making routing decisions based on cost because Visa's tactics cause merchants and Acquirers to have higher total costs if they route contestable transactions through alternative networks.

159.    On July 23, 2024, the Company announced its financial results for the third quarter of its fiscal year 2024. On that day, Visa held a conference call (the "**3Q 2024 Earnings Call**") that Defendants McInerney and Suh participated in.

160.    On the 3Q 2024 Earnings Call, Sanjay Sakhrani, an analyst from KBW, asked: "[I]s the full impact of Reg II now in the run rate, or should we expect there to be any uncertainties relating to that?"

161.    Defendant McInerney responded to Sakhrani's question by stating:

Listen, ***I want to just emphasize in terms of Reg II, the e-commerce debit market is a very competitive market and is going to be competitive for as far as we can see.*** So, while Chris noted, I think noted that the impact has remained the same. We

– 39 –

haven't seen any change in impact, and we're not expecting any change in impact for the fourth quarter. ***It is a competitive business.***

***We are out there with clients day in and day out, helping them understand the benefits of processing transactions on Visa. And there are a lot of them, which is why we feel good so far in the evolution of Reg II about how we've been able to grow that business. We feel great about the capabilities that a Visa debit transaction offers, many of which I've talked about on these calls in the past. So, we're out there, we're competing, we're selling, we're delivering our products, and we feel good about our win rate.***

162.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because it failed to disclose that an important part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described in Paragraphs 79 to 108 to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions. Therefore, it was false and misleading to portray "the capabilities that a Visa debit transaction offers" as why the Regulation II Clarification had only had a modest impact on whether merchants and Acquirers route transactions through Visa's network.

### B.  Investor Conference Misstatements About Fintech.

163.    At the May 31, 2023 Bernstein Strategic Decisions Conference an analyst asked Defendant Prabhu about how he thought about the "risk and opportunity [to Visa] from big tech?" Defendant Prabhu responded, in relevant part, by making the following statement about Apple's use of Visa's network:

Yes, look, I think sometimes sort of an assumption is made that somebody has a community, therefore, they should be able to do payments, too. It's not as easy as that, right? Meaning, you have to have a credential that can be a payment credential. Today, it's issued by banks. Are you going to be a bank? You have to have the ability to allow people to pay at various merchants. Are you going to go create an acceptance network?

You can't escape creating a network for payments. You can't just switch your existing network to a payments network. You look at ***Apple, I mean, they're riding our network***, but they're not issuers of credentials, they're not creating merchant acceptance. ***If they chose not to ride our network, they would have to issue credentials and they would have to go create a merchant network. If we can give them what they want, if we can help them achieve their objective,***

AMENDED CLASS ACTION COMPLAINT                    No. 5:24-cv-08220-NW

*which is to make that device a more valuable device because it can be used for payments, and we can do it with economics that are attractive to them, which they are, and more attractive than going out on their own, and spending the money and also an extraordinary amount of time to do it, then it makes sense for them to partner with us. And that could apply to almost all of them.*

164.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because it failed to disclose that Visa was paying Apple hundreds of millions of dollars a year not to develop a competing product as described in Paragraphs 122-123. Given that fact was undisclosed, it was false and misleading to portray Apple as not developing an alternative to Visa because of the difficulty of developing it and because Visa had helped them "achieve their objective."

165.    On May 30, 2024, Defendant McInerney gave a presentation at the Bernstein 40th Annual Strategic Decisions Conference. During the presentation, Harshita Rawat, an analyst from Bernstein, asked Defendant McInerney about how he thought about the "opportunity and risk for Visa" from big tech. Defendant McInerney responded, in relevant part, by making the following statement:

Yeah, here too, I think big tech and fintech remain a very big opportunity. If you go back 10 years ago, *I think the narrative that was emerging as you started to see big tech enter into the financial services and commerce and payment space and you started to see fintech really start to rise up, the narrative was that a lot of these companies were going to disintermediate Visa. So we made a very important strategic decision at that point in time. We said, first of all, we're going to open up our network. We're going to allow users to consume our services via APIs. We're going to open up our network to anyone that wants to build on our platform. We said we are going to lean into these emerging fintechs and to these large tech players as clients and partners and we're going to show up and cover them just like we have our traditional issuers and traditional acquirers.*

*We're going to get in their offices, we're going to understand their strategies, what they're trying to achieve for their users. And then we're going to come back and do what we do well, which is bring them ideas, products, services and put our network to work in service of them. So that was kind of the narrative 10 years ago and the decision that we made 10 years ago.* If you now fast forward to today, that's been a great opportunity for our network. We -- if you talk to most fintechs and most large tech players and ask them who their most important partner is in commerce and in payments and in financial services, I believe that many if not most would say Visa.

– 41 –

*And we've been able to help them achieve their objectives for their user base, whatever their end objectives are* and that's different whether you're a BNPL player or you're serving the merchant side of the ecosystem or you're large tech platform. So we feel good about kind of our ability to serve those partners and help them grow their business. We feel good about the impact that they've had kind of on the entire ecosystem and we're very bullish about the continued opportunity to work with them to digitize payments for buyers and sellers around the world.

166.    The foregoing statement was materially false and misleading when made because, as described in Paragraphs 109-123, Visa prevented fintechs, such as PayPal and Square, from disintermediating them by threatening high fees for the transactions that the fintechs needed Visa's rails to process. Therefore, the statement's portrayal as the relationship between fintechs and Visa as cooperative and the claim that they did not disintermediate Visa because Visa "help[ed] them achieve their objectives" was false and misleading.

**C. Misstatements in Visa's Public Filings.**

167.    On November 15, 2023, Visa filed with the SEC its annual report on Form 10-K for the fiscal year ended September 30, 2023 (the "**2023 10-K**"), which was signed by Defendants McInerny, Suh, Andreski, and Kelly. Additionally, attached to the 2023 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("**SOX**") signed by Defendants McInerny and Suh stating that they had read the 2023 10-K and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

168.    The 2023 10-K stated the following in its risk factor section concerning Visa's retention of merchants and financial institutions:

**Our revenues and profits are dependent on our client and merchant base, which may be costly to win, retain and develop.**

***Our financial institution clients and merchants can reassess their commitments to us at any time or develop their own competitive services.*** While we have certain contractual protections, our clients, including some of our largest clients, generally have flexibility to issue non-Visa products. Further, in certain circumstances, our financial institution clients may decide to terminate our contractual relationship on relatively short notice without paying significant early termination fees. Because a significant portion of our net revenues is concentrated among our largest clients, the loss of business from any one of these larger clients could harm our business, results of operations and financial condition….

169.    The bold and italicized portion of the foregoing statement was materially false and misleading when made because Visa's financial institution clients and merchants could not, in practice, reassess their commitments to Visa at any time because Visa used Cliff Pricing and the related tactics described in Paragraphs 79 to 108 to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions..

170.    On January 26, 2024, Visa filed with the SEC its quarterly report on Form 10-Q for the period ended December 31, 2023 (the "**1Q24 10-Q**"), which was signed by Defendants McInerny, Suh, and Andreski.

171.    On April 24, 2024, Visa filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2024 (the "**2Q24 10-Q**"), which was signed by Defendants McInerny, Suh, and Andreski.

172.    On July 24, 2024, Visa filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2024 (the "**3Q24 10-Q**"), which was signed by Defendants McInerny, Suh, and Andreski.

173.    Each of the 1Q24 10-Q, 2Q24 10-Q, and 3Q24 10-Q attached certifications pursuant to SOX signed by Defendants McInerny and Suh stating that they had read the quarterly report and that it "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

174.    Each of the 1Q24 10-Q, 2Q24 10-Q, and 3Q24 10-Q contain the following language incorporating the risk factor portion of the 2023 10-K by reference: "For a discussion of the Company's risk factors, see the information under the heading 'Risk Factors' in the Company's Annual Report on Form 10-K for the year ended September 30, 2023."

175.    Each of the 1Q24 10-Q, 2Q24 10-Q, and 3Q24 10-Q therefore incorporate the materially false and/or misleading statement in the 2023 10-K, repeating and reaffirming the statement anew, and constituting new misrepresentations.

**LOSS CAUSATION**

176.    On the evening of September 23, 2024, after the market closed, multiple news outlets (among them Bloomberg and Politico) reported that the DOJ planned to imminently file

suit against Visa for antitrust violations. The Bloomberg article, entitled "Visa Faces Justice Department Antitrust Case on Debit Cards," stated that DOJ was "preparing to accuse Visa of taking steps to keep rivals from challenging its dominance in the debit card market" and its "allegations include that Visa made exclusive agreements to hinder the expansion of competing networks and thwarted efforts by technology companies to enter the market."

177.    On September 24, 2024, before the market opened, the *New York Times'* DealBook Newsletter also reported that DOJ was expected to sue Visa. The Newsletter stated that "the center of the lawsuit is payment processing technology, which connects a bank to a merchant whenever a purchase is made" and DOJ planned "to argue that Visa punishes customers, including merchants, when they try to use competing services to process payments." It further reported that "[p]rosecutors are also expected to say that Visa coerces financial technology firms to work with it by threatening penalties on those who do not, and thus squeezing out potential new competitors."

178.    The DOJ filed the DOJ Complaint on September 24, 2024 (*see* Paragraphs 76-104; 109-123).

179.    On this news, the price of Visa's stock fell $15.85 per share, or approximately 5.5%, from $288.63 per share when the market closed on September 23, 2024 to $272.78 per share when the market closed on September 24, 2024. On September 25, 2024, Visa's stock fell another $3.15 per share to close at $269.63 for a total two-day loss of approximately 6.6% that harmed investors.

180.    As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

### A. The Specificity of the Misstatements of Defendants McInerney, Suh, Prabhu, Jenkyn, and Forestell Supports the Inference that They Made Them With Scienter.

1) Defendant McInerney

181.    Defendant McInerney, as Visa's CEO, made six similar misstatements about the Regulation II Clarification during five earnings calls (*see* Paragraphs 130, 138, 144, 149, 160) and an investor conference (*see* Paragraph 140). Each time an analyst asked about the impact of the Regulation II Clarification on Visa and McInerney gave a detailed answer making clear that

he had great familiarity with the Regulation II Clarification and Visa's response to it. Each time he also, with great specifically, attributed the lack of impact of the Regulation II Clarification to the capabilities of Visa's network. The inference that McInerney had deep knowledge of the issue was further supported by the fact that McInerney answered analysts' questions about the Regulation II Clarification on earnings calls even though the CFO had been the one who reported the impact of the Regulation II Clarification on those calls. Given the number of times McInerney was asked about the impact of the Regulation II Clarification and the detailed and similar nature of his answers, it is clear that he prepared for the questions and he was either intentionally or recklessly misleading when he omitted that a significant part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described above to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions.

182.     Defendants McInerney's misstatement concerning disintermediation by fintechs also had great specificity that supports the inference of scienter (*see* Paragraph 165). In response to a general question about opportunity and risk to Visa from big tech, McInerney specifically brought up the "narrative" from "10 years ago" that fintechs would disintermediate Visa. This shows that McInerney was knowledgeable about the issue and that he was intentionally or recklessly misleading when he omitted that Visa threatened fintechs with high fees for transactions that the fintechs need Visa to process to prevent them from disintermediating Visa.

2)   Defendant Suh

183.     Defendant Suh, as Visa's CFO, made five similar misstatements about the reason for the modest impact of the Regulation II Clarification during five investor conferences over a period of a little more than six months (*see* Paragraphs 146, 151, 153, 155, 157). Additionally, Suh reported on the impact of the Regulation II Clarifications on the Visa's earnings calls (*see, e.g.,* Paragraph 143). As with Defendant McInerny's misstatements on the same topic, Suh gave detailed answers showing he was knowledgeable about the Regulation II Clarification and Visa's response to it and repeatedly specifically attributed the Regulation II Clarification's lack of impact to the capabilities of Visa's network. Given the number of times Suh was asked about the impact of the Regulation II Clarification and the detailed and similar nature of his answers, it is clear that he prepared for the questions and he was either intentionally or recklessly misleading when he

omitted that a significant part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described above to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions.

3) Defendant Prabhu

184. At the May 31, 2023 Bernstein Strategic Decisions Conference (*see* Paragraph 134), where Defendant Prabhu represented Visa as CFO, an analyst specifically asked him, regarding the Regulation II clarification: "can you highlight why a merchant prefers Visa for routing, even when they have a choice of routing?" Prabhu's response, which was detailed and showed knowledge of the topic, specifically brought up the issue that Visa had higher network fees, but said that the "value" from Visa "is still greater" because of features such as fraud protection and dual messaging. Given the specificity of Prabhu's answer and the knowledge of the topic it showed, it was either intentionally or recklessly misleading when he omitted that a significant part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described above to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions.

185. Defendant Prabhu's misstatement, also at the May 31, 2023, Bernstein Strategic Decisions Conference, in response to a question about the risk and opportunity to Visa from big tech also had great specificity that supports the inference of scienter (Paragraph 163). Prabhu brought up the example of Apple and specifically asserted that Apple had not worked to develop a competing network to Visa because of the difficulties of creating an alternative and because Visa helped Apple "achieve their objective." Given the specificity of Prabhu's answer and the knowledge of the topic it showed, it was either intentionally or recklessly misleading when he omitted that Visa was paying Apple hundreds of millions of dollars a year not to develop a competing product.

4) Defendant Jenkyn

186. At the March 2, 2023, Payment & Fintech Innovators Forum (*see* Paragraph 127), where Defendant Jenkyn represented Visa as its Group President, an analyst specifically asked him regarding the Regulation II clarification: "How do you assess the potential impact [of the Regulation II Clarification] on Visa." Jenkyn's response was detailed and showed knowledge of

AMENDED CLASS ACTION COMPLAINT                    No. 5:24-cv-08220-NW

the topic; he specifically indicated that the reason merchants and acquirers would continue to route with Visa was the "capabilities and the functionality of [Visa's] network." Given the specificity of Jenkyn's answer and the knowledge of the topic it showed, it was either intentionally or recklessly misleading when he omitted that a significant part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described above to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions.

187.    That Defendant Jenkyn was knowledgeable about the Regulation II Clarification is further supported by the fact that he was Company's Group President & President, North America from 2020 to 2023, indicating he had specialized knowledge of the U.S. Debit market. Jenkyn also stated during the Moffett Nathanson's Inaugural Technology Media, and Telecom conference, which took place on May 16, 2023, that "[o]bviously, one of the topics that I get a lot of questions on U.S. regulation is Reg II," further showing that he was knowledgeable and the topic and was expecting questions about it. This further supports that Jenkyn made his misstatement intentionally or recklessly.

   5)  Defendant Forestell

188.    At the May 23, 2023 JP Morgan Global Technology Media & Communications Conference (*see* Paragraph 132), where Defendant Forestell represented Visa as its Chief Product and Strategy Officer, an analyst asked him about the Regulation II clarification. Forestell's response was detailed and showed knowledge of the topic; he specifically indicated that the reason merchants and acquirers would continue to route with Visa was the "capabilities" of Visa's network. Given the specificity of Forestell's answer and the knowledge of the topic it showed, it was either intentionally or recklessly misleading when he omitted that a significant part of Visa's response to the Regulation II Clarification was to use Cliff Pricing and the related tactics described above to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions.

**B. It Supports the Inference of Scienter that Visa's Strategy of Using Cliff Pricing to Lock Merchant and Acquirers into De Facto Exclusive Contracts Was a Direct Response to the Durbin Amendment and Regulation II Clarification.**

189.    As alleged above, the DOJ's investigation showed that Visa engaged in a Company-wide strategy of using its Cliff Pricing tactics to lock merchants and acquirers into *de facto* exclusive routing contracts with Visa as a direct response to first the Durbin Amendment and then the Regulation II Clarification (*see* Paragraphs 102-104).

190.    The result of this "relentless strategy" was that Visa entered these *de facto* exclusive routing contracts with over 180 of its largest merchants and Acquirers, covering over 75% of Visa's debit volume (80% for Card-Not-Present) and 45% of total U.S. debit volume by 2022 (*see* Paragraphs 103).

191.    The DOJ also quoted a Visa executive as advocating against lowering debit prices because "if you lower the price, there is nothing to put in a routing deal, merchant gets it by default with no commitment" and another Visa employee explaining that credit incentives made its so that it was not commercially reasonable for a merchant to switch to other debit networks (*see* Paragraphs 90-91).

192.    DOJ also specifically found and quoted Visa senior executives admitting that they structured their contracts with card issuers to discourage them from enabling PINless functionality on their cards, which made it much less attractive for merchants and acquirers to contract so they could use those networks (*see* Paragraphs 97-100).

193.    FE-1's statements corroborate that it was standard practice, through the use templates, for Visa to structure its contracts with Acquiring and Issuing Banks in the way that DOJ described. (*see* Paragraphs 105-108).

194.    Given the scope of this strategy, it is a reasonable inference that Visa and each Individual Defendant was aware of it and it contributes to each of their scienter.

195.    Defendant McInerney was certainly aware of this strategy or reckless in not being aware of it given that he was the Company's CEO when the Regulation II Clarification went into effect and he spoke repeatedly about the Regulation II Clarification's impact on Visa during multiple earning calls and investors conferences. He was required to conduct due diligence when he signed SOX certifications for the 2023 10-K and other quarterly reports during the Class Period.

196.    Defendant Suh was certainly aware of this strategy or reckless in not being aware

of it given that he became the Company's CFO shortly after the Regulation II Clarification went into effect and he spoke repeatedly about the Regulation II Clarification's impact on Visa during multiple earning calls and investors conferences. Also, as CFO, he was responsible for Visa's financial statements and for reporting on the Regulation II Clarification's impact. He was required to conduct due diligence when he signed SOX certifications for the 2023 10-K and other quarterly reports during the Class Period.

197.    Defendant Prabhu was certainly aware of this strategy or reckless in not being aware of it given that he became the Company's CFO when Regulation II Clarification went into effect and he spoke about the Regulation II Clarification's impact on Visa during multiple earning calls and investors conferences. Also, as CFO, he was responsible for Visa's financial statements and for reporting on the Regulation II Clarification's impact.

198.    Defendant Kelly was certainly aware of this strategy or reckless in not being aware of it given that he was the Company's CEO when the Regulation II Clarification was adopted and remained the Chairman of the Company's Board when it went into effect. Additionally, he was required to conduct due diligence when he signed the Company's 2023 10-K.

199.    Defendant Andreski was certainly aware of this strategy or reckless in not being aware of it given that he became the Company's Corporate Controller and Chief Accounting Officer when the Regulation II Clarification was adopted and went into effect. Furthermore, as Controller and Chief Accounting Officer, it was his responsibility to oversee the financial and contractual obligations of Visa. Additionally, he was required to conduct due diligence when he signed the Company's 2023 10-K and other quarterly reports during the Class Period.

200.    Defendant Jenkyn was certainly aware of this strategy or reckless in not being aware of it given that he spoke about the Regulation II Clarification's impact on Visa at investor conferences and admitted "[o]bviously, one of the topics that I get a lot of questions on U.S. regulation is Reg II." Furthermore, as Regional President, North America when both the Durbin Amendment went into effect and the Regulation II Clarification was adopted, he certainly would have been aware of Visa's strategic response to it.

201.    Defendant Forestell was certainly aware of this strategy or reckless in not being aware of it. He spoke about the Regulation II Clarification at investor conferences. Further, he described his position as the Company's Chief Product and Strategy Officer as "develop[ing] the corporate strategy, the business unit strategies, and local regional strategies" for Visa.

– 49 –

**C. Debit Transactions are a Core Operation of Visa, Which Supports the Inference of Scienter.**

202.     As debit transactions are indisputably a core part of Visa's revenues, Defendants were well aware of Visa's debit practices and policies. As acknowledged in the 3Q 2024 Earnings Call and the 2023 10-K payments volume is the "primary driver for [Visa'] service revenue." U.S. debit consumer debit transactions alone made up over 23% of the total nominal payments volume, with it being 23.37% in 2023 ($2.8 trillion debit transactions) and 23.03% ($2.99 trillion debit transactions) in 2024. The enormity of Visa's debit transactions, and the crucial role they played in revenue, highlights how central this was to the Company's operations.

203.     Additionally, Visa earns more from its U.S. Debit business than its U.S. credit business and it earns more revenue from its debit business in the U.S. than its debit business from any other region in the world.

204.     Defendants, furthermore, admit that debit is core to the Company's operations. In the 2023 10-K, under the heading "Core Products" Defendants stated that "Visa's growth has been driven by the strength of our core products — credit, debit and prepaid." Defendants made similar statements in their Form 10-K for the fiscal year 2024 ("**2024 10-K**") and Form 10-K for the fiscal year 2022 ("**2022 10-K**"), acknowledging how central debit is to Visa's operations. Both the 2023 10-K and 2024 10-K were signed by Defendants McInerny, Suh, Andreski, and Kelly. The 2022 10-K was signed by Defendants Kelly and Prabhu.

205.     Similarly, in their Annual Report to Shareholders for 2023 and Annual Report to Shareholders in 2024, Defendants laid out how central debit is to Visa's business. In the section entitled "Our Strategy" Defendants list "debit" as one of their "core products" and a primary driver of Visa's growth. Furthermore, right after Defendant McInerney's introductory statements to the Annual Reports, Defendants attached this graphic laying out their business strategy for the future, which highlighted the centrality of debit to Visa's growth and profits and to all parts its business:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



26    206.    Much like the 10-Ks, the Annual Reports were also signed by Defendants

27 McInerny, Suh, Andreski, and Kelly.

28

207.    The fact that Defendants acknowledge that debit is core to their business strategy, and is a core product, raises the inference that Visa and each Individual Defendants was aware of the Company's debit practices as it is a core operation of Visa and supports a finding of each Defendant's scienter.

**D. Defendants Were Motivated to Make Misstatements Because DOJ was Investigating Visa**

208.    In early 2020, Visa announced plans to acquire Plaid, a fintech company specializing in connecting user's bank accounts to various apps and services, but Visa had to abandon the deal in early 2021 after the DOJ filed an antitrust suit to block the acquisition.

209.    The DOJ's investigation into Visa's proposed Plaid acquisition led to the investigation that culminated in the DOJ Complaint. Visa disclosed DOJ's investigation into its debit practices in March 2021.

210.    Visa's 2022 10-K, filed on November 16, 2022, and the 2023 10-K stated that "the Antitrust Division of the U.S. Department of Justice (the Division) issued a Civil Investigative Demand, or 'CID' to Visa seeking documents and information regarding a potential violation of Section 1 or 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. The CID focuses on U.S. debit and competition with other payment methods and networks."

211.    Given that they were aware of the DOJ's investigation, Visa and the Individual Defendants were motivated not to discuss Visa's use of Cliff Pricing and the related tactics to pressure merchants, Acquirers, and Issuers to use Visa's network by making it uneconomical to route Contestable Transactions through alternative networks even if those networks charge lower fees for those transactions.

**E. There is a Strong Inference Visa Acted With Scienter.**

212.    Each of the Individual Defendants was a high-ranking management-level employee. The scienter of each of the Individual Defendants and of all other management-level employees of Visa, including each high-ranking officer or director, is imputable to the Company. The knowledge of each of these individuals should therefore be imputed to Visa for the purposes of assessing corporate scienter.

213.    The facts alleged herein raise a strong inference of corporate scienter as to Visa as

– 52 –

an entity. Corporate scienter may be alleged independent of the finding that any Individual Defendant had scienter where a statement is made or approved by a corporate official sufficiently knowledgeable about the company to know the statement was false or misleading. Given the importance of debit payment processing to Visa's business, the false and misleading statements alleged in this complaint would necessarily have required the approval of a corporate officer with knowledge that they were false and misleading.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

214.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Visa during the Class Period and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

215.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

216.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

217.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

218.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether Defendants' acts as alleged violated the federal securities laws;

(b)  whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)  whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)  whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)  whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)  whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

219.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

220.  Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in efficient markets;

(d)    the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)    the Company traded on NYSE, and was covered by multiple analysts;

(f)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)    Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

221.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

222.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **COUNT I**

### **Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
### **Against All Defendants**

223.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

224.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

225.    During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

226.    The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

227.    The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

228.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

229. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

230. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

231. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

232. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## <u>COUNT II</u>

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

233. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

234. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

235.    As officers of the Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company and to correct promptly any public statements issued by the Company which had become materially false or misleading.

236.    Because of their positions of control and authority as senior officers, Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

237.    The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

238.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

AMENDED CLASS ACTION COMPLAINT                          No. 5:24-cv-08220-NW

D.      Awarding such other and further relief as this Court may deem just and proper.

**<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiff hereby demands a trial by jury.

Dated: July 15, 2025                Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

By: /s/ *Brian B. Alexander*
Brian B. Alexander (admitted *pro hac vice*)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: balexander@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*

AMENDED CLASS ACTION COMPLAINT        No. 5:24-cv-08220-NW