Exhibit A

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
U.S. Department of Justice
Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530,

                              *Plaintiff,*

        v.

VISA INC.,
One Market Plaza
San Francisco, CA 94105,

                              *Defendant.*

**<u>COMPLAINT</u>**

1:24-cv-7214

**Table of Contents**

I.    **Introduction** ........................................................................................................... **4**

II.   **Nature of The Case** ............................................................................................... **6**

III.  **Debit Transactions** ............................................................................................ **12**

   A.  Overview of Debit Transactions ......................................................................... 13

   B.  Debit Networks ................................................................................................... 17

       1.  Issuers Select Which Networks Are Enabled on a Debit Card ..................... 17

       2.  How Debit Networks Get Paid ..................................................................... 18

       3.  U.S. Debit Network Evolution Helped Visa Obtain Dominance ................... 19

       4.  PIN Networks Lack Scale and Meaningful Opportunities to Compete for Debit
           Transactions .............................................................................................. 22

       5.  Alternative Debit Networks ......................................................................... 24

IV.  **Visa Systematically Dominates Debit Transactions IN the United States Through
      Exclusionary and Anticompetitive Conduct** .................................................... **25**

   A.  Visa Has Been the Largest, Most Powerful Debit Network for Over a Decade ............... 25

   B.  Visa Entered into a Web of Contracts to Hinder PIN Networks from Competing ........... 27

       1.  Visa's Contracts with Merchants and Acquirers Unlawfully Inhibit Competition and
           Stifle Innovation ......................................................................................... 28

       2.  Visa's Contracts with Issuers Unlawfully Restrict the Growth of Its Debit Competitors
           .................................................................................................................. 33

       3.  Visa's Response to the Durbin Amendment Successfully Protected Its Monopoly from
           Competition ............................................................................................... 36

       4.  Visa Uses Its Monopoly Power to Deprive Its Rivals of Scale ...................... 37

   C.  Visa Uses Its Monopoly Power to Squash Innovative Alternatives to Its Debit Network. 40

       1.  Visa Fears that Fintech Debit Networks Will Disintermediate Its Lucrative Debit
           Business ..................................................................................................... 42

       2.  Visa Leveraged Its Debit Monopoly to Prevent PayPal and Others from
           Disintermediating Visa with Staged Digital Wallets .................................... 45

       3.  Visa Uses Its Leverage Over Its Potential Debit Competitors, Including Apple, Paying
           Them Not to Create or Promote Competitive Products ................................. 49

V.    **Anticompetitive Effects** ...................................................................................... **51**

VI.  **No Countervailing Factors** .................................................................................. **54**

VII. **The Relevant U.S. Debit Markets** ........................................................................ **54**

A. The United States Is a Relevant Geographic Market ........................................... 55

B. Relevant Product Markets ................................................................................... 55

    1. General Purpose Debit Network Services Are a Relevant Product Market ................... 55

    2. General Purpose Card-Not-Present Debit Network Services Are a Relevant Product
Market ................................................................................................. 59

**VIII. Visa Has Monopoly Power in the U.S. Debit Markets.................................... 60**

**IX. Jurisdiction, Venue, and Commerce ............................................................ 63**

**X. Violations Alleged ....................................................................................... 64**

A. First Claim for Relief: Monopolization of the Markets for General Purpose Debit Network
Services and General Purpose Card-Not-Present Debit Network Services in the United
States in Violation of Sherman Act § 2 ................................................................... 64

B. Second Claim for Relief: Attempted Monopolization of the Markets for General Purpose
Debit Network Services and General Purpose Debit Card-Not-Present Debit Network
Services in the United States in Violation of Sherman Act § 2 ......................................... 65

C. Third Claim for Relief: Unlawful Agreements Not to Compete in Violation of Sherman
Act § 1 ............................................................................................................. 66

D. Fourth Claim for Relief: Unlawful Agreements that Restrain Trade in Violation of
Sherman Act § 1 ................................................................................................. 67

**XI. Request for Relief.......................................................................................... 68**

X. Violations alleged are referenced in paragraph 78 of the amended complaint.

I.    INTRODUCTION

Each year, Americans depend on debit cards to buy more than $4 trillion worth of groceries, clothing, and other goods and services. Millions of Americans, including many lower-income consumers who lack easy access to credit, use debit cards to pay for purchases directly from their bank account. While Americans rely on debit transactions for the necessities of life, most are unaware of the networks that drive those transactions. Nor are they aware that one company, Visa, has for monopolized debit transactions; penalized industry participants that seek to use alternative debit networks; and coopted innovators, technology companies, and financial institutions to forestall or snuff out threats to Visa's debit network dominance.

Visa owns and controls a debit network that connects the consumers' and the merchants' banks. In the United States, more than 60% of debit transactions run on Visa's debit network, allowing it to charge over $7 billion in fees each year for processing those transactions. Visa earns more in revenue from its U.S. debit business than its credit business as of 2022. Visa debit is core to its North American business, where Visa enjoys operating margins of 83%. But even these numbers understate Visa's monopoly power over debit transactions.

Visa maintains its dominant position not by competing on a level playing field but by insulating itself from competition through exclusionary and anticompetitive means. Visa uses its size, scale, and centrality to the debit transaction ecosystem to penalize those who would switch to a different debit network or to companies that could develop alternative debit products. It uses its dominance to limit the growth of existing competitors and to deter others from developing new and innovative alternatives.

When that stick is not enough, Visa offers a carrot: extra payments to entice potential competitors to partner instead of innovate. As Visa's CFO emphasized, "[E]veryone is a friend

and a partner. Nobody is a competitor." Such inducements are worth Visa's while too. Even though the choice to make such payments reduces Visa's immediate profits, it nonetheless pays hundreds of millions of dollars to would-be competitors to blunt the risk they develop innovative new technologies that could advance the industry but would otherwise threaten Visa's monopoly profits.

This conduct cuts off competition where it should occur today. Perniciously, it also prevents its current and potential rivals from gaining the scale, share, and data necessary to erode Visa's existing dominance.

Visa profits from its monopoly by collecting a higher fraction of each debit transaction than it would if it faced competition. Visa's schemes are largely invisible to consumers, in part because its debit transaction fees make up a relatively small fraction of each transaction, but total to billions of dollars annually. Collectively, however, Visa's systematic efforts to limit competition for debit transactions have resulted in significant additional fees imposed on American consumers and businesses and slowed innovation in the debit payments ecosystem.

As Visa's internal documents make clear, Visa feared a future where newer, better, or cheaper alternatives would force Visa to compete harder to win customers' business or, worse, displace Visa with alternatives to its debit network. Without intervention, Visa will continue to insulate itself from competition and subvert the competitive process in this essential industry that fuels U.S. commerce, all the while enriching itself at the expense of the American people who ultimately bear the brunt of Visa's unlawful monopoly and the lack of competition its conduct has wrought.

## II.    NATURE OF THE CASE

1.    Americans use their debit cards billions of times every year to buy goods and services from merchants. Debit cards comprise an increasingly large percentage of all transactions between consumers and merchants. Consumers can use their cards for purchases at brick-and-mortar stores (**card-present** or **CP** transactions) and online (**card-not-present** or **CNP** transactions).

2.    Debit transactions include several actors, including the consumers seeking to use their debit card to make a payment, merchants who accept debit, and their respective banks.

3.    For all of these debit transactions to work, the consumer's bank must connect to the merchant's bank. Over the entire economy, that means thousands of banks on the consumer side must communicate with all of the banks on the merchant side.

4.    For a debit network to process a transaction, both the bank issuing the card to the consumer (the **issuing bank** or **issuer**) and the merchant's bank that acquires the payment (the **acquiring bank** or **acquirer**) must be part of the network. Issuers decide which networks to place on their debit cards, while merchants decide which networks they will accept and which they will choose to use for a given transaction. A network can compete for a transaction only if it connects to both the issuer and the acquirer.

5.    As a result, debit networks face what Visa calls "a chicken-and-egg problem." To be successful, the network needs many issuers and acquirers to accept the network. But issuers are unlikely to join the debit network unless many merchants already use the network. And merchants are unlikely to join the network unless their customers have cards that work with the network, which requires the issuer to have activated the network. As Visa itself observes, "build[ing] scale on both sides. . . with consumers/payers and with merchants/payees" is "a

6

herculean task." Visa further recognizes that these effects create "an enormous moat" around its business.

6.      Visa's market shares demonstrate just how deep that moat is. Visa has been the largest debit network in the United States for decades. Today, over 60% of all U.S. debit transactions run via Visa's payments network. And Visa's share of card-not-present debit transactions exceeds 65%. Mastercard is a distant second, processing less than 25% of all U.S. debit transactions and card-not-present U.S. debit transactions. Other networks, known as "**PIN networks**" because they originally facilitated ATM transactions for which accountholders needed to enter a PIN, are significantly smaller.

7.      This moat is no accident. Coming out of the Great Recession, Visa identified two significant threats to its monopoly—one from legislation and one from emerging technology. Visa took steps to counter both, enriching itself handsomely in the process.

8.      In 2010, Congress passed the **Durbin Amendment**, which became law as part of the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). The Durbin Amendment requires issuing banks to include at least two debit networks on every debit card—one on the front of the card and at least one on the back of the card—that are not affiliated with each other (known as the **front-of-card** and **back-of-card** networks, respectively). This requirement would help promote competition in the debit industry by providing more merchant choice for debit routing.

9.      Visa understood the competitive threat this development created. If banks connected more cards to rival debit networks, Visa feared this could create a "tipping point" that would result in its smaller rival debit networks gaining the scale they need to compete, which would cause Visa to lose substantial volume, and therefore, fees. Indeed, in 2012, after the

Durbin Amendment became effective, Visa initially lost volume to other debit networks that offered lower fees. If this trend had continued—that is, if competition had continued to grow—Visa likely would have lost its dominant position and power. But instead, Visa used its dominant position in the debit market to limit competition.

10.     There are a substantial number of debit transactions that Visa owns outright without facing any competition. Such transactions are **non-contestable** by rival networks. For a number of reasons, Visa may be the only network available for both the merchant and issuer to use for these transactions. For these non-contestable transactions, Visa does not face meaningful competitive constraints and can threaten merchants with high rates that merchants would have to accept.

11.     But for the rest of the transactions, the merchants that sell to consumers could choose between Visa and alternative debit networks enabled by the accountholder's bank. The forces of competition from those other networks should in turn lower fees and spur innovation. Visa knows, however, that its significant volume of non-contestable transactions gives it leverage to subvert the forces of competition. These non-contestable transactions are necessary and valuable to the merchants.

12.     Visa offers a modern-day Hobson's choice. Visa leverages its control over non-contestable transactions and extracts routing deals that limit competition for contestable transactions. Absent a routing agreement, the merchant or acquirer pays a list price (known in the industry as the **rack rate**) on any transaction that is routed to Visa's debit network. Alternatively, the merchant (or acquirer) signs an agreement with Visa and receives a so-called "discount" on all transactions, both non-contestable and contestable. Visa threatens punitive rack rates if merchants (or their acquirers) route a meaningful share of their transactions to Visa's

competitors. Other debit networks cannot compete for non-contestable transactions as they often struggle to compete for any meaningful share of transactions involving a merchant subject to a Visa routing deal. And merchants suffer if they do not accept Visa's agreement.

13.     In 2014, Visa told its Board of Directors that these routing deals with the largest issuers and acquirers allow Visa "to stabilize [its] volume." Visa's routing contracts cover more than 180 of its largest merchants and acquirers, and effectively insulates at least 75% of Visa's debit volume from competition—which means that Visa has foreclosed nearly half of total U.S. debit volume. Internally, Visa touts the success of its routing deals in limiting competition. Visa renewed many of its routing agreements in 2022 to deepen its debit moat for years to come.

14.     In addition to frustrating the goal of the Durbin Amendment, Visa took steps to insulate itself from competition from emerging technologies. Visa recognized how innovative technologies could develop new ways for consumers to make debit payments and topple Visa's control of debit transactions. Visa knew that several digital platforms, including Apple, PayPal, and Square, have large existing networks that connect merchants and consumers, and offer payment products to consumers. Consumers value the payment products offered by these digital platforms, which allow consumers to link their debit card credentials to Apple Pay, PayPal, Cash App or other payment products, and make purchases in more convenient and efficient ways.

15.     Visa feared that these digital platforms may have "network ambitions," and might seek to eliminate Visa and other debit networks as links between consumers and merchants for debit transactions. Visa saw Apple Pay, for an example, as an "existential threat" to its debit business.

16.     Recognizing the threat they posed, Visa's strategy has been to "partner with emerging players before they become disruptors." To do so, Visa structures its deals with

potential competitors to dissuade them from competing. Visa offers lucrative incentives, sometimes worth hundreds of millions of dollars annually, to these potential competitors under the express condition that they do not develop a competing product or compete in ways that could threaten Visa's dominance. In addition to the carrot of these incentives, Visa has also threatened to use the stick of additional fees to dissuade their potential competitors' innovation—if they develop competing products.

17.    Through this anticompetitive conduct, Visa has harmed competition in the relevant debit markets in at least three ways.

18.    First, Visa takes advantage of its must-have status to exercise its monopoly power and deny a level playing field for its rivals and deprive them of scale. Visa is capable of this conduct because Visa-branded cards comprise a large portion of all U.S. debit cards. Further, merchants must use Visa's network for a significant number of non-contestable transactions.

19.    Second, Visa's conduct forecloses competition in a substantial portion of the relevant debit markets—at least 45% of all U.S. debit transactions and over 55% of card-not-present debit transactions.

20.    Visa's conduct subverts the competitive process. Visa deprives its smaller rivals of the scale they need to compete effectively on both price and quality. Networks need scale on both the issuer and merchant sides of the market to compete effectively; the lack of scale on one side makes it hard to build scale on the other. Visa's agreements with issuers on the one hand and merchants and acquirers on the other exacerbate its rivals' scale problems on both sides of the market. Today, the non-Visa/Mastercard-owned networks collectively represent only about 11% of all debit transactions and only about 5% of card-not-present debit transactions.

21.     Third, Visa has already secured commitments from several large would-be competitors that they would not unveil products that could threaten Visa's dominance. Rather than engage in fulsome competition, Visa's agreements with these companies, including Apple, PayPal, and Square, have succeeded in transforming these potential competitors into partners to the detriment of competition from those would-be rivals and Visa's own incentives to innovate, and at the expense of American consumers and American merchants of all sizes.

22.     Visa's actions deny Americans the benefits of competitive markets for debit transactions. Visa, one of the most profitable companies in the United States, has succeeded so thoroughly in insulating itself from competition that it is now earning outsized profit margins from its role as a dominant intermediary—a digital middleman—at the center of the debit transaction market. American merchants large and small ultimately pay much of these fees. In turn, they may raise prices to consumers or may absorb the cost by offering fewer products or lower quality. Issuers are also subject to Visa fees and may pass them through to consumers. Regardless of who pays Visa's supracompetitive prices in the short term, over the long run, these tolls are ultimately borne by the American consumer, American merchants, and the broader economy.

23.     Plaintiff United States of America brings this action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, to put a stop to Visa's exclusionary and anticompetitive schemes, unfetter the markets of Visa's unlawful monopoly, remedy the harm Visa has caused, deny Visa the fruits of its statutory violations, and prevent the recurrence of these violations of in the future.

## III. DEBIT TRANSACTIONS

24. Debit transactions are a kind of financial transaction whereby funds are drawn directly from a consumer's bank account to pay a merchant for goods or services. Consumers can use debit transactions in various ways, including to buy goods at retailers or to pay bills online.

25. Debit cards have existed in the United States since the 1960s, when banks began to innovate ways for their customers to access funds in their bank accounts. Automated teller machines (**ATMs**) allowed consumers to withdraw those funds with a debit card that was issued by the consumer's bank. Over time, some debit cards began to support purchases at retailers. Debit cards gained wider adoption by the 1990s when merchant acceptance of debit grew, and consumers demanded more convenient alternatives to cash and checks to withdraw money from their bank accounts. Over time, consumers increasingly favored debit transactions for their convenience and security, and retailers increasingly accepted them, leading debit card usage to grow substantially in the United States.

26. Today, debit transactions are an important and popular payment method within the U.S. financial system. Unlike most other kinds of financial transactions, debit transactions immediately authorize the deduction of funds from a consumer's bank account balance.

27. Tens of millions of Americans prefer to use or must rely on debit to pay for online and in-person purchases. This is despite the fact that accountholders rarely earn rewards when using their debit cards, unlike when they use credit cards. Consumers who prefer debit include those who do not want to use or are unable to obtain credit cards; those who have limited credit available to them; those who prefer to avoid the lending dynamics of a credit card (e.g., the risk of debt accumulation, credit card fees, and charged interest); those who prefer the spending

discipline of using only funds that are available in their bank account; and those that prefer the convenience of debit over cash and checks.

### A. Overview of Debit Transactions

28.     Debit is a way for consumers to purchase goods and services from merchants using a number directly tied to their bank accounts.

29.     Debit transactions are made possible by debit networks, the technological and communications infrastructure that facilitates secure, real-time payment transactions between and among businesses, merchants, and consumers from their respective bank accounts.

30.     In the United States, the most common way consumers make debit purchases is by using a general purpose debit card issued by their banks. As defined in Section VII *infra*, **general purpose** means that the debit card can be accepted at numerous, unrelated merchants. Visa, like most other debit networks, does not issue these general purpose debit cards to accountholders. Instead, debit networks like Visa typically contract with the consumer's bank (referred to as the issuing bank or issuer[1]) to issue the debit cards. Debit networks like Visa typically contract with the merchants' banks (referred to as the acquiring bank or acquirer[2]) so that merchants can accept debit cards. Debit networks are the way that thousands of issuers on the one hand connect with each of the acquirers and their millions of merchants on the other hand.

31.     The debit network's product is simple. It includes a debit credential or other account identifier unique to the consumer that can be accepted at all merchants that participate in

---

[1] The issuing bank may work with an issuer processor, which connects the issuer with the network and provides various services such as managing card issuance, authorizing or declining transaction, and communicating with settlement entities. For ease of reference, the use of the term issuer refers to both issuing banks and issuer processors.

[2] The acquiring bank may work with an acquirer processor, which sends transaction information to the network on behalf of the acquirer. For ease of reference, the use of the term acquirer refers to both acquiring banks and acquirer processors.

the network, payment guarantees for the merchant, the ability for a consumer or her bank to dispute and chargeback the transaction, fraud protections to all parties, and the "**rail**" or methods by which the merchants' and consumers' banks communicate between each other to facilitate the transaction and the transfer of funds.

32.     Notably, banks rather than debit networks ultimately move money from consumers to merchants. But debit networks play an important role in the process: they clear and oversee the interbank settlement process by aggregating all transactions each day for each bank in their systems, netting out applicable fees, and providing banks with daily settlement reports. These settlement reports are used by the banks to transfer funds among themselves, typically using a wire service available only to banks.

33.     Debit networks also set the rules for transactions flowing through the network. As the largest debit card network in the United States, Visa leverages its intermediary role not only to set rules for transactions on its own network but also to influence the rules for all other debit networks.

34.     Debit cards can be used in-person or online to make purchases from money in the consumer's bank account using a debit card credential. As illustrated in Figure 1 below, debit card credentials include several pieces of information: a 16-digit card number (known as the debit card number) that is usually found on the front of the debit card and other security features such as the expiration date, card verification value (CVV), an EMV security chip, and a four-digit PIN. The card will also graphically identify the "front-of-card" and may graphically identify the "back-of-card" networks. As further described herein, while debit cards may be enabled to process transactions over multiple networks, today, few include more than two

unaffiliated networks: the front-of-card network and one back-of-card network unaffiliated with the front-of-card network.

**Figure 1**

**FRONT OF CARD**



**BACK OF CARD**



35.     A debit transaction starts when a consumer presents his debit credentials to a merchant to pay for a purchase. First, the merchant sends a request to its acquirer. Theoretically, the merchant has a choice to use the front-of-card network (which is Visa for approximately 70% of debit card payment volume) or a back-of-card network. But as discussed *infra*, this choice is illusory —merely theoretical—and the merchant's routing decision defaults to Visa due to Visa's exclusionary and anticompetitive conduct. In all events, the merchant's bank (the acquirer) sends the consumer's account and transaction information to a debit network (e.g., Visa) to process the transaction for authorization, clearing, and settlement. The debit network, in turn, requests authorization from the consumer's bank (the issuer) to approve the transaction. The issuer will typically authorize the transaction if the consumer has a sufficient account balance to fund the

transaction and, in many cases, there are no indications of fraud. If the transaction is authorized, the issuer places a hold on the consumer's funds and sends the authorization response back over the debit network to the acquirer, minus the **interchange fee** (a fee paid by the acquirer to the issuer). In the final step, the acquirer transmits the authorization response to the merchant, allowing the merchant to complete the transaction. At the same time, Visa collects a myriad of fees from the tens of billions of debit transactions that happen each year.

**Figure 2**



36.     For most debit card transactions, this process happens in a matter of seconds, which allows debit cards to facilitate transactions between accountholders and merchants efficiently. American consumers are often unaware of how money is allocated among merchants, debit networks, processors, and financial institutions that participate in these transactions.

37.     There are slight differences in the mechanics of debit transactions depending on whether the debit card is physically present. Using debit in person at a merchant is referred to as a card-present transaction. If a consumer uses a debit credential on a website, in an app, or over the phone, the transaction is referred to as a card-not-present transaction. Today, card-not-present debit transactions make up about half of all debit spending, a dramatic increase since 2010. This

number is growing. For card-not-present transactions, the accountholder either manually enters her debit credentials or relies on debit credentials stored in a digital wallet, such as Google Pay, Apple Pay, or PayPal. Unlike card-present transactions, for card-not-present transactions, merchants can almost never prompt consumers to enter a PIN. Instead, security features, such as multi-factor authentication, help improve the security of card-not-present transactions.

## B.   Debit Networks

### 1.   Issuers Select Which Networks Are Enabled on a Debit Card

38.    In the United States, debit cards typically must have at least two debit networks: a front-of-card network and at least one back-of-card network that is unaffiliated with the front-of-card network. Issuers (consumers' banks) select one front-of-card network and choose which back-of-card networks to enable. The front-of-card networks' branding is typically displayed on the debit card (in addition to the issuer's branding). The branding of the back-of-card networks may not appear on the debit card.

39.    As a practical matter, a consumer's debit network is frequently selected for her— by the bank where she opens her checking account.

40.    Visa is the dominant front-of-card network, Mastercard is the distant second front-of-card network, and two much smaller players account for the remainder. Issuers rarely change their front-of-card network due, in part, to significant switching costs, such as the costs of re-issuing new debit cards to accountholders. Visa has secured long-term contracts with many issuers. Visa knows that Mastercard and other debit networks have little opportunity to displace Visa as the front-of-card network for those banks.

41.    Visa-branded debit cards (cards that feature Visa on the front of the card) will often include Interlink, Visa's back-of-card network, and at least one additional back-of-card

network that is not affiliated with Visa. Examples of such unaffiliated back-of-card networks include Mastercard's Maestro or a smaller debit network such as STAR, NYCE, or Pulse. These smaller debit networks are sometimes referred to as PIN networks due to their growth from ATM networks where an accountholder would enter their four-digit PIN to withdraw cash funds. Mastercard-branded debit cards typically include Maestro and at least one additional back-of-card network that is unaffiliated with Mastercard.

42.     Issuers decide whether to enable the back-of-card networks to process particular debit transactions on the issuers' debit cards. For example, issuers may not enable back-of-card networks, for a card-present transaction where a PIN was not entered. As discussed in Section IV *infra*, despite their presence on many debit cards, PIN networks have been unable to gain a meaningful share of debit transactions, in part due to Visa's exclusionary and anticompetitive conduct.

## 2.     How Debit Networks Get Paid

43.     Bank accountholders do not pay debit networks directly to use their payment networks. To make money, debit networks like Visa impose network fees on both issuers and acquirers for every debit transaction. As a general matter, there are two types of acquirer fees: per-transaction fees and fixed fees. The merchant's acquirer pays Visa a **network fee** for each transaction on Visa's network. The amount of the network fee varies based on the type of transaction, such as whether the accountholder enters a PIN or whether it is a card-present or card-not-present transaction. Starting in 2012, Visa also began charging each merchant's acquirer a fixed monthly fee, known as the **Fixed Acquirer Network Fee (FANF)**, based on factors like the number of locations operated by the merchant and the volume of the merchant's card-not-present transactions.

44. In addition, the acquirer also pays a per-transaction fee to the issuer—known as an interchange fee—that is payment to the issuer for its services. For the largest issuing banks with $10 billion or more in assets, the interchange fee amount is capped by the Federal Reserve. For smaller issuers, the debit network (e.g., Visa) sets the amount of the interchange fee.

45. The acquirer's customer, the merchant, ultimately pays at least some of the fees incurred by the acquirer. The merchant also pays a fee to the acquirer for the acquirer's services. For most transactions, Visa's network fees are significantly higher than those of the PIN networks.

### 3. U.S. Debit Network Evolution Helped Visa Obtain Dominance

46. Beginning in the 1960s, the first debit networks in the United States started as ATM networks. Banks issued ATM cards to their accountholders so they could easily withdraw funds from their accounts. To use these cards, accountholders could enter a 4-digit number (known as the **PIN**) at an unattended ATM rather than approach the bank's counter to provide a signature.

47. Merchants appreciated the elimination of checks and started installing PIN pads to enable more accountholders to use their ATM cards at the point of sale. Accountholders also became more comfortable carrying a physical card for purchases. With increased enablement across cities and geographic regions, these ATM networks, including STAR, NYCE, and Pulse, evolved to become the PIN networks.

48. Only later, after the first introduction of ATM cards, did Visa and Mastercard began to build their front-of-card debit products off of their dominant credit card infrastructure. As debit emerged, Visa and Mastercard were each joint ventures owned and controlled exclusively by their member banks, which comprised virtually all U.S. banks. Visa leveraged the

scale afforded by its member banks to jump start its debit business. When Visa launched its point-of-sale debit product, the Visa Check Card, in the 1990s, it was quickly able to scale among its member banks, which issued debit cards with the Visa logo. Unlike the PIN networks, which processed debit cards over rails designed for ATM networks, Visa processed accountholders' debit purchases over Visa's existing credit card rails. Visa and Mastercard already had access to an existing base of merchants who accepted Visa and Mastercard credit cards. This eased the way for Visa and Mastercard to roll out widely usable debit cards, especially as Visa's network rules initially mandated merchants accept both its credit and debit products. By working with issuers to add Visa's credit processing infrastructure to the issuers' installed base of ATM cards, Visa was able to quickly scale its debit offering.

49.     Visa's and Mastercard's relationships with their respective issuers were exclusive until the early 2000s, each prohibiting their issuers from issuing American Express or Discover-branded credit and debit cards thereby impairing the growth of these smaller networks. The Second Circuit found those restrictions were illegal under the antitrust laws and affirmed the district court's injunction against them in 2003, and shortly thereafter Visa and Mastercard settled private litigation and agreed to allow merchants to have the ability to accept their debit cards without accepting their credit cards, and vice versa. But Visa's dominance had already been cemented.

50.     Between 2006 and 2008, both Visa and Mastercard became independent public corporations, though banks continued to own significant stock in each of them. Although banks were now free to choose to issue a mix of Visa-branded debit cards and other cards featuring different networks, most banks chose to issue only Visa-branded debit cards or only Mastercard-branded debit cards, with the two competing with each other for front-of-card placement. It was

challenging for Visa or Mastercard to displace the other as a bank's chosen front-of-card network, due to the expense and difficulty of issuing new cards to all accountholders. It was also rare for any network other than Visa or Mastercard to win front-of-card placement because of the large base of merchant acceptance; other networks did not have the same scale of existing merchant relationships. Banks often chose to feature only one network—the front-of-card network—on debits cards they issued, meaning that merchants could not choose any network other than the front-of-card network for routing a particular transaction.

51.     That practice ended for issuers of Visa and Mastercard debit cards in 2012 after Congress passed the Durbin Amendment. The Durbin Amendment required each debit card to support at least two unaffiliated networks. In other words, issuers had to enable at least one unaffiliated back-of-card debit network as a competitor to the front-of-card brand (i.e., Visa or Mastercard), somewhat improving routing choice for many merchants accepting debit.

52.     The Durbin Amendment also set maximum limits on the interchange fees that merchants and their banks pay **regulated issuers** (banks with more than $10 billion in assets) for every debit transaction. The interchange cap has a no-evasion rule, which limits a network's ability to provide incentives to issuers by paying them more than the cap. These limits on incentives made it even more challenging for Mastercard or other networks to win front-of-card placement where Visa was the incumbent network because they often could not fully compensate the issuer for its switching costs.

53.     Today, Visa is the largest debit card network in the United States. It eclipses its smaller rival Mastercard, which has not been able to gain significant share from Visa or restrain Visa's monopoly. Visa is the front-of-card brand for over 70% of the debit card payment volume in the United States. Mastercard, by contrast, is the front-of-card brand for around 25% of debit

card payment volume, with American Express and Discover comprising the front-of-card brand on a much smaller number of debit cards. As Visa's former Head of Product North America has explained, Visa has "dominance on the front of card."

### 4. PIN Networks Lack Scale and Meaningful Opportunities to Compete for Debit Transactions

54. For a debit network to have a chance to win a transaction, it must be placed by the issuer somewhere on the debit card it issues. Even if a network is on a card, it may be ineligible for certain transaction types unless each party to the transaction—the issuer, the acquirer, and the merchant itself—has enabled the debit network to process the particular transaction type.

55. To compete effectively, however, a debit network also needs sufficient scale on both the issuer and merchant sides of the debit market. The desirability and effectiveness of a debit network depends on the breadth of its acceptance and enablement by all the network participants—accountholders, issuers, acquirers, and merchants. For example, the more issuers that place a network on a card, and therefore, the more accountholders who may present the debit network for payment, the more likely it is that merchants will accept the network, and vice versa. This feedback loop is known as **network effects**. For Visa, this is not a problem: it is the default routing option when Visa is the brand on the front of the debit card. As described earlier, however, a Visa executive has recognized that for smaller PIN networks and potential competitors, building scale on both sides of the market can be a "herculean task."

56. Despite their smaller size, PIN networks have continued to innovate. While still referred to in the industry as "PIN" networks, they have since developed capabilities to process debit transactions without requiring a consumer to enter a PIN (referred to as **PINless** debit transactions). While PIN networks require PIN entry after consumers swipe or tap their cards,

PINless technology allows these networks to process card-not-present transactions, such as online purchases, and in-person transactions in which the consumer does not enter a PIN.

57.     Despite these investments, Visa imposes contractual rules and terms in its merchant and acquirer agreements that, as a practical matter, require merchants to route the vast majority of their debit transactions to Visa, rather than back-of-card networks, which include the PIN networks, none of which has double-digit market share, and Mastercard's Maestro. Visa's dominance, its exclusionary rules, and the small size of the PIN networks mean that each PIN network can compete for only a tiny fraction of all debit transactions. Visa's contracts with merchants and acquirers lock up volume, depriving rivals of scale and limiting routing choices artificially.

58.     Some transactions must be routed to Visa and are not available to its back-of-card competitors under any circumstances. These transactions are non-contestable because those back-of-card networks are not available for particular transaction types, such as transactions over a certain dollar amount or transactions that fail to meet particular encryption criteria. Card-present transactions may be non-contestable if the issuer does not allow the network to process card-present PINless transactions and the network's PIN option is unavailable because the merchant chooses not to prompt customers to enter a PIN. Moreover, acquirers may not enable smaller PIN networks. Card-not-present transactions may be effectively non-contestable if they are tokenized, an encryption technology used to facilitate some Visa-branded debit card transactions initiated online, in a mobile app, or with a digital wallet. Indeed, only a tiny fraction of card-not-present tokenized transactions were routed over an unaffiliated networks' rails in 2023. Non-contestable transactions comprise a significant percentage of Visa-branded debit card transactions. This is in part due to issuers historically not enabling card-not-present PINless

transactions—at times at Visa's prompting—which had deterred merchants and acquirers from enabling card-not-present PINless acceptance.

59.      Merchants feel they must accept Visa or they will lose a substantial number of sales and consumers. Because of the large number of consumers using Visa-branded cards, nearly all merchants must accept Visa, which in turn requires nearly all merchants to route at least the non-contestable transactions to Visa instead of the often less costly back-of-card networks.

### 5.    Alternative Debit Networks

60.      Although debit cards are the most common way to make a debit purchase in the United States, other options exist. Other ways to make a debit purchase include alternative rails developed by fintech firms (hereinafter **fintech debit**).

61.      A fintech debit network can facilitate consumer-to-merchant payments by providing end-to-end functionality equivalent to debit card networks: it authorizes payment from a consumer's bank account, facilitates communications with the consumer's bank to authorize and clear the transaction, and provides settlement services by initiating a payment to the merchant's financial institution. Alternative debit networks can complete this final transfer of funds using money transfer services available to banks, such as the **Automated Clearing House (ACH)** or **Real Time Payment (RTP)** networks, which are lower-cost alternatives to Visa's debit offering.

62.      Visa recognizes that accountholders may one day remove Visa from its privileged place as the dominant middleman between their bank account and the merchant. By combining real-time money transfers with additional services—such as a credential that can be used at merchants that are members of the network, payment guarantees, dispute capabilities, chargeback

capability, and fraud protection—the alternative debit networks could provide equivalent functionality to debit card networks like Visa's. Visa's internal documents make clear that Visa fears a world in which alternative debit networks mature and potentially take hold if fintechs choose to pursue their "network ambitions."

## IV.    VISA SYSTEMATICALLY DOMINATES DEBIT TRANSACTIONS IN THE UNITED STATES THROUGH EXCLUSIONARY AND ANTICOMPETITIVE CONDUCT

### A.    Visa Has Been the Largest, Most Powerful Debit Network for Over a Decade

63.    Visa is one of the most profitable companies in the United States, with global operating income of $18.8 billion and an operating margin of 64% in 2022. North America is among Visa's most profitable regions, with 2022 operating margins of 83%.

64.    Visa's U.S. debit business is its largest source of revenue globally. Visa charges over $7 billion in network fees on U.S. debit volume annually, earning Visa $5.6 billion in net revenue. In 2022, Visa earned more revenue from its U.S. debit business than from its U.S. credit business, and more from its debit business in the United States than its debit business in any other region in the world.

65.    Visa's incremental cost of each additional transaction on the Visa network is "approximately zero." As Visa's former CFO put it, "the incremental transaction comes with little incremental cost." Moreover, Visa bears no financial risk for fraud. If someone uses a stolen debit card to run up fraudulent purchases, for example, the merchant or the issuer bears the financial risk—never Visa.

66.    Despite regulatory changes, the rise of e-commerce and mobile payments, the introduction of new technology, and an underlying product that is "increasingly viewed as a commodity," Visa's high share of debit transactions has hardly budged in years. Visa's rails still carry over 60% of all debit transactions and 65% of all card-not-present debit transactions in the

United States while imposing supracompetitive prices, stabilizing prices, and depressing price competition.

67.     Visa is the front-of-card brand for over 70% of the debit card payment volume in the United States. It is nearly three times the size of Mastercard, its next biggest rival, which is the front-of-card brand for around 25% of debit card payment volume. No other competitor has more than a single-digit share of front-of-card debit card payment volume. As Visa's former Head of Product North America has explained, Visa has "dominance on the front of card."

68.     The fees Visa charges to issuers tend to be smaller than those it charges to acquirers. Issuers may avoid higher fees in exchange for taking actions that benefit Visa, as further described in Section III.

69.     Visa maintains its monopoly in debit both by preventing competitors from gaining the necessary scale to challenge Visa and by co-opting would-be competitors. Visa preserves its monopoly position against its smaller competitors by making it harder for them to develop scale on both sides of the debit market: (1) merchants and their acquirers and (2) accountholders and their issuers. For merchants and acquirers, Visa locks up their debit volume with *de facto* exclusive deals that have the practical and economic effect of requiring exclusive routing. For issuers, Visa pays them not to take actions that would make it possible for merchants and acquirers to route to Visa's rival PIN networks, such as enabling PINless routing. Broader issuer enablement would reduce Visa's leverage, make more transactions contestable by rival PIN networks and, potentially, cause a tipping point for broader merchant enablement. For potential competitors, such as digital platforms that contract with Visa, Visa requires or induces them to agree not to introduce or support innovative alternatives to Visa's traditional card-based debit rails. The price of not signing a contract is high—Visa imposes onerous penalties. Those high

penalties ensure that virtually all these merchants, acquirers, issuers, and digital platforms choose the deal with Visa.

### B.    Visa Entered into a Web of Contracts to Hinder PIN Networks from Competing

70.    Visa's dominance today is the result of a meticulous strategy to lock up debit volume to prevent competition at the point-of-sale. It is not an accidental historical artifact of its large size or the result of competition on the merits, but instead the result of deliberate efforts. Visa's efforts effectively forestall competition from smaller debit networks (e.g., PIN networks) and thwart government regulation implemented over a decade ago, which Visa has seen as threats to its dominance.

71.    This regulatory threat to Visa was the Durbin Amendment, which took effect in 2012. The Durbin Amendment sought to facilitate a minimum level of competition in a debit system that had historically limited the choices of accountholders and merchants. The Durbin Amendment attempted to foster competition by requiring all debit cards to support at least two unaffiliated networks. In 2023, the **Regulation II** clarification adopted by the Federal Reserve took effect, which sought to further promote debit competition and clarified that at least one network unaffiliated with the front-of-card network on each card must be enabled for card-not-present transactions.

72.    In the years immediately following the passage of the Durbin Amendment, Visa recognized that PIN networks, "outspoken merchants," and other industry participants would use the legislation to shift share away from Visa. According to its internal documents, Visa knew it needed to act "quic[k]ly and decisively."

73.    Visa responded to the Durbin Amendment by exploiting others' dependence on Visa for certain transactions. Despite Congress's efforts to facilitate competition, Visa

understood that not all debit transactions can be routed to at least two unaffiliated networks. Even with Durbin's requirement for at least two unaffiliated networks on each debit card, Visa has estimated that roughly 45% of Visa card-present transactions are non-contestable. For card-not-present transactions, the numbers are even higher. Merchants and acquirers frequently have only one option for routing a debit transaction: the front-of-card network, which on over 70% of debit card payment volume means Visa. These captive transactions give Visa the power to demand and enforce significant volume commitments.

74.     Visa employs two reenforcing approaches to obtain the volume commitments. First, it shares its monopoly profits to buy exclusivity. Second, Visa both charges punitively expensive rack rates (listed pricing for network fees and interchange), which are divorced from Visa's incremental costs, to merchants or acquirers that refuse to sign routing agreements and includes harsh penalties in its contracts with merchants and acquirers who do sign its agreements but fail to achieve the exclusivity requirements.

### 1. Visa's Contracts with Merchants and Acquirers Unlawfully Inhibit Competition and Stifle Innovation

75.     Most merchants face staggering financial penalties each year unless they route all or nearly all eligible debit transactions to Visa, hindering PIN networks' ability to compete and frustrating one of the objectives of the Durbin Amendment. Visa ensures that most merchants who route more than a small percentage of eligible debit transactions to alternative networks will face higher fees on the non-contestable transactions.

76.     Visa has signed routing contracts both directly with many large merchants and with acquirers that control the routing decisions for merchants that do not have a direct agreement with Visa. Visa pays for their loyalty and imposes harsh penalties if merchants and acquirers fall short. Visa sometimes structures its contracts with merchants as a bid for a top

position on the routing table—a ranked list that determines which network a given debit transaction should be routed to, given the options available on the debit card used in the transaction. Absent a commitment to grant Visa the number one position or other high placement on the routing table, Visa threatens to charge the merchant high rack rates on all transactions routed to Visa. This is effectively a cliff pricing structure, where meaningfully routing away from Visa is yet again punished by the imposition of high rack rates. Dozens of merchants representing hundreds of billions of dollars of 2023 debit payment volume have signed contracts to route 100% of their eligible debit volume to Visa. For example, in 2023, Visa paid one large merchant over $20 million for exclusivity. While Visa's contracts with merchants and acquirers include varying pricing terms, one almost universal constant is that the routing contracts contain significant volume commitments.

77.    Visa structures its routing contracts, in combination with its posted rack rates (i.e., list prices), to artificially increase the cost merchants and acquirers face if they route transactions to a Visa competitor. In addition, in many routing contracts, failure to comply with Visa's volume requirements allows Visa to terminate the entire contract early and claw back as early termination fees incentives that Visa had previously paid the merchant. Terminating the routing contract may impact all the routing partner's Visa payments volume, both debit and credit: certain network fees covered by these contracts apply to both credit and debit transactions, and Visa sometimes uses credit interchange discounts to win debit routing.

78.    Visa's routing contracts artificially increase the cost merchants and acquirers face if they route transactions to a Visa competitor. Visa's volume requirements are structured as cliff pricing. **Cliff pricing** (sometimes called "all unit" pricing) grants the merchant or acquirer a lower price for every transaction routed to Visa so long as its total volume of transactions

exceeds the committed threshold. If the merchant does not meet the commitment, Visa will impose its high rack rates on all transactions routed to Visa. Visa insists on cliff pricing to discourage merchants from routing to Visa's competitors, denying them scale. In other words, merchants and acquirers that make a routing commitment to Visa receive substantial network fee, interchange, and cash concessions, but *only if* they meet their volume commitments. Absent qualification under limited safe harbors, any shortfall, even one as small as 0.01% of a merchant's volume, gives Visa the right to impose significant monetary penalties on *all* the merchant's Visa debit transactions (not just the marginal transactions). Each penalty imposed by Visa would be an additional cost to routing away from Visa.

79.     Merchants and acquirers are willing to accept *de facto* exclusive deals with Visa because they have a substantial number of debit transactions that they cannot route to any other network—these are non-contestable transactions. The merchant has only two choices: either (1) agree to exclusivity with Visa or (2) pay Visa's supracompetitive rack rates for non-contestable transactions and try to route its contestable transactions to Visa's competitors. Visa's rack rates are frequently higher than the PIN networks' rack rates. Yet if merchants want to secure better rates from Visa, they typically need to route all or almost all their Visa-eligible debit volume over Visa rails. Most of Visa's volume commitments are significant, with a minimum threshold of 90–100% of the merchant's or acquirer's eligible Visa volume. Thus, Visa leverages merchants' lack of choice for the non-contestable transactions to secure volume for additional transactions at higher rates than it would be able to secure in a competitive market.

80.     Consider a hypothetical fast-food restaurant that has a Visa routing commitment with a cliff pricing structure. During a typical day, the restaurant has one hundred customers who present Visa-branded debit cards, all with the same back-of-card network. Fifty of those

customers order online in card-not-present transactions—these transactions may be contestable by the back-of-card network. The other fifty customers present Visa-branded debit cards in person. Their cards are not enabled by the issuer for card-present PINless transactions on the back-of-card network and the customers do not enter a PIN when prompted to do so at the payment terminal. These fifty transactions from customers presenting their cards in the restaurant are non-contestable.

81.     Under the terms of its Visa routing agreement, the merchant can avoid Visa's high rack rates on the fifty non-contestable transactions, but only if it routes all one hundred transactions to Visa. If Visa's rack rate for these transactions is $0.50 per transaction and its rate for all one hundred transactions is $0.25 per transaction, then the merchant would either pay $0.50 times 50 non-contestable transactions (totaling $25 plus any PIN network fees paid on the 50 contested transactions) or $0.25 times 100 transactions (totaling $25). This example illustrates how a smaller PIN network could only compete for the fifty contestable transactions if it agreed to route the transactions for free, which compensates the merchant for the penalties incurred on the non-contestable transactions. This is because the price for contestable transactions increases dramatically in a "cliff" fashion if the target is not met and rack rates are imposed. In this example, the restaurant pays Visa either $25 to send all of the transactions to Visa or, if it does not meet the volume requirements of its Visa routing agreement, the cliff pricing is imposed and the restaurant pays at least $25 to Visa plus whatever it would owe to the back-of-card network for any transactions it routes away from Visa. PIN networks generally cannot route for free so the cliff pricing structure has the practical effect of forcing merchants into *de facto* exclusive dealing relationships with Visa for the vast majority of their volume of Visa-branded debit card transactions.

82.     Even some acquirer processors that operate rival PIN networks have agreed to exclusive routing deals with Visa. Visa has provided incentives in exchange for volume commitments from such acquirers. Visa's payments disincentivize these competitors from using their own networks to vigorously compete.

83.     As a result of Visa's cliff pricing, for a PIN network to win a meaningful set of transactions away from Visa, it must do two things. First, the PIN network must offer a better per-transaction price than Visa. Second, and more significantly, the PIN network must also compensate the merchant for the penalty Visa will impose on all the transactions the merchant still has to route to Visa, which is larger than the set of transactions for which the PIN network can compete. To compensate some merchants for the loss of Visa incentives on Visa-eligible debit transactions, the PIN network may have to offer zero or negative per-transaction prices. These penalties reflect significant and cost-prohibitive barriers to expansion for the PIN networks.

84.     When discussing potentially lowering debit prices, one Visa executive advised against it, noting that Visa has such a large number of "uncontested" transactions that the "P&L would be hammered. . . . And if you lower the price, there is nothing to put in a routing deal, merchant gets it by default with no commitment." Rather than competing on the merits, Visa chose to keep its penalty prices high so it could insulate its supracompetitive profits by creating a web of deals to foreclose rivals.

85.     To secure even more debit routing exclusivity, Visa sometimes prices other products, such as credit, based on how much debit volume merchants route to Visa. In one instance, Visa offered credit incentives, among other things, to win routing from Google and to

protect against PINless enablement. Similarly, Visa offered credit incentives to win debit routing from a health food supermarket chain.

86.    Describing one proposed credit and debit routing contract with a different large merchant, a Visa employee wrote, "We continue to believe that we made a very strong offer that they cannot replicate with our competitors. While they could recover some (but not all) of the value they receive from us for the debit routing, they will lose all credit value. Walking away would not be a commercially reasonable decision for them." As Visa recognizes, PIN network competitors do not have credit businesses to raid to buy debit routing.

87.    Visa also has a history of introducing new fees that it can so-call "waive" in exchange for exclusivity (or near exclusivity) making it difficult for merchants to route transactions to different networks. For example, Visa introduced the FANF in 2012 in response to threats of increased competition once the Durbin Amendment went into effect. FANF changed the structure of Visa's merchant pricing by charging merchants (through their acquirers) a fixed monthly fee for accepting Visa debit transactions. Visa has raised FANF twice in subsequent years. FANF is another lever that Visa uses to lock-up merchant debit volume: as an incentive to entering into routing volume-commitment contracts.

### 2.    Visa's Contracts with Issuers Unlawfully Restrict the Growth of Its Debit Competitors

88.    Issuers choose the number and identity of debit networks included on their cards. While the Durbin Amendment requires that each Visa-branded card include at least one additional network not affiliated with Visa, an issuer could choose to enable additional networks, thereby increasing the choices available to merchants and driving competition. However, Visa uses its monopoly power to induce issuers to limit the enablement of rival networks on their Visa-branded debit cards and thereby limit the choices available to merchants. In its issuing

contract with JPMorgan Chase, Visa made this requirement explicit. Chase's contract with Visa provides that only one unaffiliated PIN network can be enabled on 90% of Chase-issued Visa-branded debit cards. In 2023, Visa entered into an agreement with one of its largest fintech debit issuing customers, that limits enablement to a single non-Visa network for all debit cards issued through that fintech entity's partner issuing banks.

89.    Visa's contracts with other large and small issuers achieve a similar effect through different means. Visa has nearly 1,000 issuing contracts that contain significant volume incentives, which strongly deter the issuer putting more debit networks on the back of the card. These contracts frequently contain standardized volume requirements whereby the issuer must maintain its annual growth of Visa debit transactions in line with Visa's overall debit growth in the United States, which helps ensure that Visa's share of the issuer's transactions does not decrease.

90.    Visa debit volume gives Visa the power to impose significant monetary costs. For example, if an issuer does not meet the system growth requirement, it could be required to pay an early termination fee comprised of a percentage of the benefits it has already earned plus a multimillion-dollar fixed fee.

91.    Visa debit volume targets incentivize issuers not to enable additional networks on their debit cards and not to enable existing networks for additional transaction types (e.g., PINless routing). For example, in a 2020 issuing contract Visa included a minimum volume requirement that was designed to "mitigate a shift to PINless, RTP [Real Time Payment], etc." The language Visa obtained was viewed as "good enough" by senior Visa executives to "protect for PINless" because the only way the issuer could protect its volume was to "dump[] their debit network (Shazam) if it starts shifting volume." Similarly, Visa "signed incremental debit

incentive deals" with a number of large issuers and, as a result, Visa thought they were "unlikely to enable PINless on F2F [face-to-face] transactions." Many smaller issuers also rely on their issuer processors to make network selections, and there too Visa enters into agreements that are designed to "[p]rotect and grow existing [payment volume] from small issuers and discourage PINless enablement."

92.     Visa's issuer contracts reinforce the protections created by Visa's merchant and acquirer routing contracts by creating artificial barriers to expansion and, in effect, expanding or entrenching the transaction volume that is non-contestable. Regardless of a merchant's preferred routing choice, only networks enabled on a Visa-branded debit card can compete for the transaction. By virtue of being the dominant front-of-card network, Visa is enabled to process all transactions on over 70% of debit card payment volume in the United States.

93.     Like Visa's routing contracts with merchants and acquirers, Visa's volume requirements in issuing contracts are structured as cliff pricing. Any meaningful shortfall gives Visa the right to impose significant monetary penalties across *all* Visa debit transactions (not just the marginal transactions). If the issuer does not achieve the agreed level of exclusivity in any given year and that failure is attributable to any affirmative actions by the issuer, including enablement of any additional PIN networks, then Visa has the right to apply significant monetary penalties or even an early termination penalty.

94.     Visa sometimes leverages discounts on other products, such as its Debit Processing Services (DPS), to win issuer routing volume, similar to how it leverages discounts on other products to win merchant routing volume. Visa has packaged card-brand issuance contracts with its DPS processing services to win business from large banks.

### 3. Visa's Response to the Durbin Amendment Successfully Protected Its Monopoly from Competition.

95.    Visa feared that competition from PIN networks post-Durbin would erode its monopoly share of debit. Initially, the Durbin Amendment had some success in allowing the smaller PIN networks to grow share. While Visa initially lost share, it quickly recovered and increased its high share throughout the 14 years since the Durbin Amendment took effect.

96.    Since the enactment of the Durbin Amendment, smaller networks have attempted to chip away at Visa's dominance. For example, in the early years following the Durbin Amendment, Mastercard launched a PINless program for Maestro targeted at Visa-branded debit cards. But any gains were short lived. Again and again, Visa leveraged its tremendous scale and sheer volume of non-contestable transactions to penalize disloyalty from merchants, acquirers, and issuers, at the expense of competitors, consumers, merchants, and other market participants. Visa, by its own recognition, continues to win despite PIN networks generally offering lower prices.

97.    The Dubin Amendment did not exempt Visa, other debit networks, and issuers from complying with the antitrust laws. Rather, the Dodd-Frank Act, 12 U.S.C. § 5303, which includes the Durbin Amendment, provides that it is complementary to the antitrust laws, including the Sherman Act, and that requirements imposed on companies are in addition to, not to the exclusion of, those provided by the antitrust laws.

98.    In response to this new regulatory landscape, Visa has engaged in a relentless strategy of locking up the entities that control routing decisions and has now entered *de facto* exclusive routing contracts with over 180 of its largest merchants and acquirers. Visa's merchant and acquirer contracts cover over 75% of Visa's debit volume and results in the foreclosure of at least 45% of total U.S. debit volume. This denies competitors the scale necessary to compete

36

effectively, because issuers have a lower incentive to add networks to the debit cards they issue if merchants predominantly route to Visa. Visa's contracts with issuers magnify this problem. Visa uses its contracts with issuers to incentivize the issuers to make decisions—like choosing to disable card-present PINless or choosing not to enable it—that may make more transactions non-contestable, providing Visa with additional leverage over merchants and acquirers.

99.     Visa deployed a similar response strategy in reaction to the Federal Reserve's October 2022 clarification of the rules implementing the Durbin Amendment, referred to as Regulation II. In anticipation of the Regulation II clarification going into effect, Visa strategized to secure more volume under routing deals, to target merchant and acquirer deals with early termination fees for longer, firmer commitments of routing volume as well as to renew issuing agreements. Visa then took steps to ensure volume was locked up prior to the regulation going into effect.

### 4.  Visa Uses Its Monopoly Power to Deprive Its Rivals of Scale

100.     When two-sided transaction platforms like Visa "achieve scale on the two sides, it's an enormous moat around their business, and far more powerful than a one-sided but still network effect businesses (e.g., Facebook, Microsoft Word, etc.)." Visa's separate contracts across both sides of the debit market—accountholders and issuers on one side and merchants and acquirers on the other—widen the moat around its business and prevent any other debit network from gaining a meaningful share of the debit market. On one side of the market, Visa incentivizes issuers to enable fewer networks and fewer routing options on each non-Visa network. Because fewer issuers enable Visa's PIN-network competitors and all their features, merchants and acquirers on the other side of the market are less likely to take the time and expense to enable routing to PIN networks.

101.    Rival networks cannot grow their networks to sufficient scale or improve their networks' features. They're caught in a vicious cycle as they lack enough usage and acceptance on either side of the market to effectively compete with Visa. This network effects phenomenon results from the difficulty in building scale on both sides of a two-sided market—as described before, a "herculean task."

102.    Visa uses its power to ensure control over non-contestable transactions and then leverages its control over those transactions to demand and enforce exclusivity. To overcome Visa's scale advantage, a PIN network must not only compete on the merits for transactions it seeks to route, but also compensate the merchants, acquirers, and issuers for the cost of penalties imposed by Visa on all non-contestable transactions that the PIN network is not eligible to route.

103.    Visa has made it nearly impossible for PIN networks to win additional share. Despite the increased placement of PIN debit networks on the back of cards after the implementation of the Durbin Amendment and the PIN debit networks' development of new features to compete more closely with Visa and Mastercard, Visa has cut off PIN debit networks from gaining sufficient usage and acceptance on either side of the market to overcome network effects. Collectively, the PIN networks represent approximately 11% of all debit transactions (and only 5% of card-not-present debit transactions). No PIN debit network has more than a single-digit share of debit transactions in the United States.

104.    In the years since the Durbin Amendment, smaller networks have tried to win transactions from Visa by offering lower fees, innovating, and broadening their features. But the returns to these efforts were minimal, Visa used its immense size and large volume of non-contestable transactions to stifle these attempts at competition.

105.     A lack of scale also inhibits smaller networks from offering fraud protections equivalent or better than the market leaders because networks need sufficient transaction data to have acceptably robust fraud detection. Visa claims internally that absent sufficient transaction data, PIN networks are unable to match Visa's speed and accuracy at identifying fraud. Visa just "see[s] more" and, by its own recognition, continues to win despite PIN networks generally offering lower prices.

106.     Visa is aware of these market dynamics and exploits them to limit competition. In Spring 2023, one Visa executive observed that less than half of the debit volume in the United States was enabled by issuers to be processed as a card-present PINless transaction, and "[a]s a result, many merchants have not enabled CP [card-present] PINless." Acknowledging that issuer enablement influences merchants' enablement decisions, Visa feared that a large U.S. issuer enabling card-present PINless could "create a tipping point . . . for more [acquirer] processors and merchants enabling and routing CP [card-present] PINless." Visa thought growing card-present PINless enablement would lead to more competition from its debit network rivals.

107.     For instance, in 2023, JPMorgan Chase had Visa-branded debit cards with Mastercard's Maestro as the back-of-card network unaffiliated with Visa. Although Chase's contract with Visa prohibited it from adding a second back-of-card network, Chase requested a waiver of this contractual requirement from Visa. Chase wanted to also add Discover's Pulse network to the back of its Visa-branded debit cards to comply with Regulation II clarification announced in 2022. At the time, Maestro did not offer the card-not-present PINless functionality whereas Pulse offered both card-present and card-not-present PINless functionality. Visa executives feared that if Chase enabled Pulse on the back of its debit cards, "more than 60% of the CNP volume will be priced lower than Visa by the unaffiliated networks. As that happens,

more merchants [] will adopt PINless, resulting in lower transaction win rates for Visa, as well as a decline in effective transaction clearing price." Visa executives were concerned that if Chase enabled Pulse's PINless functionality, it could create a tipping point for more processors and merchants to enable and route to PINless, driving an "additional 5-10% in merchant volume to be enabled for PINless." Fearing that a PIN network would win more widespread placement and enablement on both the issuer and merchant sides of the market, Visa granted only a short-term waiver of its back-of-card network restriction clause to allow Chase to temporarily add Pulse as a second unaffiliated network the back of its debit cards, but also required that Chase enter a debit routing agreement with Visa.

### C. Visa Uses Its Monopoly Power to Squash Innovative Alternatives to Its Debit Network

108.    Debit cards are not the only way for consumers to pay directly with money in their bank accounts. For instance, consumers may also use an alternative debit network, such as those created by fintech companies. Fintech debit networks cut Visa out of the transaction (see Figure 3 below). They rely on a consumer's bank account number, rather than a debit card credential, to make real-time purchases directly from the consumer's bank accounts. These potential debit competitors' networks may not require a network like Visa's. In place of a physical or virtual card, fintech debit networks may store consumers' bank account credentials, allowing accountholders to purchase goods and services from merchants that participate in their networks. Visa's CEO has recognized that these sorts of "disruptive innovations are happening elsewhere in the world." Visa fears that potential competitors would attempt to replicate those successes in the United States.

**Figure 3**



109.    These potential debit competitors could be embedded in different types of payment solutions, such as digital wallets and other fintech products. Well-known digital wallets include Apple Pay, Google Pay, and PayPal. Digital wallets are software-based systems, usually on a smartphone or computer, that store a consumer's payment credentials—including debit cards, credit cards, and, in some wallets, fintech debit networks—to fund consumer-to-merchant transactions.

110.    Visa's philosophy towards preserving its monopoly from attacks by new competitors can be boiled down to the words of its former CFO: "[E]verybody is a friend and partner. Nobody is a competitor." As Visa's former CFO went on to say, "The only issue is to figure out how to make it worth their while to partner with us. And so far, we've managed to do that, whether it's with wallets, whether it's with large tech companies, whether it's with large merchants. And as long as we keep doing that and keep our network valuable for everyone, things should be fine." This strategy has worked.

111.    Over the past decade, there has been a substantial increase in the number and volume of debit transactions that occur online. The rise of mobile payments and the COVID-19 pandemic have fueled this significant change in the industry. This trend, however, has not seen a

corresponding rise in the adoption of new payment methods—new technologies and new services continue to largely run on the payment rails of the past. This is because Visa has used its monopoly power in debit markets to stifle potential competitors, such as fintech debit networks, from creating or enhancing any payment methods that compete with Visa. Visa's conduct is deliberate and part of a strategy to maintain its monopoly. Visa is always on the lookout for ways new payment technologies could reduce or eliminate the need for Visa to act as an intermediary between both sides of a debit transaction. Rather than compete with alternatives to its debit rails, Visa "seek[s] to partner with technology disruptors to mitigate threats whenever possible. . . . Identify and partner with emerging players before they become disruptors."

112.   At the heart of the strategy is a quid pro quo: Visa uses "custom incentives programs" to "target a small number of Visa's largest and most influential merchants for a custom incentive arrangement in return for disintermediation/non-discrimination protections, non-disparagement, and future commitments." These contracts amount to a horizontal product market division. As Visa describes it, "These are not routing deals, these are relationship give away deals that have nothing to do with routing." In some cases, Visa "make[s] less money than [they] would in a worst case do nothing" scenario.

### 1. Visa Fears that Fintech Debit Networks Will Disintermediate Its Lucrative Debit Business

113.   Since at least 2013, Visa has been concerned that fintech debit networks would displace Visa as an intermediary between both sides of a debit transaction. A fintech debit network can facilitate consumer-to-merchant payments by providing end-to-end functionality equivalent to debit card networks: it authorizes payments from a consumer's bank account, facilitates communications with the consumer's bank to clear the transaction, and provides settlement services by initiating a payment to the merchant's financial institution. The fintech

debit networks provide additional capabilities like payment guarantee for merchants, dispute resolution and chargeback services, and fraud protections.

114.    Visa's fear of disintermediation has been exacerbated by two developments: increasing availability of alternative payment rails that move money in real time, and a growing number of fintech firms that are able to build upon these payment rails to compete with Visa, particularly Visa's lucrative card-not-present debit business. Other participants in the payments ecosystem, such as payment processors, banks, and firms that have the ability to build the necessary connections between consumer bank accounts and merchants, also have the capability to offer fintech debit network services. As Visa recognized, real-time fintech payments "will become a viable merchant option: positioned and priced as a 'Substitute for Debit.'"

115.    Visa feared that its Big Tech "frenemies" would launch debit networks that compete with Visa by displacing card-based funding options with payments directly from consumers' bank accounts. This fear was heightened by new, non-card-based payment rails which created cheaper alternatives to Visa's payments rails. For decades, payment networks have facilitated bank transfers via ACH, an interbank payment service which took several days to settle payment and even longer to make funds available in a consumer's bank account. However, new alternatives have developed. Innovative fintech firms have sought to build new capabilities on ACH and even new infrastructure that provides a faster alternative to ACH (known as real-time payments or RTP). For example, The Clearing House launched RTP Network, a real-time-payments network that allows immediate clearance and settlement of transactions, and the Federal Reserve launched FedNow in 2023 to provide instant payment services between depository institutions. As faster payment alternatives emerge and banks begin to connect to them, they create the opportunity for making funds available in as close to real time as possible.

116.    To date, few digital wallets or other potential fintech debit networks have incorporated these new real-time payments networks. Digital wallets are financial transaction applications, usually stored in a smartphone or computer, that can be used to complete consumer-to-merchant transactions at more than one retailer using a stored payment credential. Digital wallets may enable consumers to pay for goods and services with funds in the wallet—these types of wallets are known as staged digital wallets or stored value wallets. Staged digital wallets may use funds preloaded in the wallet or may pull funds into the wallet from a linked bank account (such as a checking account, using either a debit card or a bank account number) to make transactions. In the United States, PayPal and Square's Cash App operate as staged digital wallets. A second type of digital wallet, called a pass-through wallet, transmits a consumer's payment credentials (such as a debit card account number) directly to a merchant's acquirer, which then uses those credentials to process the payment in a manner similar to a traditional debit transaction. Apple Pay and Google Pay are two popular examples of pass-through digital wallets.

117.    Visa is particularly concerned with potential competitors that have relationships with both accountholders and merchants, because these companies are positioned to build the scale necessary to succeed as a payment platform. Visa knew that tech companies like PayPal, Apple, and Square had acceptance at millions of merchants and relationships with over one hundred million accountholders in the United States. Like traditional debit networks, fintech debit networks require both consumer and merchant participation. Consumers enroll in the fintech company's network, including going through the steps to link their bank accounts. Merchants also enroll in the service.

118.    For example, Visa understood that Apple Pay's broad merchant acceptance and popularity with consumers represented "an existential threat" to Visa's debit business. Visa has consistently viewed Apple as a threat, in large part due to its broad merchant acceptance and broad base of Apple Pay users. Visa feared that Apple on its own, or in partnership with another entity, could build its own payment network independent of Visa's rails. Visa was aware that Apple had approached a large debit issuer about building a network without Visa or Mastercard.

### 2.    Visa Leveraged Its Debit Monopoly to Prevent PayPal and Others from Disintermediating Visa with Staged Digital Wallets

119.    According to one Visa executive's assessment, the only major entity to successfully disintermediate Visa in the United States is PayPal. But in 2016 Visa blunted this threat by signing a massive deal with PayPal, using Visa's standard playbook of threatening high fees and dangling big payoffs to move PayPal transaction volume back to Visa's rails and stop PayPal from competing aggressively against Visa.

120.    In the 2000s and early 2010s, many merchants started accepting PayPal as part of their expansion into e-commerce. Some of PayPal's customers used their Visa debit cards to pay for transactions at these merchants, including many online small- and mid-sized businesses. As a result, PayPal brought significant incremental volume to Visa, which Visa initially supported. But in 2015, when PayPal was spun-off from its parent company, eBay, Visa's view of PayPal changed. Visa viewed the new company as an "innovative competitor that will be more aggressive as standalone entity." In particular, Visa was concerned about PayPal's scale and its move to encourage PayPal users to pay directly for goods and services with their bank accounts rather than with their debit or credit cards.

121.    PayPal offered a staged digital wallet with an alternative debit credential: accountholders loaded funds into their PayPal wallet using their bank credentials and could make

purchases using ACH. ACH transactions from PayPal's wallet included many of the same features as debit, such as fraud detection, fund guarantees, and the ability to dispute a transaction. Visa wanted to discourage staged digital wallets, such as PayPal, because it viewed them as an "increased disintermediation risk for issuers and Visa" which came with a "cannibalization risk." A Visa executive viewed having a commercial relationship with a company supporting a staged wallet model as a "line that must never be crossed."

122.     Visa had an ace card in its negotiations with PayPal. Even with PayPal's new model encouraging consumers to pay directly with their bank accounts, a substantial number of its customers had continued to make payments through PayPal using their Visa-branded debit cards. To squash PayPal's use of ACH in the staged digital wallet model, Visa used the threat of exorbitant wallet fees and high rack rates on these Visa transactions to induce PayPal to enter into a new, expansive routing contract. PayPal risked losing customers who used Visa on its platform if it told them they could no longer use their Visa-branded cards, and so it had little choice but to take the deal.

123.     At this time, PayPal was also entering into new partnerships to bring its payments innovations to in-store merchants. Visa stymied these partnerships by imposing a restriction on ACH funding transactions when the PayPal customer had an existing Visa-branded card in their PayPal wallet. While Visa relaxed its restrictions in 2021, Visa mandated information sharing so that it could monitor PayPal's product success and to this day restricts PayPal's in-store ACH funding transactions to a QR code model whereby a consumer must scan a merchant's QR code before connecting to PayPal to complete a transaction. Visa's continued restrictions on PayPal add frictions that limit the use of PayPal as an in-store alternative to Visa.

124.     In 2022, PayPal and Visa entered into a new 10-year contract that limits PayPal's incentives and ability to disrupt the debit market. This includes a debit routing commitment of 100% of its Visa-eligible volume from years four to ten, penalties for failing to convert its co-branded debit cards to Visa, a requirement to participate in certain Visa programs and services, and preservation of most of Visa's "customer choice" provisions, which preference Visa payment methods over other competitive alternatives. Visa's continued dominance of the debit market and the looming threat of Visa's exorbitant wallet fees and rack rates left PayPal with few alternatives to compete on Visa's terms.

125.     Since 2016, Visa has threatened to impose the staged digital wallet fee on other entities, but all have signed deals with Visa rather than pay it. Visa views the fee as "a behavioral fee to reflect the propensity of SDWOs [staged digital wallet operators] to disintermediate Visa," and waives the fee if the wallets behave as Visa demands. In other words, Visa offered the staged digital wallets a choice: agree not to compete with Visa or pay substantial targeted fees that make the alternative networks far less profitable to operate.

126.     Visa has also entered into a series of contracts with Square that have foreclosed Square from competing aggressively against Visa and prevented Square from developing a viable alternative for consumer-to-merchant payments.

127.     In 2013, Square launched a new service, Square Cash (later called Cash App) that enabled person-to-person payments. Square sought to avoid additional Visa fees for Square Cash so that it could facilitate such payments using debit cards. Visa worried that if it did not sign a contract for Square Cash, Square was "likely to build in an ACH option." An ACH routing option (which requires a consumer to link their bank account credential) would pose a threat to

Visa's debit payment volume because Square could use the bank account credentials from person-to-person transactions to launch a new consumer-to-merchant debit product.

128.     Visa chose to participate in Square Cash and offered not to charge high rack rates for transactions using Visa's debit network, but Visa required that it have the right to terminate for convenience, in case Square started to compete with Visa. Visa believed it got two main benefits from the deal: (1) the debit routing commitment; and (2) "non-disintermediation, of which the major concern is ACH."

129.     After signing the first contract with Square in 2014, a Visa executive stated, "we've got Square on a short leash and our deal structure was meant to protect against disintermediation."

130.     In 2016, Square innovated and announced a new product, called "Cash Drawer" that allowed users to store funds in their Square Cash account, similar to PayPal and its person-to-person payments platform Venmo. Visa was concerned that the product was a "greater disintermediation threat" that had the potential to disrupt its (and its issuer clients') profitable debit rails.

131.     Visa acted quickly to prevent any disruption. Visa sent a letter of intent to terminate its contract with Square, reporting to Square that Cash Drawer was a "huge deal for us" and a "third rail" issue as "a staged wallet model was antithetical [to] what we worked so hard to develop together with Square Cash." Faced with the risk of paying higher fees and other penalties on its Visa debit transactions, Square quickly backed down and removed the feature; Visa did not terminate the contract.

132.     More recently, Square launched Cash App Pay, which enables consumers to use Cash App to make purchases from merchants. This new product would trigger Visa's

burdensome staged digital wallet fees, and Square asked Visa to waive those fees. Visa recognized that these threatened fees gave it "a significant lever in negotiation." As one Visa executive noted after the launch of Cash App Pay, "Square's approach is predictable and follows the disintermediation playbook to the letter." But in 2023, Visa used the leverage from the staged digital wallet fees to obtain commitments from Square that it would route 97% of its Cash App Pay transactions over Visa's rails, which would preference Visa in Cash App Pay signup flow and default settings, and would not steer customers to ACH in Cash App Pay.

### 3. Visa Uses Its Leverage Over Its Potential Debit Competitors, Including Apple, Paying Them Not to Create or Promote Competitive Products

133.   Even for entities that do not operate staged digital wallets, Visa guards against the potential of being disintermediated. Many of Visa's potential competitors are also Visa customers. Visa uses its monopoly power, and the threat of imposing its high fees, rack rates, and other penalties, to induce potential competitors to sign contracts that preserve Visa's prime position in the payments ecosystem. Each year, Visa spends a portion of its supracompetitive profits to buy off potential competitors, ensuring Visa can continue to reap the financial benefits of its monopoly.

134.   Visa benefits from partnering with established Big Tech players like Google and Apple by obtaining "total control of ecommerce acceptance and online payments flow in their ecosystems."

135.   Visa targets a small number of Visa's largest and most influential Big Tech merchants with custom incentive arrangements on Visa-eligible debit volume in return for commitments from them to not dislodge Visa as the middleman, and other future commitments. These contracts amount to a horizontal product market division. As a Visa executive clarified, the incentive deals Visa has reached with Apple and Amazon, "are not routing deals, these are

relationship give away deals that have nothing to do with routing." In some cases, Visa recognizes that its choice to enter into a routing deal might not be as profitable absent an impact on competition, stating that Visa "make[s] less money than [it] would in a worst case do nothing" scenario.

136.    For example, Visa has deals with Apple in which Apple agrees that it may not develop or deploy payment functionality with the aim of competing with Visa, such as creating payment functionality that relies primarily on non-Visa payment processes or payment products. Apple is also barred from providing incentives "with the intent of disintermediating Visa or inciting customers to cease using Visa Cards." In return, Visa shares its monopoly profits with Apple. Visa has also provided Apple with reduced merchant fees in exchange for Apple's commitment not to "build, support, or introduce payment technologies that disintermediate Visa" or steer customers to third party payment methods such as ACH. Visa payments to Apple amounted to hundreds of millions of dollars in 2023.

137.    Visa recognized internally that the benefit of Visa's disintermediation terms with Apple was "volume staying on Visa." When Visa first entered its contract with Apple in 2012, Visa wanted the "right to terminate [the] deal if [a] competitor or competitive products emerge." As Visa noted: "Cooperation is preferred." Visa has continued to condition its participation on Apple maintaining its status as a non-competitor to Visa. In 2022, Visa worried that its relationship with Apple was at a "tipping point," as Apple created new inroads into the traditional debit and credit ecosystems. Visa viewed Apple as an "existential threat" that could negatively affect both Visa's yields and its transaction volumes. Visa's strategy has been to align its incentives with Apple, which Visa refers to as a "mutually assured destruction principle." Visa's key question for its Apple relationship: "Do we partner with Apple and if so, how?" Visa

has always answered that question in the affirmative, with massive payments and financial incentives to Apple.

## V.   ANTICOMPETITIVE EFFECTS

138.   For years, Visa has been able to maintain its dominant position in the market through actions that harm competition. Its web of exclusionary and anticompetitive contract terms and its control over currently non-contestable transactions both excludes competition for those transactions that can—and should—be contested and insulates those currently non-contestable transactions from competition in the future.

139.   Absent Visa's exclusionary and anticompetitive contracts with merchants, acquirers, and issuers, and other industry participants, Visa's back-of-card competitors (i.e., PIN networks, including Mastercard's Maestro), would have the chance to gain the scale needed to compete effectively with Visa and offer banks and merchants real choices. Absent Visa's exclusionary and anticompetitive contracts with potential fintech rivals, those would-be competitors would have greater incentive to innovate and compete more directly with Visa—and Visa would have more incentive to respond—offering consumers and businesses new choices and better features. Thus, absent Visa's anticompetitive and exclusionary conduct, competition from current and potential rivals would increase competition and likely lead to lower fees, better service, or greater innovation.

140.   Visa's exclusionary and anticompetitive conduct has broken the competitive process that should benefit other market participants, including issuers, acquirers, merchants, and consumers. Visa's conduct prevents its rivals from being enabled on both the consumer (issuer) and merchant (acquirer) sides of the debit networks at a scale to compete effectively with Visa.

141.     Visa's success in its anticompetitive endeavors is both facilitated and reflected by the substantial foreclosure of competition it has achieved in the relevant markets. Visa itself calculated that by the end of 2022 at least 75% of all its debit volume—and 80% of its card-not-present debit volume—were insulated from competition by its rivals through its contracts. Looking beyond the debit volume Visa received, its merchant and acquirer routing contracts alone foreclose at least 45% of all debit transactions in the United States, and an even higher fraction of card-not-present debit transactions.

142.     Visa's exclusionary and anticompetitive conduct creates a vicious cycle that further insulates it from competition. By locking up debit volume through agreements that constrain competition on both sides of the market, Visa has deprived rivals of the scale they need to offer effective competition now and in the future. This means that rival networks have limited or no ability to compete on price and quality (e.g., fraud detection) today. Visa's agreements limit how much additional volume rival networks can win if they lower prices or invest in new benefits or features. This reduces the benefits to PIN networks of cutting prices or investing in new benefits and innovative features. And weakening its rivals in these ways not only protects Visa from competition for transactions that should be subject to competition today, but also reduces the chances that those rivals can offer the features and services necessary to erode Visa's advantage on non-contestable transactions later, such as further development of PINless routing.

143.     Visa's exclusionary and anticompetitive conduct has stopped beneficial innovation in other ways. For more than a decade, Visa has sought to delay or deter the development of fintech network services that would offer Americans new ways to pay merchants directly from their bank accounts. This has likely delayed or deterred the introduction of features such as staged digital wallets, store-credit or discount offers in digital wallets, or other features

that would increase convenience and security and build closer relationships between merchants and consumers. Visa's efforts have not only reduced innovation from other companies that would benefit consumers and businesses today, but also its own incentives to innovate: Visa admitted that it has not materially invested in innovation in the last decade other than its tokenization efforts.

144.    Vigorous competition should constrain Visa's prices and spur its investment in innovation and benefits for its customers and American consumers. But that sort of vigorous competition is exactly what Visa has worked so hard to avoid. Visa insulates its debit transaction volume from competition whenever it can; sometimes by foreclosing rivals from being able to meaningfully compete for significant shares of the market and sometimes by reducing incentives to compete via imposing fees or providing financial benefits. Visa's conduct further suppresses incentives of current and potential rivals—as well as its own incentives—to compete and innovate.

145.    But competition, not Visa, should control whether and how issuers, acquirers, merchants, and consumers interact with each other. Competition, not Visa, should set the fees that those issuers, acquirers, merchants, and consumers pay directly or indirectly to debit networks. And competition, not Visa, should set the pace of innovation—from both rivals and Visa itself—of features and services that benefit consumers, merchants, acquirers, and issuers in the markets for debit transactions.

146.    Visa has done exactly what it intended to do: capture a substantial volume of contestable transactions through anticompetitive means, preserve or expand the pool of non-contestable transactions, block or discourage competitive threats from current or would-be rivals, and benefit from the monopoly that results. Since the enactment of the Durbin Amendment, PIN

networks have attempted to chip away at Visa. For example, in the early years following the Durbin Amendment, Mastercard launched a PINless program for Maestro targeted at Visa-branded debit cards. But any gains were short lived. Visa repeatedly leveraged its massive scale and immense volume of non-contestable transactions to penalize disloyalty from merchants, acquirers, and issuers, at the expense of competitors, consumers, merchants, and other market participants. Visa, by its own recognition, continues to win despite PIN networks generally offering lower prices.

## VI.     NO COUNTERVAILING FACTORS

147.    There are no valid, procompetitive benefits to Visa's exclusionary conduct that outweigh its anticompetitive effects or cannot be obtained through less restrictive means. Visa's anticompetitive contract terms and related conduct are not reasonably necessary to protect Visa's technology, incentivize customer growth, prevent free riding, or achieve any other claimed benefit. Visa can achieve any legitimate, procompetitive objectives without imposing the anticompetitive terms challenged in this case, or those benefits could be achieved through less restrictive means. Moreover, Visa's agreements with current and potential direct competitors are not ancillary to its vertical relationship. Rather, they are simply divisions of the relevant markets by direct competitors.

## VII.    THE RELEVANT U.S. DEBIT MARKETS

148.    Courts define a relevant market, which has both a geographic and product market dimension, to help identify the lines of commerce and areas of competition impacted by alleged anticompetitive conduct. There can be multiple relevant markets covering the same or similar products and services and markets need not have precise metes and bounds.

149.    There are two relevant markets for purposes of identifying Visa's unlawful, exclusionary conduct. General purpose debit network services in the United States is a relevant market. General purpose card-not-present debit network services in the United States is also a relevant market, one that is narrower and included within the market for general purpose debit network services in the United States.

### A.    The United States Is a Relevant Geographic Market

150.    The United States is a relevant geographic market. Federal laws and regulations that govern debit transactions, including card-not-present transactions, operate at the national level. Visa organizes its U.S. debit business at the national level, as demonstrated by its separate rules governing merchant acceptance in the United States and its separate pricing of debit, including card-not-present debit, to merchants, acquirers, and issuers in the United States. The relevant parties to a debit transaction—consumers, issuers, acquirers, and merchants—could not practicably turn to debit network services offered elsewhere as alternatives. Therefore, a firm that was the only seller of general purpose debit network services or general purpose card-not-present debit network services in the United States would be able to maintain prices above the level that would prevail in a competitive market.

### B.    Relevant Product Markets

151.    There are two relevant product markets: (1) general purpose debit network services; and (2) general purpose card-not-present debit network services.

### 1.    General Purpose Debit Network Services Are a Relevant Product Market

152.    General purpose debit network services are payment products and services that facilitate the debit (i.e., withdrawal) of funds directly out of a consumer's bank account, often using a credential or other account number to identify the consumer. Visa and its debit card

network and fintech debit competitors provide products and services that are inputs to and that enable debit transactions. They compete to provide debit network services for general purposes, meaning that their debit credentials are accepted at numerous, unrelated merchants. These networks sell services simultaneously to both issuers and acquirers, or, in the case of some alternative debit networks, accountholders and merchants. They serve as intermediaries between accountholders and merchants, operating two-sided transaction platforms that facilitate transactions between merchants and accountholders from their respective bank accounts. These services that Visa and its debit network competitors enable constitute a relevant product market.

153.    Debit networks, like Visa, provide a variety of services that enable a debit transaction, and this suite of services constitutes a product that is jointly consumed by merchants and accountholders (as well as the acquirers and the issuers). These services include the ability for the consumer or her bank to dispute and chargeback the transaction; payment guarantees for merchants; fraud protections for all parties; as well as the "rail" or methods in which the other parties communicate among each other to facilitate the transaction and transfer funds from the consumer's bank account to the merchant's account. These minimum attributes of debit are important to merchants, consumers, and banks alike and distinguish debit from other methods of payment. Although accountholders do not contract directly with Visa, the accountholders and their banks rely on Visa and other networks to make possible purchases from merchants.

154.    Debit networks are two-sided platforms that exhibit a high degree of interdependency between accountholders and issuers on the one side and merchants and acquirers on the other. Accountholders and issuers get more value from a network that connects to more merchants, and merchants and acquirers get more value from a network that connects to more accountholders.

155.     General purpose debit network services constitute a relevant product market under the antitrust laws. Many consumers would not find other payment services to be a suitable substitute for debit. Issuers, knowing that many of their accountholders value debit, do not consider alternative payment services to be a suitable substitute for debit. Merchants do not consider other payment services to be a substitute for debit because they do not want to risk lost sales by not accepting many consumers' preferred payment method. Acquirers, knowing that their merchants value debit, do not view alternative payment services to be a suitable substitute for debit. Thus, there are no reasonable substitutes for general purpose debit network services, and a firm that was the only seller of services to facilitate debit transactions would be able to maintain prices above the level that would prevail in a competitive market.

156.     The market for general purpose debit network services includes services sold by debit networks other than traditional debit card networks. Fintech debit networks can be accepted at all merchants that participate in the network and provide payment guarantees, dispute resolution and chargeback capabilities, and fraud protection services. In a debit transaction processed by a fintech network, the consumer does not have a "debit card" and there is no "issuer" of a physical or virtual debit card, however, the services provided by fintech debit networks provide the same functionality to consumers and merchants.

157.     General purpose credit card network services are not reasonably interchangeable with debit network services because debit payments draw from funds already in a consumer's bank account, rather than from a line of credit. Visa describes debit as a "pay now" product and credit as a "pay later" product. The distinction between credit and debit is widely accepted in the payments industry. Visa and other card networks have different pricing for debit and credit transactions, and the Durbin Amendment's limitations of issuer transaction fees does not apply to

credit. Many accountholders do not qualify for credit cards or have a strong preference for paying out of their existing funds rather than taking on debt to make purchases using a line of credit. Given many accountholders' strong preference for debit, issuers cannot substitute from debit to credit.

158.    Network services for store cards and other prepaid cards are not reasonably interchangeable with debit network services. Rather, Visa sees prepaid cards as "complements" to its other card products. Prepaid cards are not connected to a consumer's bank account, so only funds that have been loaded on the card in advance can be spent. For that reason, Visa refers to prepaid as a "pay before" product, while debit is a "pay now" product. Visa also prices prepaid card network services differently to merchants, acquirers, and issuers than debit cards.

159.    Payments made through basic ACH transfers offered by The Clearing House or the Federal Reserve are often used for disbursements, paychecks, interbank settlements, and recurring fixed payments like mortgage and tuition payments. A basic ACH transfer is not reasonably interchangeable for most debit transactions. Absent services created by fintech firms and other payment networks, basic ACH transfers are inconvenient for consumers because they require a burdensome onboarding process in which the consumer must enter his bank account and routing information for each merchant, and then take steps to verify his account, which requires additional input and can take several hours or even days. ACH transfers are inconvenient for merchants because it can take two to three days to determine whether a payment is successful, and such transfers are more subject to fraud. Basic ACH transfers also lack the guarantee of payment for merchants and the dispute resolution and chargeback capabilities for consumers that debit offers. Newer interbank instant payment services, such as the Federal Reserve's FedNow and The Clearing House's RTP, may provide faster payment transfers in the

future, but they would require the same additional services from a fintech or other payment network, such as fraud detection, dispute resolution, and chargeback services, to become a viable alternative to debit.

160.    Cash and check payments are not reasonably interchangeable for debit network services. Merchants and accountholders do not view cash and check transactions as reasonably interchangeable with debit transactions. The procedures and costs for accepting and processing cash and check payments differ widely from those for accepting and processing payments directly from the accountholder's bank.

### 2.    General Purpose Card-Not-Present Debit Network Services Are a Relevant Product Market

161.    General purpose network services for all debit transactions, where debit credentials are accepted at numerous, unrelated merchants, constitute a relevant market; however, industry participants, including Visa, also categorize debit network services in narrower markets that are best understood as submarkets of the larger market for debit network services. General purpose card-not-present debit network services are a narrower relevant product market included within the broader general purpose debit network services market. Card-not-present debit network services are primarily utilized for e-commerce transactions.

162.    The general purpose card-not-present debit network services market includes both traditional debit card transactions and fintech debit transactions. Both enable consumers to pay for goods and services at numerous, unrelated merchants directly from the funds in their bank accounts.

163.    General purpose card-not-present debit network services constitutes a relevant product market under the antitrust laws. Few consumers, issuers, merchants, or acquirers would find other payment services to be a suitable substitute for card-not-present debit. In the card-not-

present channel, there are even fewer viable forms of payment (for example, cash is not an option) than in the broader general purpose debit network services market. Thus, there are no reasonable substitutes for card-not-present debit, and a firm that was the only seller of general purpose card-not-present debit network services would be able to maintain prices above the level that would prevail in a competitive market.

## VIII.   VISA HAS MONOPOLY POWER IN THE U.S. DEBIT MARKETS

164.    Visa is a monopolist in the general purpose debit network services and general purpose card-not-present debit network services markets in the United States with market shares of at least 60% and 65%, respectively, by payment volume. Mastercard is the second largest debit network in the United States and processes less than 25% of debit transactions in either relevant market. No other competitor has more than a single digit share of debit transactions in either market.

165.    Visa has monopoly power in the relevant debit markets because it has the power to control prices and exclude competition in each market.

166.    Visa has been able to maintain monopoly prices as reflected in its high profit margins. Visa has an operating margin of 83% in North America, of which its U.S. debit business is the largest contributor. These margins are well above Visa's reported high margins globally, since it became a public company in 2007, and much higher than the vast majority of public companies.

167.    Visa has been able to successfully exclude competition in each market, as reflected in its durable high market shares that persist in the face of regulatory changes. After a brief period of adjustment when the Durbin Amendment took effect in 2012, Visa's market shares have increased over the last decade. Immediately after the Durbin Amendment went into

effect, Visa's share dropped from approximately 63% of debit payment volume in 2011 to approximately 56% in 2012. But leading up to the implementation of the Durbin Amendment, Visa took steps to insulate its debit business from PIN network competition. Visa began a program of signing contracts with merchants and acquirers to ensure that all or nearly all their Visa-eligible debit volume was routed to Visa. Within a few years, Visa was able to regain and strengthen its debit monopoly. And in subsequent years, it has repeated this playbook in response to each new threat to its debit monopoly.

168.    Similarly, even with the recent Regulation II clarification requiring issuers to enable at least one network unaffiliated with the front-of-card network for card-not-present debit transactions, there has been no meaningful impact to Visa's market shares.

169.    Several additional factors beyond Visa's high margins and durable market shares show that it has monopoly power.

170.    Unlike the smaller PIN networks, Visa and Mastercard are accepted by nearly all U.S. merchants that accept debit as a form of payment—regardless of whether the merchant derives most of its revenue from card-present or card-not-present sales. Merchants view Visa and Mastercard as must-haves, accepting both networks to maximize their ability to make a sale with whichever debit cards their customers present. This feature of the market for debit transactions increases the power that Visa is able to exercise over merchants. In contrast to more competitive industries, merchants cannot simply walk away from Visa when charged higher prices or given worse terms. In addition, debit networks face barriers to entry and expansion such as regulation and brand recognition.

171.    Merchants and acquirers are more likely to incur the costs of enabling and maintaining compliance with networks that have sufficient volume to make the expense and

effort worth it. Similarly, issuers are more likely to enable networks if those networks are widely accepted by merchants. Additionally, Visa recognizes that smaller rivals lack scale—widespread enablement by issuers on their debit cards and acceptance by merchants. Because the market is two-sided, it is difficult to win widespread enablement without widespread acceptance and vice-versa. This creates a feedback loop, known as "network effects," that makes the need for scale a particularly significant barrier to entry and expansion.

172.    Banks generally only issue debit cards under a single front-of-card network, entering long-term contracts with either Visa or Mastercard and infrequently switching between the two, in part because of the cost and consumer disruption associated with switching. These switching costs further protect Visa's dominance on the front-of-card by inhibiting Mastercard's growth and the potential for other front-of-card competitors to enter or expand.

173.    Visa recognizes and exploits these barriers to entry, including switching costs and network effects, to protect itself from competition from rival networks and potential competitors that may break Visa's stranglehold on U.S. debit markets. For example, to prevent any PIN network from gaining scale, in 2023, Visa informed issuers they may be required to pay monetary penalties if they enabled new features of rival PIN networks that resulted in the loss of Visa debit network volume. At the time, new regulations from the Federal Reserve mandated that issuers enable at least two unaffiliated networks for card-not-present transactions. Previously, many issuers had relied exclusively on the front-of-card networks—either Visa or Mastercard— to process those transactions. Visa worried that merchants and acquirers would finally enable rival debit networks' PINless capabilities. However, the Federal Reserve's requirement applied only to card-not-present transactions. To slow the enablement of PINless capabilities by merchants and acquirers, Visa began encouraging issuers to *turn off* PINless capabilities for card-

present debit transactions. Among the approved talking points was a reminder that enabling card-present PINless may result in the issuing partner paying higher fees and other penalties. These penalties would serve as a price increase to issuers, one which they could not easily avoid due to the costs of switching networks. Visa's actions to encourage disabling card-present PINless helps Visa increase its set of non-contestable transactions, which it utilizes to create penalties for disloyalty.

174.     Visa is able to set prices without regard to its costs. Visa is also able to price discriminate between various industry groups and such price discrimination is unrelated to Visa's costs in providing its services to those industry groups.

175.     Moreover, Visa has successfully imposed new, unfavorable pricing structures without losing debit volume. For example, in 2012, Visa implemented its new monthly FANF across all merchants and acquirers. In October 2023, Visa introduced the mandatory Digital Commerce Service fee. This fee bundled several previously optional "value-added services" fees charged to card-not-present transactions. Visa anticipates almost five-times the net revenue from the new mandatory fee than from the previously optional fees. Despite imposing a new fee for merchants through their acquirers, Visa knew it wouldn't lose transactions. Visa sets fees, not based on its costs or competition, but rather "relative to value we provide," i.e., Visa's perception of its own value.

## IX.     JURISDICTION, VENUE, AND COMMERCE

176.     The United States brings this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain Visa's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

177.    This Court has subject matter jurisdiction over this action under Section 4 of the

Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

178.    The Court has personal jurisdiction over Visa; venue is proper in this District

under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391 because Visa

transacts business and is found within this District.

179.    Visa Inc. is a Delaware company headquartered in San Francisco, California. Visa

is a global payments company that operates the largest debit network in the United States,

routing 57.6 billion debit transactions worth $2.8 trillion in 2023. Visa provides a two-sided

transactions platform that authorizes, clears, and settles debit transactions between businesses,

consumers, and banks. Visa reported revenues of approximately $32.7 billion in fiscal year 2023,

including $14 billion in the United States.

180.    Visa engages in, and its activities substantially affect, interstate trade and

commerce. Visa provides services that are marketed, distributed, and offered throughout the

United States, including across state lines and in this district. Visa's actions are ongoing and are

likely to continue or recur, including through other practices with the same purpose or effect.

## X.    VIOLATIONS ALLEGED

### A.    First Claim for Relief: Monopolization of the Markets for General Purpose Debit Network Services and General Purpose Card-Not-Present Debit Network Services in the United States in Violation of Sherman Act § 2

181.    Plaintiff incorporates the allegations of paragraphs 1 through 180 above.

182.    Visa has monopolized, in violation of Section 2 of the Sherman Act, 15 U.S.C. §

2, two relevant markets related to debit transactions in the United States: (1) the market for

general purpose card-not-present debit network services; and (2) the market for general purpose

debit network services.

183.    Visa has monopoly power in both relevant markets.

184.     Visa has willfully and unlawfully maintained its monopoly in each relevant market through an exclusionary course of conduct and anticompetitive acts described herein. Each of Visa's actions individually and collectively increased, maintained, or protected its monopoly in each relevant market.

185.     While each of Visa's acts is anticompetitive in its own right, Visa's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process in each relevant market, including, as compared to a more competitive environment, raising barriers to competition by other current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, restricting output or other services, and slowing innovation.

186.     Visa's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Visa's anticompetitive and unlawful conduct.

**B.     Second Claim for Relief: Attempted Monopolization of the Markets for General Purpose Debit Network Services and General Purpose Debit Card-Not-Present Debit Network Services in the United States in Violation of Sherman Act § 2**

187.     Plaintiff incorporates the allegations of paragraphs 1 through 180 above.

188.     Visa has attempted to monopolize, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services; and (2) the market for general purpose debit network services.

189.     Visa has monopoly power, or alternatively has a dangerous probability of obtaining monopoly power, in both relevant markets.

190.     Visa has attempted to monopolize each relevant market through an exclusionary course of conduct and anticompetitive acts described herein. While each of Visa's acts is

anticompetitive in its own right, Visa's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process in each relevant market, including, as compared to a more competitive environment, raising barriers to competition by other current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, restricting output or other services, and slowing innovation.

191.   In undertaking this course of conduct, Visa has acted with specific intent to monopolize each relevant market in the United States. Each of Visa's actions individually and collectively were specifically intended to monopolize each relevant market in the United States by destroying effective competition in those markets through the acts alleged herein. There is a dangerous probability that, unless restrained, Visa will succeed in monopolizing each market in the United States in violation of Section 2 of the Sherman Act.

192.   Visa's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Visa's anticompetitive and unlawful conduct.

**C.   Third Claim for Relief: Unlawful Agreements Not to Compete in Violation of Sherman Act § 1**

193.   Plaintiff incorporates the allegations of paragraphs 1 through 180 above. Plaintiff incorporates the allegations of paragraphs 1 through 180 above.

194.   Visa's agreements with competitors and potential competitors not to compete unreasonably restrain competition, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services; and (2) the market for general purpose debit network services.

195.   Visa has market power in both relevant markets.

196.     Visa's agreements pay competitors not to compete in each relevant market and pay potential competitors not to develop alternatives to debit card networks or adopt new technologies that may disintermediate traditional debit card networks. These agreements reduce or eliminate competition from existing or potential rivals who would challenge Visa's dominance and thus impede competition and unreasonably restrain trade in each relevant market. Compared to a more competitive environment, the effects of these agreements include raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, restricted output or other services, and slowing innovation.

197.     These agreements are not reasonably necessary to accomplish any procompetitive goals. Any procompetitive benefits are outweighed by anticompetitive harm, and there are less restrictive alternatives by which Visa would be able to reasonably achieve any procompetitive goals.

**D.     Fourth Claim for Relief: Unlawful Agreements that Restrain Trade in Violation of Sherman Act § 1**

198.     Plaintiff incorporates the allegations of paragraphs 1 through 180 above. Plaintiff incorporates the allegations of paragraphs 1 through 180 above.

199.     Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, in two relevant markets related to debit transactions in the United States: (1) the market for general purpose card-not-present debit network services; and (2) the market for general purpose debit network services.

200.     Visa has market power in both relevant markets.

201.     These agreements contain penalties, cliff pricing terms, volume commitments, and other terms that unreasonably restrain competition, including by foreclosing a substantial share of each relevant market. These agreements make it difficult for competition from existing

or potential rivals to challenge Visa's dominance and thus impede competition and unreasonably restrain trade in each relevant market. The effects of these agreements include raising barriers to competition by current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, reducing output or other services, and slowing innovation.

202.    These agreements are not reasonably necessary to accomplish any procompetitive goals. Any procompetitive benefits are outweighed by anticompetitive harm, and there are less restrictive alternatives by which Visa would be able to reasonably achieve any procompetitive goals.

## XI.    REQUEST FOR RELIEF

203.    To remedy these illegal acts, Plaintiff requests that the Court:

a.    Adjudge and decree that Visa has acted unlawfully to monopolize, or, in the alternative, attempt to monopolize, the market for general purpose card-not-present debit network services in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

b.    Adjudge and decree that Visa has acted unlawfully to monopolize, or, in the alternative, attempt to monopolize, the market for general purpose debit network services in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

c.    Adjudge and decree that Visa has acted unlawfully to contract or conspire to restrain trade in the market for general purpose card-not-present debit network services in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

d.    Adjudge and decree that Visa has acted unlawfully to contract or conspire to restrain trade in the market for general purpose debit network services in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

e.       Enter such relief as needed to cure the anticompetitive harm from all of Visa's unlawful actions;

f.       Enjoin Visa from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with the same purpose or effect as the challenged practices, including, but not limited to:

    i.   bundling credit services or credit incentives with debit network services or debit volume;

    ii.  imposing pricing or incentive structures, such as cliff pricing, that discourage or eliminate competition from rivals, potential rivals, or customers;

    iii. referencing rivals for Visa debit transactions, implicitly or explicitly, in Visa's contracts;

    iv.  imposing fees on debit transactions routed over non-Visa networks; and

    v.   limiting, by contract or other means, the number of back-of-card networks on Visa-branded cards;

g.       Enjoin Visa from continuing to engage in the anticompetitive practices described herein and from engaging in any other practices with the same purpose or effect as the challenged practices, including but not limited to:

    i.   agreeing, implicitly or explicitly, not to compete;

    ii.  imposing contractual limitations on the use of payment methods and payment rails (e.g., ACH, RTP, fintech debit, or alternative debit networks) that may compete with general purpose card-not-present debit network services or general purpose debit network services; and

   iii.   imposing contractual limitations on the ability of customers to offer their

          own payment networks or methods, or adopt new technologies that may

          disintermediate Visa;

   h.    Enter any other preliminary or permanent relief necessary and appropriate

to restore competitive conditions in the markets affected by Visa's unlawful conduct;

   i.    Enter any other relief necessary and appropriate to prevent evasion of the

Court's preliminary or permanent injunction(s); and

   j.    Award Plaintiff an amount equal to its costs, including reasonable

attorneys' fees, incurred in bringing this action.

Dated: this 24th day of September, 2024

Respectfully Submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

DOHA MEKKI
Principal Deputy Assistant Attorney General
Antitrust Division

HETAL J. DOSHI
Deputy Assistant Attorney General for
Litigation

MICHAEL KADES
Deputy Assistant Attorney General for Civil
Enforcement

RYAN DANKS
Director of Civil Enforcement

CATHERINE K. DICK
Acting Director of Litigation

MIRIAM R. VISHIO
Deputy Director of Civil Enforcement

OWEN M. KENDLER
Chief, Financial Services, Fintech, & Banking
Section

_s/ Edward Duffy_____
EDWARD DUFFY*
LILLIAN OKAMURO HAFFNER
CAMPBELL HAYNES
CHRISTINE A. HILL
KEVIN KRAUTSCHEID
GREGG MALAWER
BENNETT J. MATELSON
LAUREN G.S. RIKER
MICHELE TRICHLER
ROBERT VANCE
RACHEL L. ZWOLINSKI
*Attorneys*

United States Department of Justice
Antitrust Division
450 Fifth Street N.W., Suite 4000
Washington, DC 20530
Telephone: (202) 812-4723
Facsimile: (202) 514-7308
Email: edward.duffy@usdoj.gov

Attorneys for the United States

* LEAD ATTORNEY TO BE NOTICED