Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff and Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| BEIBEI CAI, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>VISA INC, RYAN MCINERNEY, CHRIS SUH, VASANT PRABHU, ALFRED F. KELLY, JR., PETER ANDRESKI, OLIVER JENKYN, and JACK FORESTELL,<br><br>    Defendants. | Case No. 5:24-cv-08220-NW<br><br>CLASS ACTION<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>JUDGE:    Hon. Noël Wise<br>DATE:     December 17, 2025<br>TIME:     9 a.m.<br>CTRM:    Courtroom 3, 5th Floor |

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

ISSUES TO BE DECIDED ..................................................................................................2

FACTUAL BACKGROUND.................................................................................................2

    A.    Visa and the Individual Defendants...................................................................2

    B.    How Debit Transactions Work ..........................................................................3

    C.    Visa Describes Debit as a "Core Product[]" and Dominates the U.S. Market.............3

    D.    How Visa Came to Dominate the U.S. Debit Market .........................................3

    E.    Congress Unsuccessfully Tries to Break Visa's Dominance ............................4

    F.    Defendants' Misstatements ...............................................................................4

    G.    DOJ's Extensive Investigation Shows that Defendants' Statements Were False ........5

       1.    Visa Thwarted the Durbin Amendment and Regulation II Clarification by Threatening High Prices for Non-Contestable Transactions.....................................5

         a.    Visa Uses the Threat of High Costs for Non-Contestable Transactions to Force Merchants and Acquirers to Route Nearly all Eligible Debit Through Visa.......................................5

         b.    Visa Pressures Card Issuers to Make it Difficult to Use Other Networks..............6

         c.    Visa's Strategy Was a Direct Response to the Durbin Amendment and the Regulation II Clarification .....................................7

       2.    Visa Also Uses its Power Over Debit to Suppress Fintech Alternatives ....................8

    H.    A Former Visa Senior Contract Analyst Corroborates the DOJ Complaint...............8

    I.    When the Truth About Visa's Response to the Durbin Amendment and the Regulation II Clarification Was Revealed, its Stock Dropped, Harming Investors.................................................9

    J.    Visa's Motion to Dismiss the DOJ Complaint is Denied .................................9

ARGUMENT.........................................................................................................................9

I.    PLAINTIFF ALLEGES ACTIONABLE MISSTATEMENTS ................................10

    A.    Defendants' Misstatements Are Not Inactionable Puffery ..........................10

- i -

B.    **Defendants' Statements Were Misleading**.......................................................................12

II.    **PLAINTIFF ALLEGES SCIENTER**..............................................................................15

A.    **Defendants Acted Knowingly or Recklessly**.................................................................16

B.    **Defendants Were Motivated to Lie Because of the Ongoing DOJ Investigation**.......19

C.    **The Balance of Inferences Supports Scienter**................................................................19

III.    **PLAINTIFF ALLEGES LOSS CAUSATION**..............................................................20

A.    **The DOJ's Detailed Complaint was a Substantive Disclosure Revealing that the Defendants' Earlier Statements were False or Misleading**....................................21

B.    **The Stock's Recovery Over Time Does Not Refute the Inference of Loss Causation**.........................................................................................................................24

**CONCLUSION** ............................................................................................................................25

OPPOSITION TO DEFENDANTS' MTD             CASE NO. 5:24-cv-08220-NW

**TABLE OF AUTHORITIES**

**Page(s)**

<u>Cases</u>

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
    692 F.3d 34 (2d Cir. 2012) ............................................................................................25

*Azar v. Yelp, Inc.*,
    2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ...............................................................12

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) .........................................................................................12

*Brody v. Transitional Hosps. Corp.*,
    280 F.3d 997 (9th Cir. 2002) .........................................................................................14

*Curry v. Yelp Inc.*,
    875 F.3d 1219 (9th Cir. 2017) .......................................................................................23

*Donley v. Live Nation Ent., Inc.*,
    2024 WL 794641 (C.D. Cal. Feb. 23, 2024) ..................................................................19

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023) ..........................................................................................16

*Eminence Cap., LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) .......................................................................................25

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) .......................................................................... 10, 11, 15, 18

*Hable v. Godenzi*,
    2023 WL 8653185 (D. Nev. Dec. 12, 2023) ..................................................................25

*Hadian v. Fate Therapeutics, Inc.*,
    2025 WL 2696995 (S.D. Cal. Sept. 22, 2025) ...............................................................25

*In re Apple Inc. Sec. Litig.*,
    2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ............................................................19, 20

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ...................................................................... 2, 21, 22, 23

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
    97 F.4th 1171 (9th Cir. 2024) ........................................................................................21

OPPOSITION TO DEFENDANTS' MTD                    CASE NO. 5:24-cv-08220-NW

*In re SVB Fin. Grp. Sec. Litig.*,
 2025 WL 1676800 (N.D. Cal. June 13, 2025) ...........................................................................10

*In re VeriFone Holdings, Inc. Sec. Litig.*,
 704 F.3d 694 (9th Cir. 2012).....................................................................................................20

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
 282 F. Supp. 3d 1074 (N.D. Cal. 2017) ...................................................................................16

*Karinski v. Stamps.com, Inc.*,
 472 F. Supp. 3d 747 (C.D. Cal. 2020)......................................................................................12

*Lloyd v. CVB Fin. Corp.*,
 811 F.3d 1200 (9th Cir. 2016)..............................................................................................20, 24

*Loos v. Immersion Corp.*,
 762 F.3d 880 (9th Cir. 2014)..............................................................................................22, 25

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
 540 F.3d 1049 (9th Cir. 2008)...............................................................................14, 20, 22, 25

*Monroe Cnty. Employees' Ret. Sys. v. S. Co.*,
 332 F.R.D. 370 (N.D. Ga. 2019) ..............................................................................................25

*Mulderrig v. Amyris, Inc.*,
 492 F. Supp. 3d 999 (N.D. Cal. 2020) .....................................................................................15

*Nathanson v. Polycom, Inc.*,
 87 F. Supp. 3d 966 (N.D. Cal. 2015) ........................................................................................25

*Nguyen v. Endologix, Inc.*,
 962 F.3d 405 (9th Cir. 2020)....................................................................................................20

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
 320 F.3d 920 (9th Cir. 2003)...............................................................................................10, 15

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
 575 U.S. 175 (2015) ...................................................................................................................15

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
 774 F.3d 598 (9th Cir. 2014)............................................................................................10, 20, 22

*Petrie v. Elec. Game Card, Inc.*,
 308 F.R.D. 336 (C.D. Cal. 2015) ..............................................................................................25

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
 759 F.3d 1051 (9th Cir. 2014)...................................................................................................20

OPPOSITION TO DEFENDANTS' MTD                    CASE NO. 5:24-cv-08220-NW

*Pujo v. EHang Holdings Ltd.*,
   2025 WL 1242324 (C.D. Cal. Mar. 26, 2025) ................................................................25

*Reese v. BP Expl. (Alaska) Inc.*,
   643 F.3d 681 (9th Cir. 2011).........................................................................................10

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014).............................................................................15, 16, 19

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008).........................................................................................16

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016).........................................................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................................16, 20

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ........................................................................20

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021).......................................................................................24

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009).........................................................................................20

OPPOSITION TO DEFENDANTS' MTD                    CASE NO. 5:24-cv-08220-NW

**<u>INTRODUCTION</u>**

Visa, Inc.'s ("**Visa**" or the "**Company**") network dominates the U.S. debit transaction market. To combat this, Congress passed the Durbin Amendment, which required all debit cards to be enabled for use on at least two unaffiliated debit networks. In October 2022, the Federal Reserve adopted a clarification of Regulation II, the Durbin Amendment's implementing regulation, that clarified that the two unaffiliated network requirement extended to transactions where the debit card was not present. Defendants were asked numerous times by analysts about the impact of the Regulation II Clarification on Visa's debit volume and how Visa was responding to the regulatory change. They answered repeatedly that the Regulation II Clarification would have or was having little impact on Visa because merchants and their banks chose to route their transactions through Visa because the value of certain features of Visa's network outweighed the lower cost of alternative networks. Defendants were also asked about the risk of technology companies building their own payment networks and cutting out Visa and they responded that they have dulled any threat by helping those companies achieve their objectives.

After a more than three-year investigation, the Department of Justice ("**DOJ**") filed a complaint against Visa, on September 24, 2024, alleging antitrust violations, that showed Defendants' statements were false. Contrary to Defendants' statements, the cornerstone of Visa's response to the Regulation II Clarification was to use certain undisclosed pricing tactics to make it uneconomical for merchants and their banks to route transactions over alternative networks and to force them into *de facto* exclusive debit routing contracts with Visa. Visa also used similar pricing tactics to prevent technology companies from developing competing products. When the truth was revealed, Visa's stock dropped, harming investors.

*Falsity.* Defendants' primary argument on falsity is that their statements were puffery, but they do not come close to showing that their statements were so obviously unimportant to a reasonable investor that dismissal as a matter of law is warranted. Additionally, since Defendants elected to speak specifically about their response to the Regulation II Clarification, they were required to disclosure their pricing strategy so they would not mislead investors. Instead, they portrayed Visa as competing based on network capabilities despite being more expensive.

- 1 -

***Scienter***. Defendants acted, at minimum, recklessly. Defendants' repeated statements specifically addressing Visa's strategy for responding to the Regulation II Clarification, including specific discussion of the sales tactics they used with merchants and their banks, showed their knowledge of the Company's Regulation II Clarification response. Yet, they failed to disclose Visa's pricing strategy even though the allegations show it was a company-wide strategy that enabled Visa to lock 75% of its debit volume into *de facto* exclusive contracts. Defendants were also put on notice by DOJ's investigation and admitted that debit was a core product of Visa. They had a motive to conceal their pricing tactics because DOJ was investigating them.

***Loss Causation.*** First, Defendants' argument that allegations in a complaint can never be a corrective disclosure is precluded by the Ninth Circuit's holding in *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 792 (9th Cir. 2020). Second, Visa's stock price did not "immediately rebound[]." Instead, it took almost a month, undermining Defendants' argument.

The Court should deny Defendants' motion.

## ISSUES TO BE DECIDED

Whether the Complaint pleads claims under Sections 10(b) and 20(a) of the Exchange Act by alleging falsity, scienter, and loss causation.

## FACTUAL BACKGROUND

### A.    Visa and the Individual Defendants

Visa runs, by far, the largest U.S. debit network. ¶¶43-45.[1] Defendant McInerney has served as Visa's CEO since February 1, 2023 and previously was its President starting in 2013 ¶31. Defendant Kelly served as CEO from 2016 to February 2023 and as Chairman of Visa's Board from 2019 to January 23, 2024. ¶34. Defendant Suh has been CFO since August 1, 2023 and Defendant Prabhu served as CFO & Vice Chairman between February 2015 and September 2023. ¶32-33. Defendant Andreski has served as the Company's Global Corporate Controller and Chief Accounting Officer since July 1, 2022. ¶35. Defendant Jenkyn served as Visa's Group President

---

[1] Plaintiff cites to the Amended Complaint ("Complaint," ECF No. 38) as "¶_", to Exhibits attached to the Declaration of Brian B. Alexander, attached to this memorandum, as "P.Ex._," and to Defendants' motion to dismiss (ECF No. 45) as "MTD." All emphasis is added and citations and quotation marks are omitted unless otherwise indicated.

- 2 -

since February 2023 and was President for North America starting in 2011. ¶36. Defendant Forestell has been the Company's Chief Product and Strategy Officer since February 2023 and served at other high level positions concerning Visa's product offerings starting in 2014. ¶37

### B.    How Debit Transactions Work

Debit transactions are financial transactions where funds are drawn directly from a consumer's bank account to pay a merchant ¶49. They are made possible by debit networks, the communications infrastructure that facilitates real-time payment. ¶50. Debit networks, like Visa, contract with the consumer's bank (the "**Issuer**") to issue debit cards that use their network and with the merchants' bank (the "**Acquirer**"), so merchants can accept those cards. ¶51. Using a debit card in person is a "**Card-Present Transaction**" and using a debit credential remotely is a "**Card-Not-Present Transaction**." ¶53. Debit networks, like Visa, charge a "Network Fee" on both the Issuer and Acquirer for every debit transaction. ¶55.

### C.    Visa Describes Debit as a "Core Product[]" and Dominates the U.S. Market

Over 60% of U.S. debit transactions, including over 65% of Card-Not-Present debit transactions (which make up 50% of debit spending), are processed over Visa's network. ¶45. Visa's North America business, its most profitable debit region, has an 83% operating margin. ¶44. In 2022, Visa earned more from its U.S. Debit business (23% of Visa's total nominal payments) than its U.S. credit business, and it earned more from U.S. debit than from any other region. ¶¶47, 202. In its annual reports, signed by McInerny, Suh, Andreski, Kelly, Prabhu, Visa described debit as a "core product[]" that drove its growth. ¶¶204-207.

### D.    How Visa Came to Dominate the U.S. Debit Market

The first debit cards were ATM cards issued by banks — merchants started installing PIN pads so that customers could enter their 4-digit ATM codes to make purchases. ¶¶56-57. These networks are referred to as "**PIN Networks**." ¶57. Visa began to dominate the debit market in the 1990s by (1) requiring merchants to accept its debit cards if they wanted to accept its credit cards and (2) requiring banks that issued Visa's debit cards to have exclusive relationships with Visa. ¶¶58-59. Litigation ended those practices, but, by that time, Visa dominated the debit market. ¶¶60-61.

OPPOSITION TO DEFENDANTS' MTD                    CASE NO. 5:24-cv-08220-NW

### E.    Congress Unsuccessfully Tries to Break Visa's Dominance

Congress passed the "**Durbin Amendment**" as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. ¶63. "**Regulation II**," the Federal Reserve rule implementing the Durbin Amendment, required debit card issuers to enable at least one unaffiliated network as a competitor to the network that appeared on the front of the card (the "**Front-of-Card Network**"), which is almost always Visa (over 70% of the market) or Mastercard. ¶63. The additional unaffiliated networks appear on the back of cards, referred to as "**Back-of-Card Networks**." ¶64. In October 2022, the Federal Reserve adopted the "**Regulation II Clarification**" (effective July 1, 2023), which clarified that at least one unaffiliated back-of-card network must also be enabled for Card-Not-Present Transactions. ¶65.

Back-of-Card Networks are frequently PIN Networks. ¶64. Despite their origins as ATM networks, PIN Networks have innovated by developing a system called "**PINless**," which allowed them to process transactions without the consumer entering a PIN. ¶66. For most transactions, ***the PIN Networks' fees are significantly lower than Visa's***. ¶67. Despite this, the Durbin Amendment and the Regulation II Clarification have had little effect on Visa' debit market share. ¶68.

### F.    Defendants' Misstatements

*Regulation II Clarification Misstatements.* Analysts over and over again asked Defendants McInerney, Prabhu, Suh, Jenkyn, and Forestell during earnings calls and investor conferences about the impact of the Regulation II Clarification. Those Defendants repeatedly gave detailed answers explaining that the impact was or would be small because merchants and Acquirers continued to choose to route through Visa because certain superior features Visa's network offered outweighed the lower price of other networks. *See* ¶¶127-162.

*Fintech Misstatements.* At investor conferences, analysts asked Defendant Prabhu and McInerney similar questions about the risk of technology companies building their own payment networks and cutting Visa out of the payment process. Both Defendants downplayed the threat. Prabhu specifically brought up Apple which he described as "riding [Visa's] network" with Apple Pay because Visa had "help[ed] them achieve their objective." ¶163. Similarly, McInerney stated that fintech companies did not "disintermediate," *i.e.* cut Visa out of the payment process, because

- 4 -

they helped those companies "achieve their objectives for their user base." ¶165.

*Public Filing Misstatements.* Visa's annual and quarterly reports during the Class Period stated: "[o]ur financial institution clients and merchants can reassess their commitments to us at any time or develop their own competitive services." ¶¶167-175.

**G.    DOJ's Extensive Investigation Shows that Defendants' Statements Were False**

DOJ began investigating Visa's debit practices in March 2021. ¶76. The *New York Times* reported: DOJ "conducted hundreds of interviews with parties, including retailers, grocery stores and banks" and "looked at the negotiations, contracts and ways in which the penalties were structured." ¶77. After a more than three-year investigation, DOJ filed a detailed complaint under the Sherman Antitrust Act in the Southern District of New York (the "**DOJ Complaint**"). ¶78.

1.    <u>Visa Thwarted the Durbin Amendment and Regulation II Clarification by Threatening High Prices for Non-Contestable Transactions</u>

In contrast to Defendants' public statements, which claimed that Visa's debit volume was unaffected by the Regulation II Clarification because of the superior features of Visa's network, the DOJ's investigation showed that the cornerstone of Visa's response was to make it uneconomical for merchants and Acquirers to route transactions over alternative networks. Visa did this by exploiting that about half the time a customer uses a debit card with Visa on the front, it cannot be processed with an unaffiliated Back-of-Card Network (referred to as "**Non-Contestable Transactions**) — even after the new regulation. ¶80. Visa's ability to impose high costs on Non-Contestable Transactions, which merchants have to process through Visa regardless of the price, enabled it to pressure merchants, Acquirers, and Issuers into debit routing contracts that prevented transactions from being routed over the PIN Networks even when a transaction was eligible for those networks and could be processed over those networks for a lower price. ¶81.

a.    *Visa Uses the Threat of High Costs for Non-Contestable Transactions to Force Merchants and Acquirers to Route Nearly all Eligible Debit Through Visa*

Visa prevents merchants and Acquirers from routing transactions through unaffiliated Back-of-Card Networks by charging them artificially high "**Rack Rates**" for non-contestable transactions unless they route all or nearly all eligible debit transactions through Visa. ¶82. These

OPPOSITION TO DEFENDANTS' MTD                    CASE NO. 5:24-cv-08220-NW

volume requirements are structured as "**Cliff Pricing**" — Visa grants the merchant or Acquirer a lower price for every transaction routed to Visa if its total volume exceeds a certain threshold. ¶83. But if the merchant or Acquirer does not meet that threshold, even by a small amount, Visa imposes its high Rack Rate on *all* transactions routed through its network, *including the Non-Contestable Transactions that must be routed through Visa.* ¶¶83, 87. Since merchants and Acquirers need to route almost all their Visa-eligible debit transactions over Visa to avoid the Rack Rates, the merchants and Acquirers have two options — (1) agree to exclusivity with Visa or (2) try to route its "**Contestable Transactions**" (transactions that can be routed through Visa or an alternative network) to Back-of-Card Networks and be forced to pay Visa's exorbitant Rack Rates for Non-Contestable Transactions. ¶84. Since the second option generally leads to greater total cost for merchants and Acquirers, they are forced to accept *de facto* exclusive agreements with Visa. *Id.*

To avoid these Rack Rates, merchants representing hundreds of billions of dollars of 2023 debit volume have signed contracts to route 100% of their eligible volume to Visa. ¶86. Furthermore, while Visa's contracts include varying pricing terms, they almost universally include significant volume commitments and failure to comply with that commitment frequently allows Visa to terminate the entire contract early and claw back previously paid incentives. *Id.* The threat of Visa's Rack Rates is so strong even some Acquirers *that operate rival PIN Networks*, have agreed to exclusive routing deals with Visa. ¶89. The DOJ Complaint quoted a Visa executive confirming this strategy — the executive advised against lowering debit Rack Rates, noting that because Visa had such a large number of "uncontested" transactions that "P&L [Profit and Loss] would be hammered…And if you lower the price, there is nothing to put in a routing deal, merchant gets it by default with no commitment." ¶90. Visa also uses other financial incentives to ensure exclusivity, including: (1) waiving other fees on merchants and Acquirers in exchange for exclusivity, including a fixed monthly fee that it introduced shortly after the Durbin Amendment went into effect and (2) tying credit card transaction incentives to debit volume. ¶¶85, 88, 91.

        *b. Visa Pressures Card Issuers to Make it Difficult to Use Other Networks*

Visa has also blunted the effect of the Durbin Amendment and Regulation II Clarification by using similar Cliff Pricing tactics to pressure debit card Issuers to enable only a single

- 6 -

unaffiliated Back-of-Card Network and make that network difficult to use. ¶92. For example, Visa's contract with JPMorgan Chase provides that only one unaffiliated PIN Network can be enabled on 90% of Chase-issued Visa debit cards. ¶93. Visa also has 1,000 Issuer contracts that impose significant monetary penalties across all Visa debit transactions if issuers do not meet volume requirements. ¶94. Risk of being penalized for failing to meet volume requirements is higher if it can be attributed to action by the issuer, including the decision to enable additional PIN Networks. ¶95. These volume requirements deter Issuers from putting more networks on the back of their cards and incentivize them not to enable the existing networks for additional transaction types, such as PINless routing over lower cost PIN Networks. ¶¶96-100. The DOJ Complaint quoted a Visa senior executive stating that the language in a contract was "good enough" to protect Visa from PINless networks because the only way the Issuer could meet the volume requirement was "to dump[] their [alternative] debit network…if it starts shifting volume." ¶97. Visa executives also acknowledged that Visa discourages Issuers from enabling PINless transactions because they know that if fewer Issuers enable those networks, fewer merchants will make the effort to accept those networks. ¶99.

c.  *Visa's Strategy Was a Direct Response to the Durbin Amendment and the Regulation II Clarification*

The DOJ found that, following the passage of the Durbin Amendment, Visa recognized that it needed to act "quickly and decisively" to prevent the shift of debit share away from its network. ¶102. Visa engaged in a "relentless strategy" of locking up entities that control routing decisions and entered into *de facto* exclusive routing contracts that covered over 75% of Visa debit volume (including 80% of card-not-present volume) and at least 45% of total U.S. debit volume by the end of 2022. ¶103. Visa's contracts with Issuers magnified this by incentivizing Issuers to make more transactions non-contestable. *Id.* Visa told its Board of Directors that its routing deals "allow Visa 'to stabilize [its] volume.'" *Id.* DOJ specifically found that in anticipation of the Regulation II Clarification going into effect, Visa "strategized to secure more volume under routing deals, to target merchant and acquirer deals with early termination fees for longer, firmer commitments of routing volume as well as to renew issuing agreements [and]… took steps to

OPPOSITION TO DEFENDANTS' MTD                    CASE NO. 5:24-cv-08220-NW

ensure volume was locked up prior to the regulation going into effect." ¶104.

### 2. Visa Also Uses its Power Over Debit to Suppress Fintech Alternatives

The DOJ's investigation also showed that McInerney and Prabhu's claims that they dulled the threat that fintech companies posed by helping them achieve their objectives were misleading. Instead, Visa used its playbook of threatening high fees for transactions that those companies needed Visa to process to prevent them from cutting Visa out of transactions. Both PayPal and Square developed systems that allowed customers to pay with Visa or directly from their bank accounts using a digital wallet. ¶¶111, 118-119. In both cases, Visa used the fact that a significant number of customers continued to want to make payments through PayPal and Square using their Visa-branded debit cards to force those companies not to disintermediate Visa from other transactions. Visa threatened to impose exorbitant digital wallet fees and Rack Rates for PayPal's Visa transactions unless PayPal entered into a new routing contract with Visa that required it to fund transactions using Visa's network if a customer had a Visa-branded card in their PayPal wallet instead of directly withdrawing money from the customer's bank account. ¶¶113-115.

When Square announced the product "Cash Drawer," which allowed people to store funds in their Square Cash account as an alternative to paying with Visa debit, Visa threatened to terminate its contract with Square and impose high fees and other penalties on the Visa debit transactions Square processed. ¶118. Because of this threat, Square removed the Cash Drawer feature. *Id.* Square later announced another feature, Cash App Pay, which one Visa executive stated "follows the disintermediation playbook to the letter." ¶119. Visa used the threat of high digital wallet fees to obtain commitments from square to route 97% of its Cash App Pay transactions over Visa's network. ¶120. Visa also threatened to impose staged digit wallet fees on other entities, but all of them signed routing deals with Visa instead of paying the fee. ¶121.

Contrary to Prabhu's statement, Visa considers being disintermediated by Apple an "existential threat." ¶122. Because of Visa's concerns, Visa paid Apple hundreds of millions of dollars in 2023 in exchange for a commitment not to disintermediate Visa. ¶123.

### H. A Former Visa Senior Contract Analyst Corroborates the DOJ Complaint

FE-1, a Senior Contract Analyst at Visa, who worked on contracts with both Acquirer and

Issuer banks corroborated the DOJ's findings about the structure of Visa's contracts. ¶105. Just like the DOJ, FE-1 stated that the contracts had a Cliff Pricing structure so that "if you hit this [volume] mark, this is your rate" and when the customers missed usage targets, Visa would clawback incentives. ¶¶106-107. FE-1 further stated that these contract structures were company-wide policy since they were all contained in templates. ¶108.

## I.    When the Truth About Visa's Response to the Durbin Amendment and the Regulation II Clarification Was Revealed, its Stock Dropped, Harming Investors

On the evening of September 23, 2024, after the market closed, multiple news outlets reported that DOJ planned to file suit against Visa. ¶176. *Bloomberg* stated that DOJ's "allegations include that Visa made exclusive agreements to hinder the expansion of competing networks and thwarted efforts by technology companies to enter the market." *Id.* On September 24, 2024, before the market opened, *The New York Times* reported that DOJ planned to allege that "Visa punishes customers, including merchants, when they try to use competing services to process payments" and "that Visa coerces financial technology firms to work with it by threatening penalties on those who do not, and thus squeezing out potential new competitors." ¶177. DOJ filed the DOJ Complaint later that day. ¶178. On this news, the price of Visa's stock fell $15.85 per share, or approximately 5.5%, from where it closed on September 23, 2024, to $272.78 per share at market close on September 24, 2024. On September 25, 2024, Visa's stock fell another $3.15 per share to close at $269.63 for a total two-day loss of approximately 6.6% that harmed investors. ¶179.

## J.    Visa's Motion to Dismiss the DOJ Complaint is Denied

On June 23, 2025, the Honorable John G. Koeltl denied Visa's motion to dismiss the DOJ Complaint, holding it plausibly alleged that Visa's contracts "included cliff pricing, clawback provisions, and other penalties [that] in effect, took away the ability of customers to terminate the agreements" and that "Visa's loyalty program prevented Visa's customers from routing to PIN networks even when PIN networks offered lower per-transaction prices than Visa." ¶¶124-125. Judge Koeltl further held that the "allegations suggest plausibly that Visa's contracts work to suppress competition from fintech rivals and to prevent entry by potential competitors." ¶126.

## ARGUMENT

OPPOSITION TO DEFENDANTS' MTD                    CASE NO. 5:24-cv-08220-NW

On a Rule 12(b)(6) motion, "[a]ll allegations of material fact made in the complaint are taken as true and construed in the light most favorable to the plaintiff" and "[a] complaint should not be dismissed unless it appears beyond a doubt that the plaintiff cannot prove any set of facts...that would entitle him or her to relief." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003) ("*America West*").

## I.    PLAINTIFF ALLEGES ACTIONABLE MISSTATEMENTS

"A statement or omission is misleading in the securities fraud context if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011).

### A.    Defendants' Misstatements Are Not Inactionable Puffery

Defendants argue that their statements are not actionable because they are puffery. MTD at 21. "'Puffery' is not actionable under the PSLRA because the law deems such statements so amorphous as to be immaterial," but "determining whether a given statement is material entail[s] delicate, fact-intensive assessments that are more properly left to the jury." *In re SVB Fin. Grp. Sec. Litig.*, 2025 WL 1676800, at *11 (N.D. Cal. June 13, 2025). Accordingly, "in deeming a statement puffery at the motion to dismiss stage, courts must exercise great caution" and "to dismiss claims on that ground…the Court must conclude that the statement is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Id.* The alleged misstatements do not meet this stringent standard.

Defendants base their entire argument on *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014), where the Ninth Circuit held that no investor would have relied on a series of generally optimistic, essentially boilerplate, statements about the future prospects of the company. This case is easily distinguishable from *Apollo* because of, among other things, the context in which the statements were made. As explained by the Ninth Circuit in the more recent case of *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023), even "general statements of optimism, when taken in context, may form a basis for a securities fraud claim." Thus, *Forescout* held that phrases such as "tracking very well" and "very large pipeline" were misleading because they "contravened the unflattering facts in [Forescout's

- 10 -

possession]" and were made in response to specific questions asked by analysts. *Id.* at 770-771.

Here, like *Forescout* and unlike *Apollo*, most of the alleged misstatements were made in response to specific questions from analysts about the impact of the Regulation II Clarification. Analysts specifically asked Defendants over and over again about the impact it had on merchant and Acquirer routing choice and Defendants repeatedly made statements that gave the impression that (1) the Regulation II Clarification would have or was having little or no effect on Visa's debit volume and (2) the reason was that, ***even though other networks cost less***, merchants and Acquirers continue to choose Visa because its network has superior features. ¶¶127-162. This gave investors the impression of a state of affairs that differed in a material way from what actually existed because, in reality, a key part Visa's strategic response to the Regulation II Clarification ***was to use Cliff Pricing and related tactics to make it so that merchants and Acquirers would have higher overall network fees*** if they routed Visa eligible transactions to other networks, even if the alternative network was cheaper for those particular transactions. ¶¶79-108.

Defendants highlight some portions of the statements that they claim are puffery. (MTD 21-22). First, this is misleading because it divorces the statements from their overall context — the Court cannot evaluate the overall impression that they gave investors from an isolated sentence or two. Second, there are many instances where Defendants concretely stated that the reason Regulation II Clarification was having little impact was because the features of Visa's network outweighed the lower cost of other networks. For example:

- There are certain things ***we do that other networks don't that cause merchants today to use us, even though some may think we're more expensive*** because it's a total cost of use, right? If you want to use another network, but fraud is going to be higher, you may be better off using our network… So the merchant can look at it objectively and say, yes, I mean, ***the price they charge may be different, but the value is still greater*** here. ¶134 (Prabhu);

- ***[I]t's not just a cost-based decision***. And we bring a lot to merchants in terms of the way we help them with managed risk. ¶138 (McInerney);

- ***People think cost is the predominant***, but there are other factors. There's actual sort of functionality, there's security and you think about ***there's a big difference between what we do and what sort of the pin-based debit networks can do***. ¶151 (Suh);

- [M]erchants, ultimately, will have a choice under Reg II. ***And that choice comes down***

OPPOSITION TO DEFENDANTS' MTD                    CASE NO. 5:24-cv-08220-NW

*to not only cost, but to capabilities and liability*. ¶153 (Suh);

- *[M]erchants have choices. Cost is one of them. But they also understand capability differences* between us and what is historically a pin-based debit network. ¶155 (Suh).

Notably, Defendants highlight a snippet of one statement in which Defendant Suh says "Visa's value prop is very good" (¶146), but, in context, Suh is misleadingly saying that Visa's "value prop" is good, despite its higher network fees, because of its network's additional features.

Accordingly, Defendants' statements concerning the Regulation II Clarification (¶¶127-162) were not so obviously unimportant to a reasonable investor that they can be dismissed as puffery on a motion to dismiss. *See, e.g. Karinski v. Stamps.com, Inc.*, 472 F. Supp. 3d 747, 752 (C.D. Cal. 2020)  (statements such as "I think it was really meant to highlight the win-win nature of the partnership and how both sides are succeeding" were not puffery). Although Defendant do not directly address them, Plaintiff notes that Defendants' other statements are also not puffery. As discussed further below, Defendants Prabhu and McInerney both gave detailed answers to specific analyst questions about the risks that Visa faced from fintech companies. ¶¶163-166. Additionally, the statement "our financial institution clients and merchants can reassess their commitments to us at any time or develop their own competitive services" that appeared in Visa public filings in the Class Period was clearly a concrete (and false) statement. ¶¶167-175.

## B.    Defendants' Statements Were Misleading

Even if disclosure might not otherwise be required, once defendants speak about an issue, they must do so in a way that is not misleading. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("Had defendants released no backlog reports, their failure to mention the stop-work orders might not have misled anyone. But once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of."); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 702, 707-708 (9th Cir. 2016) (mention of requirement to conduct preclinical animal studies put their results at issue). *Azar v. Yelp, Inc.*, 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018), is instructive. It held the statement that Yelp's local ad sales were "a fairly proven model that we feel we're pretty good at operating" was misleading because of the omission of the churn of advertisers in the program.  *Id.* at *13.

OPPOSITION TO DEFENDANTS' MTD                    CASE NO. 5:24-cv-08220-NW

Defendants claim that their statements were not misleading because they do not "discuss Visa's contractual practices, its pricing, or its incentives for customers." MTD at 24. Defendants' description of the statements and the omitted information is misleading. The bulk of the misstatements are Defendants' statements concerning the Regulation II Clarification. ¶¶127-162. All of those statements are similar: an analyst asked one of the Defendants about the impact of the Regulation II Clarification and the Defendant answered by explaining that Visa was successfully responding to the Regulation II Clarification by selling merchants and Acquirers on the added value of the greater capabilities of Visa's network. As discussed above, in many of the statements Defendants explicitly state that the greater capabilities of Visa's network outweighs the higher cost of its network. *See* ¶¶130, 134, 138, 146, 151, 153, 155, 157. It was misleading for Visa to tout its successful response to the Regulation II Clarification while omitting that an important part of its response was to use Cliff Pricing and related tactics to make it so that merchants and Acquirers would have higher overall network fees if they routed Visa eligible transactions to other networks, even if an alternative network was cheaper for those particular transactions.

There is also a close connection between the other misstatements and the facts the Complaint alleges were omitted from them. For both fintech misstatements, an analyst asked about the risk and opportunity to Visa from technology companies. ¶¶163, 165. Prabhu gave a detailed response where he specifically stated that Apple was "riding [Visa's] network" because of the difficulty of building an alternative and because Visa could "help them achieve their objective" and "do it with economics that are attractive to them." ¶163. Prabhu's omission of the material fact that Visa was paying Apple hundreds of millions of dollars a year not to develop a competing product gave investors a misleading impression. ¶¶122-123, 164. In his statement, McInerney responded by stating that going back 10 years, there was a narrative that "[fintech] companies were going to disintermediate Visa[,]" but that Visa prevented this by "putting [its] network to work in service of them" and "help[ing] them achieve their objectives." ¶165. McInerney omitted the material fact that an important part of Visa's response to the threat of disintermediation by fintech was threatening high fees for the transactions that the fintechs needed Visa to process. ¶¶109-123.

The repeated statement in Visa' public filings was also straightforwardly misleading.

- 13 -

¶¶167-175. Stating that "[o]ur financial institution clients and merchants can reassess their commitments to us at any time" gave investors a misleading impression given that Visa used Cliff pricing and related tactics to push merchants, Acquirers, and Issuers into contracts that made it functionally difficult, if not financially impossible, for them to reassess their commitment to Visa.

*Brody v. Transitional Hosps. Corp.*, 280 F.3d 997 (9th Cir. 2002) and *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008), are not applicable — the relationship between the statements and allegedly omitted facts in those cases was vastly more attenuated. *See Brody*, 280 F.3d at 1006 (plaintiffs argued with little explanation that a press release about a stock repurchase program was misleading because it did not disclose company's possible takeover); *Metzler*, 540 F.3d at 1070 (plaintiffs alleged that "virtually every Class Period statement discussing Corinthian's financial status was false" based on general allegations of fraudulent practices and failure to disclose regulatory investigations). Defendants try to analogize *Metzler* to this case because of the number of misstatements concerning the Regulation II Clarification. But, in contrast to *Metzler*, these are all detailed statements about a specific topic about which Defendants omitted material facts. The large number of similar statements that were false for similar reasons just shows the extent of Defendants' fraud.

Defendants also misrepresent the cases they cite concerning the disclosure of unproven allegations of wrongdoing. MTD at 24. They stand for the proposition that defendants do not have a free-floating obligation to confess to wrongdoing. They do not stand for the proposition (as Defendants seem to claim) that a defendant can make detailed statements about their response to a government regulation (in this case the Regulation II Clarification) and leave out an important part of their response because the DOJ might think it is illegal. Notably, Defendants would not have had to portray their practices negatively to make their statements not misleading. They simply had to disclose that a significant part of their strategy was to use pricing and contract structures that incentivized merchants and Acquirers to continue to route their transactions through Visa. Instead, possibly with an eye towards what the DOJ would think, Defendants misled investors.

Finally, Defendants argue that some of their statements are inactionable because they are opinions. Defendants concede that the statements in Paragraphs 132, 134, 146, 151, 155, 163, and

- 14 -

168 are not opinions. MTD at 24. Additionally, Defendants claim that some statements are opinions, but ignore parts of the statement that are not opinions. *See, e.g.* ¶130 ("So the ability to save a couple of basis points in cost have to be weighed against the risk that comes from the liability of fraud in the e-commerce space."); ¶138 ("[W]hen they're making decisions, it's not just a cost-based decision"); ¶144 (explaining Visa's strategy was to get in front of any adverse impact from Regulation II by talking to clients and partners about "the benefits of a Visa transaction, especially…fraud liability"); ¶153 ("[M]erchants, ultimately, will have a choice under Reg II. And that choice comes down to not only cost, but to capabilities and liability"); ¶165 ("we've been able to help [fintechs] achieve their objectives for their user base, whatever their end objectives are"). In fact, even if a sentence starts with "I believe" or something similar, "embedded statements of fact" are still treated as non-opinion statements. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185 (2015) (explaining that "we use a patented technology to which our competitors do not have access" would be a statement of fact even if prefaced by "I believe our TVs have the highest resolution available because…").

Furthermore, if a statement is an opinion, it is still actionable when a plaintiff identifies "particular (and material) facts going to the basis for the…opinion…whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194. As discussed above, Plaintiff has identified omitted material facts that render the alleged misstatements misleading. *See Forescout*, 63 F.4th at 778–79 ("[T]he statements include phrases [that] might render the statements *opinions*…, but it does not follow that the statements do not create [a misleading impression]" (emphasis in original)).

## II.    PLAINTIFF ALLEGES SCIENTER

Scienter may be pled by pleading "knowledge of the falsity as well as 'deliberate or conscious recklessness.'" *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1013 (N.D. Cal. 2020) (quoting *America West*, 320 F.3d at 937). One acts with deliberate recklessness "if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled by City of Dearborn Heights*

- 15 -

*Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). An inference of scienter is strong "if a reasonable person would deem the inference…cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Thus, a tie goes to the plaintiff. *Id.* The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). A motive is not required to plead scienter, but can be a relevant consideration. *Id.* at 325.

Defendants misconstrue the scienter allegations in the Complaint, claiming the basis for scienter is only a core operations argument. Instead, the Complaint alleges that Defendants acted, at minimum recklessly, because (1) Defendants specifically addressed the strategy that Visa was using to respond to the Regulation II Clarification repeatedly; (2) the use of Cliff Pricing and related tactics to lock merchants, Acquires, and Issuers into *de facto* exclusive contracts was a company-wide strategy; (3) Defendants were put on notice to look into their practices by the DOJ's Investigation; and (4) debit was a core operation of Visa. Also, contrary to Defendants' claim, Plaintiff pled a motive — Defendants were motivated not to tell the truth about their response to the Regulation II Clarification and fintech companies because DOJ was investigating it.

### A.    Defendants Acted Knowingly or Recklessly

*First,* when defendants make specific statements that show their knowledge of the subject area of the misstatement, that strongly supports scienter. For example, in *Reese*, 747 F.3d at 572, the Ninth Circuit held the fact that a defendant "addressed corrosion rate data specifically, render[ed] it unlikely that she was not aware of it[,]" and that this "'bridge[d] the [scienter] gap.'" (*quoting S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 783 (9th Cir. 2008)). *See also E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 939-40 (9th Cir. 2023) (defendant's repeated statements during earnings calls that showed knowledge of subject area of misstatements contributed to scienter); *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1100 (N.D. Cal. 2017) (contributed to scienter that defendant "spoke extensively" about cross-selling, the subject area of misstatements, and about the company's "success" in that area and its

OPPOSITION TO DEFENDANTS' MTD                          CASE NO. 5:24-cv-08220-NW

"purported value" to customers).

The statements of Defendants McInerney, Suh, Prabhu, Jenkyn, and Forestell show that they were knowledgeable about the Regulation II Clarification and that they were involved in and closely monitoring Visa's response to it. **Defendant McInerney**, Visa's CEO, made six specific misstatements on earning calls and at an investor conference. ¶¶130, 138, 140, 144, 149, 161. McInerney repeatedly explained what the Regulation II Clarification requires and that it was having little impact on merchants' routing choice due to the superior features of Visa's network. McInerney stepped in to answer questions about the Regulation II Clarification even when they were directed at his CFO. *See, e.g.* ¶¶138, 144. He also described the specifics of the discussions Visa had with Merchants about the Regulation II Clarification. *See* ¶140 ("When we're having conversations with merchants on this front, which…our teams are doing regularly…the conversations tend to gravitate to a couple things."); ¶144 ("our sales teams are in with merchant clients and acquire clients day-in and day-out, explaining the value of our products"); ¶149 (addressing results "client by client"). McInerney also highlighted that Visa was having "conversations at more senior levels in the organization about the details of our products than we've ever had before." ¶149. McInerny's statement about fintech disintermediation of Visa also shows great knowledge of that area — he discussed the history of Visa's relationships with fintech companies, including a "decision that we [referring to Visa] made 10 years ago." ¶165.

**Defendant Suh**, Visa's CFO, made five similar misstatements about the reasons for the modest impact of the Regulation II Clarification at five investor conferences in a little more than six months. ¶¶146, 151, 153, 155, 157. As with McInerny, Suh repeatedly explained how the Regulation II Clarification worked, *see, e.g.* ¶146 ("What is Reg II? For those that aren't familiar…"), and described how Visa's sales team was engaging with merchants about the features of Visa's network, *see, e.g.* ¶157 ("Since the implementation of Reg II, we've had an opportunity to engage many of our clients…and really articulate what we think is the value proposition, the differentiation of the Visa network relative to alternative pin-based debit network"); ¶¶151, 153.

An analyst asked **Defendant Prabhu**, when he was CFO, "why a merchant prefers Visa for routing, even when they have a choice of routing," and he responded by explaining that "[m]any

- 17 -

of our issuers are already enabling multiple networks online" and that Visa was differentiating itself based on network services even though "we're more expensive." ¶134. Regarding his fintech misstatement, Prabhu specifically brought up Apple and gave a long explanation of its relationship with Visa and why it was "riding [Visa's] network." ¶163. By specifically addressing that, he was, at minimum, reckless in not disclosing Visa's huge payments to Apple to stay on Visa's network.

*Defendant Jenkyn* also showed his knowledge, stating: "[o]bviously, one of the topics that I get a lot of questions on U.S. regulation is Reg II." ¶187. When asked about the potential effect of the Regulation II Clarification, he explained the rule and stated: "we spend all our time talking to these merchants…and acquirers," and that the "capabilities and the functionality of [Visa's] network" was the differentiating factor. ¶127. Jenkyn served as Visa's President of North America starting in 2011, giving him U.S. debit knowledge ¶¶36, 187. *Defendant Forestell* gave a similarly detailed response when asked for his thoughts on the Regulation II Clarification. ¶¶132, 188.

*Second*, scienter is further supported by the fact that Visa's use of Cliff Pricing tactics to lock merchants and Acquirers into *de facto* exclusive routing contracts was a company-wide strategy. ¶¶102-104; 189-192. In *Forescout*, 63 F.4th at 772, the Ninth Circuit held that "Plaintiffs' allegations of a company-wide pressure campaign, on their own, are sufficient to raise a strong inference of scienter." The DOJ's investigation found that Visa undertook this strategy in direct response to the Durbin Amendment and again in anticipation of the Regulation II Clarification taking effect. ¶¶102, 104. By the end of 2022, such contracts covered ***75% of Visa's debit volume (including 80% of card-not-present volume) and at least 45% of total U.S. debit volume.*** ¶103. Visa told its Board of Directors that the contracts "stabilize[d] [Visa's] volume" and the DOJ quoted a Visa executive and an employee as explicitly discussing how routing deals made it not commercially reasonable for merchants to route transactions through other networks. ¶¶90-91, 103. FE-1 corroborated the use of Cliff Pricing contracts as standard at Visa. ¶¶105-108.

*Third*, DOJ scrutiny supports the inference that Defendants' statements were, at minimum, reckless. Visa received Civil Investigative Demands ("CIDs") from DOJ on March 26, 2021, June 11, 2021, January 4, 2023, and May 2, 2023, which, according to Visa's public filings, concerned "U.S. debit and competition with other payment methods and networks." ¶210; P.Ex.1. An ongoing

- 18 -

government investigation contributed to scienter in *Reese*, 747 F.3d at 571, where the Ninth Circuit held that a government investigation into an earlier oil spill gave defendant "every reason" to review pipe corrosion data that would have made her aware that her statement was false.

*Fourth*, the core operations inference further bolsters Plaintiff's other scienter allegations as part of the holistic analysis. According to Visa's 2023 10-K, its payments volume is the "primary driver for [its] service revenue." U.S. debit alone made up over 23% of Visa' total nominal payments volume. ¶202. Additionally, Visa earns more from its U.S. Debit than from U.S. credit and it earns more revenue from U.S. debit than from any other region. ¶203. Furthermore, annual reports signed by Defendants McInerny, Suh, Andreski, Kelly, and Prabhu state that debit is a "core product[]" of Visa. ¶¶204-207. *See In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *9 (N.D. Cal. Nov. 4, 2020) (core operations inference supported scienter as part of holistic analysis because China was Apple's third-latest market and accounted for nearly 20% of Apple's revenue).

**B.    Defendants Were Motivated to Lie Because of the Ongoing DOJ Investigation**

Defendants erroneously claim that the Complaint does not plead a motive. The Complaint pleads that Defendants were motivated not to discuss Visa's use of Cliff pricing and related tactics because of DOJ's pending investigation. *See Donley v. Live Nation Ent., Inc.,* 2024 WL 794641, at *10 (C.D. Cal. Feb. 23, 2024) (pending antitrust investigation supported scienter because of inference that defendants were motivated "not to disclose the full picture[,]" "'not because [they] believed [the contextual statements] were meaningless but because [they] understood their likely effect on the investigations into alleged anticompetitive conduct").

**C.    The Balance of Inferences Supports Scienter**

Taking the allegations collectively, the inference that Defendants acted, at minimum, recklessly is cogent and at least as compelling as any opposing inference. Defendants made repeated specific statements about Visa's response to the Regulation II Clarification, showing deep knowledge of the subject, including about specific conversations with merchants and Acquirers. Defendants portrayed Visa's Regulation II Clarification response as based on convincing merchants and Acquirers to use Visa's network, *despite its greater cost*, because of the superior features of Visa's network, omitting that they were engaging in a company-wide strategy to use

- 19 -

Cliff Pricing and related tactics to make it uneconomical for merchants and Acquirers to route transactions over other networks. Further supporting Defendants' recklessness is they were put on notice to investigate their practices by the DOJ's CIDs and debit was core to Visa's business.

Defendants' arguments ignore both the recklessness standard, *see In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("turning a '"blind eye' is equally culpable…under Rule 10(b)-5"), and *Tellabs*, 551 U.S. at 324-325, holding that scienter does not require a "smoking gun" or a "pecuniary motive." *See also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1044 (N.D. Cal. 2016) (lack of alleged stock sales not an important scienter consideration, especially under recklessness theory). Also, Defendants' reliance on *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020), undermines their argument. *Endologix* had unusual facts, holding that it made no sense for Defendants to tell the market that the FDA would approve a drug they knew would not be approved. *See Apple Inc. Sec. Litig.*, 2020 WL 6482014, at \*13 (declining to interpret *Endologix* as requiring a specific theory of defendants' motives). This case is nothing like *Endologix*, since Defendants had strong incentive to portray Visa's business practices as positively as possible and to omit practices that could be considered anti-competitive, especially given that the DOJ was scrutinizing them. Notably, the repeated similar statements by various high-level Visa employees indicates a coordinated effort to misleadingly portray Visa's business practices.[2]

## III.    PLAINTIFF ALLEGES LOSS CAUSATION

Loss causation "is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop….'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). "That effort 'should not prove burdensome,' for even under Rule 9(b) the plaintiff's allegations will suffice so long as they give…'notice of plaintiffs' loss causation theory' and provide the court 'some assurance that the theory has a basis in fact.'" *BofI*, 977 F.3d at 794. "[A] disclosure 'need not precisely mirror the earlier

---

[2] *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000-01 (9th Cir. 2009), *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062-63 (9th Cir. 2014), *Metzler*, 540 F.3d at 1068, and *Apollo*, 774 F.3d at 608, did not concern the type of repeated specific misstatements by defendants that are at issue here.

- 20 -

misrepresentation[.]'" *Id.* at 790. Nor must a plaintiff "show 'that a misrepresentation was the *sole* reason' for a price decline, but rather that it was 'one substantial cause.'" *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1183 (9th Cir. 2024).

**A.   The DOJ's Detailed Complaint was a Substantive Disclosure Revealing that the Defendants' Earlier Statements were False or Misleading**

Defendants' argument that "the DOJ's Complaint is just that—an allegation—not a finding, adjudication, or admission of wrongdoing" and therefore cannot be a corrective disclosure (MTD 11) has already been rejected by the Ninth Circuit. In *BofI,* 977 F.3d at 792, the district court "held that allegations in a lawsuit, standing alone, can never qualify as a corrective disclosure…." The Ninth Circuit reversed, explaining:

> We join the Sixth Circuit in rejecting any such categorical rule. To be sure, allegations in a lawsuit do not provide definitive confirmation that fraud occurred. But short of an admission by the defendant or a formal finding of fraud—neither of which is required—any corrective disclosure will necessarily take the form of contestable allegations of wrongdoing. As the Sixth Circuit observed, 'every representation of fact is in a sense an allegation, whether made in a complaint, newspaper report, press release, or under oath in a courtroom.'

*Id*. The Ninth Circuit clarified that, to plead loss causation, the shareholders did not need to establish that the allegations in the lawsuit were in fact true. *Id*. at 791. Rather, *BofI* held that the shareholders had properly pleaded loss causation because the lawsuit disclosed facts that, if true, rendered earlier statements that Defendants had made false and misleading. *Id*. at 793.

That holding applies here. Defendants assured investors that the Regulation II Clarification would not and did not cause merchants and Acquirers to route transactions away to other networks due to Visa's superior capabilities, even though it was cheaper. *See* ¶¶127-162. Visa omitted that an important part of its response to the Regulation II Clarification was to use Cliff Pricing and related tactics to pressure merchants and Acquirers to remain on Visa's network. *See id*. Visa's true tactics were not made public until the news broke concerning the contents of the DOJ's lawsuit, first in news articles, and then in the DOJ's Complaint itself. ¶¶176-178. When investors learned of the Cliff Pricing and related tactics, it became clear that Visa's statements touting its strong performance in the face of the regulatory changes — and the attribution of that performance

- 21 -

to Visa's superior features —  were misleading, causing the stock to fall by approximately 6.6%. ¶¶179-180. Nothing more is required. The news articles and DOJ Complaint similarly revealed the falsity of the fintech statements and statements in Visa's annual reports. *See* ¶¶163-175.

The cases that Defendants rely on are inapposite (for the same reasons that many were distinguished in *BofI*, 977 F.3d at 792-93). In *Metzler*, 540 F.3d at 1063, plaintiffs attempted to show loss causation based on a *Financial Times* story that revealed a D.O.E. investigation into one of Corinthian's 88 colleges and stated explicitly that the investigation does not affect the status of the other Corinthian schools. The court held plaintiff's theory that the news revealed "widespread financial aid manipulation by Corinthian" to require "unwarranted inferences." *Id*. at 1063-64.

In *Loos v. Immersion Corp.*, 762 F.3d 880, 885 (9th Cir. 2014), defendant announced that it was conducting "an internal investigation into certain previous revenue transactions in its Medical line of business." Plaintiff could not rest his theory of loss causation on that announcement standing alone, because an "announcement of an investigation reveals just that—an investigation—and nothing more." *Id*. at 890. The announcement there did not reveal to the market any *facts* that could call into question the veracity of any prior statements; the market could only speculate about "what the investigation will ultimately reveal." *Id.; see BofI*, 977 F.3d at 792-93 (distinguishing *Loos*). *Apollo* is similar to *Loos. See Apollo*, 774 F.3d at 608 ("The Plaintiffs do not allege specific statements made by the Defendants that were made untrue or called into question by subsequent public disclosures [including the disclosure of a D.O.E. review]").

This case is easily distinguishable.  That the DOJ was investigating Visa's debit practices was disclosed in March of 2021. ¶209. If that were the disclosure at issue, then Defendants' arguments would be well-taken: In March 2021, the market could only speculate about "what the investigation will ultimately reveal." *See Loos*, 762 F.3d at 890. The disclosure at issue here, however, is precisely what that investigation ***did*** reveal: Visa's use of Cliff Pricing and related tactics, rendering Defendants' statements false and misleading. It was these revealed facts – not the bare disclosure of a DOJ investigation – that caused Visa's stock to fall.

Whether these facts were disclosed by a government enforcement action, a criminal indictment, a whistleblower, or a newspaper tell-all does not matter. *See BofI*, 977 F.3d at 790-92.

- 22 -

What matters is whether "the market treats allegations in a lawsuit as sufficiently credible to be acted upon as truth, and the inflation in the stock price attributable to the defendant's misstatements is dissipated as a result, then the allegations can serve as a corrective disclosure." *Id*. at 792. Here, the DOJ's findings that Visa relied on Cliff Pricing and related tactics to pressure merchants were sufficiently credible to cause Visa's stock to drop, which pleads loss causation.

To be sure, DOJ has not yet proven in court that Visa relied on Cliff Pricing, but that is not a requirement. Its allegations constitute the factual findings of its three-year investigation, armed with the subpoena power and the full resources of the federal government. ¶¶76-78. Contrary to Defendants' attempt to distinguish *BofI* on this basis, DOJ's allegations here are more credible than the allegations in the civil lawsuit that was the disclosure in that case, which was brought by a whistleblower seeking financial gain. *See BofI*, 977 F.3d at 792. The DOJ's allegations that Visa relied on Cliff Pricing and related tactics are also far more credible than what the Ninth Circuit deemed inadequate in *Curry v. Yelp Inc.*, 875 F.3d 1219, 1225 (9th Cir. 2017) — customer complaints made to the FTC *without a subsequent government investigation*. Additionally, none of Defendants' district court cases fit the facts and they all were decided before *BofI*.

Defendants also quote a series of analyst reports in an attempt to raise doubts about whether the DOJ will prevail in its antitrust action against Visa. *See* MTD 12-13. But even if the Court takes judicial notice of these reports, they fail to undercut Plaintiff's theory of loss causation, which is that the allegations in the DOJ's Complaint — that Visa engaged in Cliff Pricing and other related tactics to, *inter alia*, pressure merchants and Acquirers to use its network — constituted a corrective disclosure. Defendants' argument appears to be that, because it remains to be seen whether Visa's Cliff Pricing and related tactics are ultimately found to violate antitrust law, then Plaintiff fails to show loss causation. This contention fails. *First*, as discussed "a corrective disclosure need not consist of an admission of fraud by the defendant or a formal finding of fraud by a government agency." *BofI*, 977 F.3d at 790. *Second,* and even more importantly, Plaintiff is not alleging that Defendants' tactics will be found to violate antitrust law. Maybe they will or maybe they will not, but the fraud that Plaintiff alleges is different: Defendants attributed their strong performance in the face of the new regulations to the superior features of Visa's network,

- 23 -

concealing the key role that Cliff Pricing and related tactics played in driving that performance behind the scenes. When the news of these previously concealed tactics was revealed, it showed that Defendants' statements were false and misleading, causing Visa's stock to drop.

Finally, Defendants ignore *Lloyd*, 811 F.3d at 1206, a Ninth Circuit case that comes after *Metzler*, *Loos* and *Apollo*, which held that since "loss causation is a 'context-dependent' inquiry," even the announcement of an investigation could form the basis of loss causation under certain circumstances "[b]ecause loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement… foreseeably caused the plaintiff's loss." *Id*. at 1210. In *Lloyd*, the defendant disclosed that it had received an SEC subpoena, leading to a drop in its stock. *Id*. About a month later, the company announced that it was charging off million of loans, lending credence to the investors' reaction to the SEC subpoena and demonstrating loss causation. *Id*. The Ninth Circuit found that the news of the subpoena gave rise to loss causation, holding that "[u]nder the facts of this case, loss causation was sufficiently pleaded. ***Indeed, any other rule would allow a defendant to escape liability by first announcing a government investigation and then waiting until the market reacted before revealing that prior representations under investigation were false***." *Id*. at 1210 (emphasis added). In arguing that the DOJ Complaint cannot be a corrective disclosure because it merely anticipates legal action, Defendants are asking for just the kind of brightline rule that *Lloyd* rejected. *See id*. Like the subpoena in *Lloyd*, the DOJ Complaint was not just an "announcement of a government investigation, without more," but conveyed facts demonstrating the inaccuracy of previous statements. *See id*.

**B.    The Stock's Recovery Over Time Does Not Refute the Inference of Loss Causation**

Defendants also contend that Plaintiff fails to show loss causation because Visa's "stock-price decline was modest, and the stock price recovered quickly," but misrepresent the facts. *See* MTD 13-16. As can be seen by Defendants' own chart, the stock price, which was at $288.63 on September 23, 2024, the day before the corrective disclosure, did not "immediately rebound." ¶179. Instead, it drifted up over time and did not recover until the second half of October, nearly a month after the corrective disclosure. *See* MTD 15, Chart 1. This is far longer than in the cases Defendants rely on. MTD at 13-14. In *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021),

- 24 -

the stock recovered almost entirely the very next trading day. In *Metzler*, the stock rebounded completely within three trading days and the court found that the disclosure contained a far more plausible reason for the stock drop than the alleged fraud. *See Loos*, 762 F.3d at 889 (discussing the three-day recovery in *Metzler*, 540 F.3d at 1063-65). Courts have distinguished those cases and found that loss causation is properly pleaded, even though the stock price recovers over time. *See, e.g., Hable v. Godenzi*, 2023 WL 8653185, at \*8 (D. Nev. Dec. 12, 2023) (distinguishing *Tesla* and *Metzler* where the stock took one month to recover); *Pujo v. EHang Holdings Ltd.*, 2025 WL 1242324, at \*14 (C.D. Cal. Mar. 26, 2025) (even one week is not a quick recovery sufficient to defeat loss causation at the motion to dismiss stage).

Moreover, it does not make sense to discount plaintiff's theory of loss causation on a motion to dismiss simply because the stock recovered weeks later, or at any other time that is disconnected from the corrective disclosure at issue. *See, e.g., Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 349 (C.D. Cal. 2015) (efficient markets react quickly in processing information and reflecting it in the market price); *Monroe Cnty. Employees' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 391 (N.D. Ga. 2019) (collecting securities cases where the appropriate event window is a matter of *days*). Thus, that a stock recovers the loss weeks or months later does not negate loss causation. This is because, as the Second Circuit has explained, "it is improper to offset gains that the plaintiff recovers after the fraud becomes known against losses caused by the revelation of the fraud if the stock ***recovers value for completely unrelated reasons***." *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012) (emphasis added); *see also Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 985 (N.D. Cal. 2015) (citing *Acticon* and rejecting defendants' reliance on dicta in *Metzler*, finding that "basic economic principles preclude dismissing a complaint on these grounds [that the stock gained back its value]").

## CONCLUSION

The Motion should be denied. If the Court grants it, Plaintiff respectfully requests leave to amend, which should be freely granted unless it is clearly futile. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). There is no special rule for loss causation. *See, e.g., Hadian v. Fate Therapeutics, Inc.*, 2025 WL 2696995, at \*25 (S.D. Cal. Sept. 22, 2025).

- 25 -

DATED: October 10, 2025                THE ROSEN LAW FIRM, P.A.

Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

By: /s/*Brian B. Alexander*
Brian B. Alexander, Esq. (*pro hac vice*)
Michael Cohen (*pro hac vice* forthcoming)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: balexander@rosenlegal.com
        mcohen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and Class*

- 26 -

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: October 10, 2025                    /s/ *Brian B. Alexander*
                                           Brian B. Alexander

CERTIFICATE OF SERVICE                                    CASE NO. 4:20-CV-01720-JSW