Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Lead Plaintiff and Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| BEIBEI CAI, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> VISA INC, RYAN MCINERNEY, CHRIS SUH, VASANT PRABHU, ALFRED F. KELLY, JR., PETER ANDRESKI, OLIVER JENKYN, and JACK FORESTELL, <br><br><br> Defendants. | Case No. 5:24-cv-08220-NW <br><br> <u>CLASS ACTION</u> <br><br> **CORRECTED PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** <br><br> JUDGE:  Hon. Noël Wise <br> DATE:    April 29, 2025 <br> TIME:    9 a.m. <br> CTRM:   Courtroom 3, 5th Floor |

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

ISSUES TO BE DECIDED ..........................................................................................................3

FACTUAL BACKGROUND .........................................................................................................3

    A.    Visa and the Individual Defendants .................................................................3

    B.    Visa Dominates the U.S. Debit Market and Describes Debit as a Core Product .........3

    C.    Congress Unsuccessfully Tries to Break Visa's Dominance ...........................................4

    D.    Defendants' Misstatements ...........................................................................4

    E.    DOJ's Extensive Investigation Shows that Defendants' Statements Were False ........5

        1.    Visa Thwarted the Regulation II Clarification by Threatening High Prices for Non-Contestable Transactions ...................................................5

          a.    Visa Uses the Threat of High Costs for Non-Contestable Transactions to Force Merchants and Acquirers to Route Nearly all Eligible Debit Through Visa ..........................................5

          b.    Visa Pressures Card Issuers to Make it Difficult to Use Other Networks ..............6

          c.    Visa's Strategy Was in Direct Response to the Durbin Amendment and the Regulation II Clarification ...........................................6

        2.    Visa Also Uses its Power Over Debit to Suppress Fintech Alternatives ....................7

    F.    Defendants Made Large Sales of Visa Stock While Misleading Investors. ..................7

    G.    When the Truth Was Revealed, Visa's Stock Dropped, Harming Investors ..............7

    H.    Defendants' Fraud Caused a Significant Drop in Visa's Stock. ...................................8

    I.    Visa's Motion to Dismiss the DOJ Complaint is Denied ...........................................9

ARGUMENT ..............................................................................................................................10

I.    PLAINTIFF ALLEGES LOSS CAUSATION. .............................................................10

    A.    The SAC Pleads Corrective Disclosures. ..................................................................10

    B.    The Stock's Recovery Over Time Does Not Refute the Inference of Loss Causation ................................................................................................................15

OPP. TO DEFS' MTD SAC                                     CASE NO. 5:24-cv-08220-NW

II.    PLAINTIFF ALLEGES ACTIONABLE MISSTATEMENTS ..................................17

A.    Defendants' Misstatements Are Not Inactionable Puffery ............................................17

B.    Defendants' Statements Were Misleading.........................................................................19

III.    PLAINTIFF ALLEGES SCIENTER...........................................................................21

A.    Defendants Acted Knowingly or Recklessly.....................................................................22

B.    Defendants Had Motive........................................................................................................24

C.    The Balance of Inferences Supports Scienter..................................................................25

CONCLUSION .......................................................................................................................25

OPP. TO DEFS' MTD SAC                                    CASE NO. 5:24-cv-08220-NW

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acticon AG v. China N. E. Petroleum Holdings Ltd.*,
 692 F.3d 34 (2d Cir. 2012) ................................................................................ 17

*AMI - Gov't Emps. Provident Fund Mgmt. Co. Ltd. v. Alphabet Inc.*,
 2025 WL 899959 (N.D. Cal. Mar. 24, 2025) ...................................................... 14

*Azar v. Yelp*, Inc.,
 2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ............................................... 12, 19

*Bajjuri v. Raytheon Techs. Corp.*,
 641 F. Supp. 3d 735 (D. Ariz. 2022) .................................................................. 16

*Berson v. Applied Signal Tech., Inc.*,
 527 F.3d 982 (9th Cir. 2008) .............................................................................. 19

*Brody v. Transitional Hosps. Corp.*,
 280 F.3d 997 (9th Cir. 2002) .............................................................................. 20

*City of Pontiac Gen. Emps. Ret. Sys. v. First Solar Inc.*,
 2023 WL 155861 (D. Ariz. Jan. 11, 2023) .......................................................... 13

*Curry v. Yelp Inc.*,
 875 F.3d 1219 (9th Cir. 2017) ............................................................................ 14

*Daniels Fam. 2001 Revocable Tr. v. Las Vegas Sands Corp.*,
 709 F. Supp. 3d 1217 (D. Nev. 2024) ................................................................. 15

*Donley v. Live Nation Ent., Inc.*,
 2024 WL 794641 (C.D. Cal. Feb. 23, 2024) .................................................. 21, 24

*Dura Pharmaceuticals, Inc. v. Broudo*,
 544 U.S. 336 (2005) ...................................................................................... 10, 15

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
 81 F.4th 918 (9th Cir. 2023) ......................................................................... 15, 22

*Eminence Cap., LLC v. Aspeon, Inc.*,
 316 F.3d 1048 (9th Cir. 2003) ............................................................................ 25

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
 63 F.4th 747 (9th Cir. 2023) ................................................................... 17, 21, 23

- iii -

*Gonsalves v. Block, Inc.*,
2026 WL 42657 (N.D. Cal. Jan. 6, 2026) .................................................................................14

*Hable v. Godenzi*,
2023 WL 8653185 (D. Nev. Dec. 12, 2023) ............................................................................16

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020)...........................................................................24

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020)............................................................................... 10, 11, 13, 14

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
97 F.4th 1171 (9th Cir. 2024)...................................................................................................14

*In re Intel Corp. Sec. Litig.*,
792 F. Supp. 3d 1008 (N.D. Cal. 2025) ...................................................................................15

*In re Questcor Sec. Litig.*,
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ............................................................................24

*In re SVB Fin. Grp. Sec. Litig.*,
2025 WL 1676800 (N.D. Cal. June 13, 2025) .........................................................................17

*In re Teva Sec. Litig.*,
671 F. Supp. 3d 147 (D. Conn. 2023) ......................................................................................12

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012).....................................................................................................25

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
282 F. Supp. 3d 1074 (N.D. Cal. 2017) ...................................................................................22

*Kang v. PayPal Holdings, Inc.*,
620 F. Supp. 3d 884 (N.D. Cal. 2022) .....................................................................................20

*Karinski v. Stamps.com, Inc.*,
472 F. Supp. 3d 747 (C.D. Cal. 2020).....................................................................................18

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016)............................................................................................. 1, 11

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014).....................................................................................................15

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
927 F. Supp. 1297 (C.D. Cal. 1996)........................................................................................24

- iv -

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) .......................................................................... 16, 20, 25

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020) ....................................................................... 21

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ....................................................................................... 25

*Nguyen v. Radient Pharms. Corp.*,
    2011 WL 5041959 (C.D. Cal. Oct. 20, 2011) .............................................................. 12

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ................................................................................. 10, 21

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ..................................................................................... 15

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ..................................................................................................... 21

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ................................................................................. 14, 25

*Petrie v. Elec. Game Card, Inc.*,
    308 F.R.D. 336 (C.D. Cal. 2015) ................................................................................ 16

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ..................................................................................... 25

*Pujo v. EHang Holdings Ltd.*,
    2025 WL 1242324 (C.D. Cal. Mar. 26, 2025) ........................................................... 16

*Ramos v. Comerica Inc.*,
    2024 WL 2104398 (C.D. Cal. Apr. 12, 2024) ............................................................. 16

*Reese v. BP Expl. (Alaska) Inc.*,
    643 F.3d 681 (9th Cir. 2011) ....................................................................................... 17

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ................................................................................. 22, 24

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ....................................................................................... 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..................................................................................................... 22

OPP. TO DEFS' MTD SAC                                    CASE NO. 5:24-cv-08220-NW

*Veal v. LendingClub Corp.*,
　423 F. Supp. 3d 785 (N.D. Cal. 2019) ........................................................................20

*Wochos v. Tesla, Inc.*,
　985 F.3d 1180 (9th Cir. 2021)..............................................................................2, 16

*Zucco Partners, LLC v. Digimarc Corp.*,
　552 F.3d 981 (9th Cir. 2009)...................................................................................25

OPP. TO DEFS' MTD SAC　　　　　　　　　　　　　　CASE NO. 5:24-cv-08220-NW

**INTRODUCTION**

Visa, Inc.'s ("**Visa**" or the "**Company**") network dominates the U.S. debit transaction market. To combat this, Congress passed the Durbin Amendment, which required all debit cards to be enabled for use on at least two unaffiliated debit networks. In October 2022, the Federal Reserve adopted a clarification of Regulation II, the Durbin Amendment's implementing regulation, that clarified that the two unaffiliated network requirement applied to transactions where the debit card was not present (the "**Regulation II Clarification**"). When asked repeatedly about the impact of the Regulation II Clarification on Visa and how Visa was responding to it, Defendants answered that it was having little impact because merchants and their banks chose to use Visa's network because the value of certain features of its network outweighed the lower cost of alternative networks. Defendants were also asked about the risk of technology companies building their own payment networks and cutting out Visa and responded that they have dulled any threat by helping those companies achieve their objectives. After a more than three-year investigation, the Department of Justice ("**DOJ**") filed an antitrust complaint against Visa (the "**DOJ Complaint**") that showed Defendants' statements were false. The DOJ's investigation revealed that the cornerstone of Visa's response to the Regulation II Clarification was to use certain undisclosed pricing tactics to make it uneconomical for merchants to route transactions over alternative networks, forcing them into *de facto* exclusive contracts with Visa. Visa used similar tactics to prevent technology companies from developing competing products. When the truth was revealed, the drop in Visa's stock caused approximately $423 million in damages to investors.

***Loss Causation.*** New allegations in the Second Amended Complaint (the "**SAC**," ECF No. 58) address the defects that the Court identified in its December 10, 2025 Order (the "**Order**," ECF No. 55). Regarding the connection between the articles published shortly before the filing of the DOJ Complaint and Plaintiffs' theory of the fraud, the SAC (1) pleads that the disclosures in those articles were much more extensive than Visa's previous disclosures about the investigation and (2) specifies which statements in the articles correct each type of misstatement in the SAC. Additionally, the Court should consider the disclosures in the articles together with the even more extensive disclosures in the DOJ Complaint under *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209-

- 1 -

1211 (9th Cir. 2016). Defendants contend, for the first time, that Plaintiff does not plead corrective disclosures because the truth was already revealed by two *Wall Street Journal* ("**WSJ**") articles from 2021, but those articles are from long before the alleged misstatements and are significantly different than the later disclosures. Defendants also renew their argument that the DOJ Complaint cannot be a corrective disclosure because it is mere "allegations," but that argument is weak given the obvious credibility of facts found during a more than three-year DOJ investigation.

The SAC pleads additional facts showing that the drop in Visa's stock was not modest and the recovery was not sufficiently quick to undermine loss causation. According to Plaintiff's expert, because of Visa stock's low volatility, the drop in Visa's stock on September 24, 2024, was statistically significant at the 99% confidence level and four times as impactful as the stock drop in *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021) ("**Tesla**"). The expert further found the recovery of the stock did not defeat loss causation because: (1) based on economic literature and efficient market theory, the more than three-week period in this case was too long a recovery period and (2) the recovery was unrelated to the disclosures about the DOJ's lawsuit.

**Falsity.** Defendants' statements were not puffery — they were not so obviously unimportant to a reasonable investor that dismissal as a matter of law is warranted. Additionally, since Defendants elected to speak specifically about their response to the Regulation II Clarification, they were required to disclosure their pricing strategy so they would not mislead investors. Lastly, most of Defendants' statements are not opinions, but, even if they were, they are misleading because they omit facts going to the basis of the opinion.

**Scienter.** Defendants acted, at minimum, recklessly. Defendants made repeated statements specifically about Visa's strategy in response to the Regulation II Clarifications that showed their knowledge of the topic. Yet, they failed to disclose Visa's company-wide pricing strategy that enabled Visa to lock 75% of its debit volume into *de facto* exclusive contracts. Defendants were also put on notice by DOJ's investigation and admitted that debit was a core product of Visa. They had a motive to conceal their pricing tactics because DOJ was investigating and the Individual Defendants sold tens of millions of dollars' worth of Visa shares during the Class Period.

The Court should deny Defendants' motion.

OPP. TO DEFS' MTD SAC                                    CASE NO. 5:24-cv-08220-NW

## ISSUES TO BE DECIDED

Whether the Complaint pleads claims under Sections 10(b) and 20(a) of the Exchange Act by alleging falsity, scienter, and loss causation.

## FACTUAL BACKGROUND

### A.    Visa and the Individual Defendants

Visa runs, by far, the largest U.S. debit network. ¶¶43-45.[1] The Individual Defendants are: (1) McInerney, CEO since February 1, 2023 and President from 2013; (2) Kelly, former CEO (2016 to February 2023) and Board Chairman (2019 to January 23, 2024); (3) Suh, CFO since August 1, 2023; (4) Prabhu, former CFO (February 2015 to September 2023); (5) Andreski, Global Corporate Controller since July 1, 2022; (6) Jenkyn, Group President since February 2023; (7) Forestell, Chief Product and Strategy Officer since February 2023. ¶¶31-37.

### B.    Visa Dominates the U.S. Debit Market and Describes Debit as a Core Product

In a debit transaction, funds are drawn directly from a consumer's bank account to pay a merchant. ¶49. Debit networks, like Visa, contract with the consumer's bank (the "**Issuer**") to issue debit cards that use its network and with the merchant's bank (the "**Acquirer**"), so the merchant can accept those cards. ¶51. Using a debit card in person is a "**Card-Present Transaction**" and using a debit credential remotely is a "**Card-Not-Present Transaction**." ¶53. Debit networks charge a "**Network Fee**" on the Issuer and Acquirer for every transaction. ¶55.

The first debit cards were ATM cards — customers entered 4-digit ATM codes to make purchases. ¶¶56-57. Those operated over "**PIN Networks**." ¶57. Visa began to dominate the debit market in the 1990s. ¶¶58-61. Over 60% of U.S. debit transactions, including over 65% of Card-Not-Present debit transactions (which make up 50% of debit spending), are processed over Visa's network. ¶¶45, 53. North America is Visa's most profitable debit region with a 83% operating margin. ¶44. Visa earns more from its U.S. Debit business (23% of Visa's total nominal payments) than its U.S. credit business, and more from U.S. debit than from any other region. ¶¶47, 232. Its annual reports described debit as a "core product[]" that drives its growth. ¶¶234-237.

---

[1] Plaintiff cites to the SAC as "¶_" and to Defendants' motion to dismiss (ECF No. 61) as "MTD." All emphasis is added and citations and quotation marks are omitted unless otherwise indicated.

- 3 -

OPP. TO DEFS' MTD SAC                                          CASE NO. 5:24-cv-08220-NW

### C.     Congress Unsuccessfully Tries to Break Visa's Dominance

Congress passed the "**Durbin Amendment**" as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act. ¶63. "**Regulation II**," the Federal Reserve rule implementing the Amendment, required debit card issuers to enable at least one network unaffiliated with the network on the front of the card (the "**Front-of-Card Network**"). ¶63. The Front-of-Card Network is almost always Visa (over 70%) or Mastercard. *Id.* The unaffiliated networks appear on the back of the card, referred to as "**Back-of-Card Networks**." ¶64. In October 2022, the Federal Reserve adopted the "**Regulation II Clarification**" (effective July 1, 2023), which clarified that at least one unaffiliated back-of-card network must also be enabled for Card-Not-Present Transactions. ¶65. Back-of-Card Networks are frequently PIN Networks. ¶64. PIN Networks have innovated by developing "**PINless**," which allows the customer to purchase without entering a PIN. ¶66. For most transactions, *the PIN Networks' fees are significantly lower than Visa's*. ¶67. Despite this, these regulatory changes had little effect on Visa's debit market share. ¶68.

### D.     Defendants' Misstatements

*Regulation II Clarification Misstatements.* Analysts repeatedly asked Defendants McInerney, Prabhu, Suh, Jenkyn, and Forestell about the impact of the Regulation II Clarification. Defendants gave detailed answers explaining that the impact was or would be small because merchants and Acquirers continued to choose to route through Visa since certain superior features that Visa's network offered outweighed the lower price of other networks. *See* ¶¶130-165.

*Fintech Misstatements.* Analysts asked Prabhu and McInerney similar questions about the risk of technology companies building their own payment networks and cutting Visa out of the payment process. Both Prabhu (specifically bringing up Apple) and McInerney downplayed the threat, stating that fintech companies had not "disintermediate[d]" Visa because Visa had helped those companies meet their objectives. ¶¶166-169.

*Public Filing Misstatements.* Visa's Class Period annual and quarterly reports stated: "[o]ur financial institution clients and merchants can reassess their commitments to us at any time or develop their own competitive services." ¶¶170-178.

**E.    DOJ's Extensive Investigation Shows that Defendants' Statements Were False**

After a more than three-year investigation, DOJ filed the DOJ Complaint on September 24, 2024. ¶¶14, 76. Earlier on the same day, *The New York Times* DealBook Newsletter (the "**NYT article**") reported that during its investigation the DOJ "conducted hundreds of interviews…" and "looked at the negotiations, contracts and ways in which the penalties were structured." ¶77.

1. Visa Thwarted the Regulation II Clarification by Threatening High Prices for Non-Contestable Transactions

In contrast to Defendants' statements claiming that Visa's debit volume was unaffected by the Regulation II Clarification because of the superior features of Visa's network, the DOJ's investigation showed that the cornerstone of Visa's response to the Clarification was to make it uneconomical to route transactions over alternative networks. Visa did this by exploiting that about half the time a customer uses a Visa debit card, it cannot be processed with an unaffiliated Back-of-Card Network ("**Non-Contestable Transactions**"), even after the new regulation. ¶80. Visa's ability to impose high costs on Non-Contestable Transactions enables it to pressure merchants, Acquirers, and Issuers into debit contracts that prevent transactions from being routed over the PIN Networks even if eligible to be processed by those networks for a lower price. ¶81.

a. *Visa Uses the Threat of High Costs for Non-Contestable Transactions to Force Merchants and Acquirers to Route Nearly all Eligible Debit Through Visa*

Visa prevents merchants and Acquirers from routing transactions through other networks by charging them artificially high "**Rack Rates**" for non-contestable transactions unless they route nearly all eligible debit transactions through Visa. ¶82. These volume requirements are structured as "**Cliff Pricing**" — Visa grants the merchant or Acquirer a lower price for every transaction routed to Visa if its total volume exceeds a certain threshold. ¶83. But if the merchant or Acquirer does not meet that threshold, Visa imposes its high Rack Rate on *all* transactions routed through its network, ***including on the Non-Contestable Transactions that must be routed through Visa.*** ¶¶83, 87. Since merchants and Acquirers need to route almost all their Visa-eligible debit transactions over Visa to avoid the Rack Rates, they have two options — (1) agree to exclusivity with Visa or (2) try to route its "**Contestable Transactions**" (transactions that can be routed through Visa or an alternative network) to Back-of-Card Networks and pay Visa's exorbitant Rack

- 5 -

Rates for Non-Contestable Transactions. ¶84. Accordingly, they are forced to accept *de facto* exclusive agreements with Visa. *Id.* The DOJ Complaint quoted a Visa executive confirming this strategy. ¶90. To avoid Visa's Rack Rates, merchants representing hundreds of billions of dollars of 2023 debit volume signed contracts to route 100% of their eligible volume to Visa. ¶86. Visa also uses other financial incentives to ensure exclusivity. ¶¶85, 88, 91.

### b. Visa Pressures Card Issuers to Make it Difficult to Use Other Networks

Visa has also responded to the Durbin Amendment and Regulation II Clarification by using similar Cliff Pricing tactics to pressure debit card Issuers to enable only a single unaffiliated Back-of-Card Network and make it difficult to use. ¶92. Visa's contract with JPMorgan Chase provides that only one unaffiliated PIN Network can be enabled on 90% of Chase-issued Visa debit cards and Visa also has 1,000 Issuer contracts that impose significant monetary penalties across all Visa debit transactions if issuers do not meet volume requirements. ¶¶93-94. Risk of being penalized for failing to meet volume requirements is higher if it is due to the Issuer enabling additional PIN Networks. ¶95. These volume requirements deter Issuers from putting more networks on the back of their cards and incentivize them not to enable the existing networks for additional transaction types. ¶¶96-100. The DOJ Complaint quoted a Visa senior executive explaining that the language in a contract was enough to protect Visa from the PIN networks because the only way the Issuer could meet the volume requirement was to dump those networks if volume started shifting to them. ¶97. Visa executives also acknowledged a strategy of discouraging Issuers from enabling PIN Network transactions, so that fewer merchants will make the effort to accept them. ¶99.

### c. Visa's Strategy Was in Direct Response to the Durbin Amendment and the Regulation II Clarification

The DOJ found that, following the passage of the Durbin Amendment, Visa recognized that it needed to act "quickly and decisively" to prevent the shift of debit share away from its network and engaged in a "relentless strategy" of locking up entities that control routing decisions ¶102-103. DOJ specifically found that in anticipation of the Regulation II Clarification going into effect, Visa "strategized to secure more volume under routing deals, to target merchant and acquirer deals with early termination fees for longer, firmer commitments of routing volume as

- 6 -

well as to renew issuing agreements [and]… took steps to ensure volume was locked up prior to the regulation going into effect." ¶104. Visa had entered into *de facto* exclusive routing contracts that covered over 75% of Visa debit volume (including 80% of card-not-present volume) and at least 45% of total U.S. debit volume by the end of 2022. ¶103. Visa told its Board of Directors that its routing deals "allow Visa 'to stabilize [its] volume.'" *Id.*

> 2.  Visa Also Uses its Power Over Debit to Suppress Fintech Alternatives

The DOJ's investigation also showed that McInerney and Prabhu's statements that fintech companies did not disintermediate Visa because Visa helped them achieve their objectives were misleading. When PayPal and Square developed systems that allowed customers to pay directly from their bank accounts using a digital wallet, Visa threatened to impose exorbitant digital wallet fees and high Rack Rates on transactions from customers who used Visa cards on PayPal and Square to stop those companies from cutting Visa out of the payment process. ¶¶109-121. Visa threatened to impose staged digit wallet fees on other fintechs, but all of them signed routing deals with Visa to avoid it. ¶122. Contrary to Prabhu's statement, Visa considers being disintermediated by Apple an "existential threat." ¶123. Because of this, Visa paid Apple hundreds of millions of dollars in 2023 in exchange for a commitment not to disintermediate Visa. ¶124.

**F.    Defendants Made Large Sales of Visa Stock While Misleading Investors.**

Kelly made two sales of about $13 million (26% of his total holdings) and $9.4 million (22%) in Visa stock on March 6, 2023 and November 1, 2023 — his largest sales since 2019. ¶¶243-244. From April 27 to May 1, 2023, Prabhu sold over $16.8 million in Visa stock, which consisted of 50% of his holdings and were his first sales in more than two years. ¶¶245-246. McInerney sold approximately $29.5 million of Visa stock during the Class Period, including a sale of $5.8 million on July 5, 2023, right after the Regulation II Clarification became effective. ¶247. On February 7, 2024, Andreski sold 35% of his Visa stock holdings for $729,281. ¶248.

**G.    When the Truth Was Revealed, Visa's Stock Dropped, Harming Investors**

On September 23, 2024, after the market closed, *Bloomberg* reported that DOJ planned to file suit against Visa and allege "that Visa made exclusive agreements to hinder the expansion of competing networks and thwarted efforts by technology companies to enter the market." ¶185. On

September 24, 2024, before the market opened, the *NYT* article reported that DOJ planned to allege that "Visa punishes customers, including merchants, when they try to use competing services to process payments" and "that Visa coerces financial technology firms to work with it by threatening penalties on those who do not, and thus squeezing out potential new competitors." ¶186. DOJ filed the DOJ Complaint while the market was open on September 24, 2024, providing significant additional detail about what was revealed by *Bloomberg* and the *NYT*. ¶¶76-104, 109-124, 191.

The SAC pleads that before the *Bloomberg* and *NYT* articles, all Visa disclosed about the DOJ's investigation was that it concerned "U.S. debit and competition with other payment methods and networks." ¶¶179-184. Unlike Visa's earlier disclosures, *Bloomberg* and the *NYT's* disclosures that "Visa made exclusive agreements to hinder the expansion of competing networks" and "Visa punishes customers, including merchants, when they try to use competing services to process payments" showed that Defendants' statements portraying the capabilities of Visa's network as why the Regulation II Clarification had not caused merchants and Acquirers to route transactions through other networks (¶¶130-165) were misleading. ¶188. Those disclosures also showed that the statements in Visa's public filings that "[o]ur financial institution clients and merchants can reassess their commitments to us at any time…" (¶¶170-178) were misleading. ¶189. The disclosures in *Bloomberg* and the *NYT* that Visa "thwarted efforts by technology companies to enter the market" and "coerces financial technology firms to work with it by threatening penalties on those who do not, and thus squeezing out potential new competitors," showed that McInerney and Prabhu's statements that Apple and other fintechs did not disintermediate Visa because Visa helped them achieve their objectives were (¶¶166-169) misleading. ¶190.

On this news, the price of Visa's stock fell $15.85 per share, or approximately 5.5%, from where it closed on September 23, 2024, to $272.78 per share at market close on September 24, 2024. On September 25, 2024, Visa's stock fell another $3.15 per share to close at $269.63 for a total two-day loss of approximately 6.6% that harmed investors. ¶192.

**H.    Defendants' Fraud Caused a Significant Drop in Visa's Stock.**

Prior to the filing the SAC, Plaintiff retained economics expert Dr. Adam Werner. ¶¶194-195. He found that Visa's share price decline on September 24, 2024 was statistically significant

- 8 -

at the 99% confidence level, *i.e.*, there is less than a 1% chance that Visa's price movement on September 24, 2024 can be deemed "typical" compared to all other Class Period days. ¶197. The decline was more than 7 times greater than the typical daily movement during the Class Period and was the largest daily movement during the Class Period. *Id.* Dr. Werner found that while the raw percentage drop of Visa on September 24, 2024 (5.5%) and the decline at issue in *Tesla* (3.9%) might appear similar, the movement in Visa's stock was four times as impactful when he took into account that Tesla's stock is 2.8 times more volatile than Visa's. ¶¶199-200. For the drop in *Tesla* to have been statistically equal to the drop in Visa's stock, Tesla's stock would have had to decline more than 15%. ¶200. The stock drop in *Tesla* was not even statistically significant, and was only the 13th largest daily movement during that case's class period. ¶201.

Visa's stock continued to decline the day after its statistically significant September 24, 2024 drop and did not come close to its closing price on September 23, 2024 until October 16, 2024. ¶202. In contrast, in *Tesla*, the stock almost fully recovered the next day. *Id.* Dr. Werner found that this almost complete recovery on the next day was qualitatively different from this case (recovery took over three weeks) because economic literature and efficient market theory justifies measuring the impact of a corrective disclosure over two trading days, but there is generally no basis to extend that further. ¶203. Dr. Werner also found that Visa's price recovery did not sever the link between the corrective disclosure and the loss because the only statistically significant increase in Visa's stock during the recovery period was on October 16, 2024 and that was driven by news completely unrelated to this case. ¶¶204-206. Random volatility was the most likely reason for the rest of the increase over the three-week period. ¶206. Dr. Werner determined that, despite the stock's rebound, aggregate damages to investors from Visa's September 24, 2024 stock drop was approximately $423.4 million with 43 million shares damaged. ¶¶207-210.

### I.     Visa's Motion to Dismiss the DOJ Complaint is Denied

On June 23, 2025, the Honorable John G. Koeltl denied Visa's motion to dismiss the DOJ Complaint, holding it plausibly alleged that "cliff pricing… and other penalties…in effect, took away the ability of customers to terminate the agreements" and stopped them "from routing to PIN networks even when PIN networks offered lower per-transaction prices." ¶¶127-128. He further

held: "Visa's contracts…suppress competition from fintech rivals…." ¶129.

## ARGUMENT

On a Rule 12(b)(6) motion, "[a]ll allegations of material fact made in the complaint are taken as true and construed in the light most favorable to the plaintiff" and "[a] complaint should not be dismissed unless it appears beyond a doubt that the plaintiff cannot prove any set of facts...that would entitle him or her to relief." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003) ("*America West*").

### I.    PLAINTIFF ALLEGES LOSS CAUSATION.

To plead loss causation a plaintiff must allege that: "(1) a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements; and (2) disclosure of the truth caused the company's stock price to decline….[P]laintiff's task is to allege with particularity facts 'plausibly suggesting' that both showings can be made." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791 (9th Cir. 2020). "That effort 'should not prove burdensome'… even under Rule 9(b)." *Id.* at 794 (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

### A.    The SAC Pleads Corrective Disclosures.

The Court held that it was not clear that articles published after the market closed on September 23, 2024 were corrective disclosures because Visa had previously disclosed the DOJ's investigation and Plaintiff had not connected those articles to the theory of fraud. Order at 9-10. To address this, the SAC pled that whereas Visa made only the vague disclosure that the DOJ's investigation "focus[ed] on U.S. debit and competition with other payment methods and networks," the *Bloomberg* and the *NYT* articles disclosed much more. ¶¶179-187. The SAC also added specific allegations that the disclosures in those articles that "Visa made exclusive agreements to hinder the expansion of competing networks" and "punishes customers, including merchants, when they try to use competing services to process payments" showed that Defendants' Regulation II Clarification Misstatements (¶¶130-165) and Public Filing Misstatements (¶170-178) were misleading and that disclosures in those articles that Visa "thwarted efforts by technology companies to enter the market" and "coerces financial technology firms to work with it by threatening penalties on those who do not, and thus squeezing out potential new competitors"

- 10 -

showed that the Fintech Misstatements (¶¶166-169) were misleading. ¶¶188-190.

Since they disclosed key facts from the DOJ Complaint that were new to the market, such as Visa's use of exclusive agreements, the punishment of merchants to prevent the use of competing networks, and coercion of technology firms by threatening penalties, the *Bloomberg* and *NYT* articles qualify as independent corrective disclosures. But even if the Court holds that those articles, by themselves, are not sufficient, it still must consider them together with the more extensive disclosures in the DOJ Complaint under *Lloyd*, 811 F.3d at 1209-1211. In *Lloyd*, the company made a disclosure that it had received an SEC subpoena, leading to a drop in its stock. *Id*. at 1204. About a month later, the company made another disclosure that was sufficiently detailed to show that the defendants' statements were misleading, but the company's stock barely moved. *Id*. at 1205 The Ninth Circuit found the plaintiff could combine the stock drop from the SEC subpoena and the facts from the later disclosure to plead loss causation because they were related. *Id*. at 1210. Given that *Lloyd* considered the two disclosures together even though they were *a month apart*, the Court should consider the *Bloomberg* and *NYT* articles and the DOJ Complaint together since the DOJ Complaint was filed less than 24 hours after the *Bloomberg* article and the same day as the *NYT* article and the articles described the contents of the DOJ Complaint. ¶¶185-191. Moreover, those two articles and the DOJ Complaint impacted trading of Visa stock on the same trading day. Given the extensive detail in the DOJ Complaint about (1) Visa's company-wide strategy to use exclusive contracts, Cliff Pricing, and related tactics to thwart the Regulation II Clarification by making it uneconomical for merchants to route to other networks (¶¶79-104) and (2) its use of similar tactics to prevent fintechs from providing an alternative to Visa's network (¶¶109-124), it was sufficiently detailed to correct Defendants' misstatements.

These allegations easily meet the low standard for pleading a causal connection for loss causation, which is "not…burdensome" and only requires allegations that give the "defendant notice of plaintiffs' loss causation theory and provide the court some assurance that the theory has a basis in fact." *BofI*, 977 F.3d at 794. Defendants' only argument concerning causal connection is that the corrective disclosures do not mention the challenged statements or that fraud was revealed (MTD at 6), but those are not a pleading requirements where, as here, Plaintiff alleges

- 11 -

that the corrective disclosure revealed a previously concealed truth. *See Azar v. Yelp*, Inc., 2018 WL 6182756, at \*21 (N.D. Cal. Nov. 27, 2018) ("[L]oss causation can be established by an event that disclose[s] part of the truth that was previously concealed by the fraud, even if the event does not identify specific company statements as false or misleading.").

Defendants argue, for the first time, that Plaintiff does not plead corrective disclosures because the truth was already revealed in 2021 by two *WSJ* articles. MTD at 6-8. The *WSJ* articles did not reveal the same information as the September 2024 corrective disclosures and Defendants do not meet the high standard for injecting a truth-on-the-market defense into loss causation. *See In re Teva Sec. Litig.*, 671 F. Supp. 3d 147, 197-98 (D. Conn. 2023) (whether corrective disclosures revealed new information is an intensely fact-specific "truth-on-the-market" defense and "rarely an appropriate basis for dismissing"); *Nguyen v. Radient Pharms. Corp.*, 2011 WL 5041959, at \*6-\*7 (C.D. Cal. Oct. 20, 2011) (courts "rarely dismiss" for truth-on-the-market).

As an initial matter, the 2021 *WSJ* articles were published two years and 16 months before the first misstatements in this case and long before the Regulation II Clarification was adopted in October 2022. ¶65. It is not clear how articles published years earlier can correct misstatements about a regulatory clarification that did not exist yet. Also, the *Bloomberg* and *NYT* articles' disclosures that DOJ was alleging that "Visa made exclusive agreements to hinder the expansion of competing networks" and "punishes customers, including merchants, when they try to use competing services to process payments," were very different from the disclosures Defendants highlight from the *WSJ*. ¶¶185-189; MTD at 7 (table - top row). The first statement that Defendants highlight just says that "the probe highlights the important role of…network fees." This says nothing about the tactics at issue in this case and Plaintiff has never claimed that the importance of network fees was concealed. The second *WSJ* statement says that "Merchants…alleged that they are often unable to route online debit-card purchases over smaller networks." This was not disclosing anything new. The Regulation II Clarification was adopted because merchants were not able to route some online debit-card purchases over alternative networks (¶¶63-65) and this says nothing about the tactics Visa used to respond to the Clarification (which was not adopted yet). The third statement, "DOJ[]…is also examining whether Visa unfairly limited merchants from

- 12 -

routing…over other rails," is a weak disclosure since all it said was that DOJ is "examining" the issue. It also did not indicate what Visa might be doing that was unfair or say anything about exclusive agreements or punishing merchants. Similarly, the *WSJ* articles mention Visa providing incentives to fintech companies, but say nothing about "thwart[ing]" those companies' market entry or "coerc[ing] [fintechs] to work with [Visa] by threatening penalties" like the *Bloomberg* and *NYT* articles. *Compare* MTD at 7 (table – bottom row) *with* ¶¶185-190. Thus, the *Bloomberg* and *NYT* articles disclosed much more than the *WSJ* articles. Also, as discussed above, under *Lloyd*, the Court should consider the DOJ Complaint in combination with the *Bloomberg* and *NYT* articles and it is indisputable that the DOJ Complaint disclosed far more than the *WSJ* articles.

The disclosures in the *WSJ* articles are also not equivalent to the disclosures in *Bloomberg*, the *NYT*, and the DOJ Complaint because the later reported the findings of the DOJ's three-year long investigation. In contrast, the *WSJ* articles speculated about an investigation that had just begun. The later *WSJ* article (October 2021) stated: "There is no indication that the [DOJ] has reached any conclusions." MTD Ex. 2. As discussed below, Defendants argue that the facts pled in the DOJ Complaint were not definitive enough to be a corrective disclosure because they are mere "allegations." It is contradictory for Defendants to also argue that the *WSJ's* vague discussion of possible topics of the DOJ's nascent investigation revealed everything. Defendants' citations are easily distinguishable. *See BofI,* 977 F.3d at 794 (anonymous blog posts were based entirely on already public sources); *City of Pontiac Gen. Emps. Ret. Sys. v. First Solar Inc.*, 2023 WL 155861, at *5 (D. Ariz. Jan. 11, 2023) (company had previously disclosed "that very information").

The Court should also reject Defendants' renewed argument that the DOJ Complaint cannot be a corrective disclosure because it is only "allegations." MTD at 8. As the Ninth Circuit held in *BofI,* 977 F.3d at 790, a corrective disclosure can come "from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters." It rejected any "categorical rule" about what can be a corrective disclosure because "short of an admission by the defendant or a formal finding of fraud—neither of which is required—any corrective disclosure will necessarily take the form of contestable allegations of wrongdoing" and "every representation of fact is in a sense an allegation, whether made in a complaint, newspaper

- 13 -

report, press release, or under oath in a courtroom." *Id.* at 792. Notably, *In re Genius Brands Int'l, Inc. Sec. Litig.,* 97 F.4th 1171, 1178, 1186-87 (9th Cir. 2024), held that a short seller report was a corrective disclosure even though short sellers publish reports to decrease the company's stock price. *See also Gonsalves v. Block, Inc.*, 2026 WL 42657, at *8 (N.D. Cal. Jan. 6, 2026) (same).

Since not everything qualifies as a corrective disclosure, Defendants have highlighted some cases where disclosures were not sufficiently credible to qualify. *See Curry v. Yelp Inc.*, 875 F.3d 1219, 1225 (9th Cir. 2017) (customer complaints made to the FTC *without any government investigation into them* were not a corrective disclosure); *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014) (company's disclosure that Department of Education "expressed a concern" about whether students understood implication of enrollment was not a corrective disclosure where plaintiffs did not "allege specific statements made by the Defendants that were made untrue or called into question" by the disclosures). *BofI*, 977 F.3d at 792, also concerned an alleged corrective disclosure that was potentially suspect, a complaint brought by a former employee seeking money, but still held it was sufficient.

The factual allegations of the DOJ Complaint are vastly more credible than any of the disclosures discussed above. Its allegations constitute the factual findings of DOJ's three-year investigation during which it obtained Visa's internal documents and conducted hundreds of interviews. ¶¶76-78. By putting these factual findings in a complaint filed in federal court, the DOJ subjected itself to Rule 11. If the findings of an extensive DOJ investigation are not sufficiently credible to be a corrective disclosure, then almost nothing is. *See AG complaint AMI - Gov't Emps. Provident Fund Mgmt. Co. Ltd. v. Alphabet Inc.*, 2025 WL 899959, at *9 (N.D. Cal. Mar. 24, 2025) (allegations in attorney general complaint were corrective disclosure).

Contrary to Defendants' contention, there is no general requirement plaintiffs plead analyst commentary and Defendants attempt to confuse the issue by quoting analyst reports that raise doubts about whether the DOJ will prevail in court against Visa. *See* MTD at 9-10. Defendants' introduction of these reports to refute the allegations of the SAC are improper. *See* Opp. to Defs.' RJN (filed concurrently). The reports are also irrelevant because Plaintiff's theory is the ***factual allegations in the DOJ Complaint*** render Defendants' statements misleading regardless of

- 14 -

whether a courts ultimately determines the allegations constitute an antitrust violation. *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014), is inapplicable because it held that the announcement of *the beginning of* an investigation, without more, cannot constitute a corrective disclosure. The filing of the DOJ Complaint marked *the end of the DOJ's investigation* and its allegations constituted DOJ's final factual findings that corrected Defendants' misstatements.

Finally, Defendants invoke *Dura*, 544 U.S at 347, but it cuts against them. The question the Supreme Court addressed is *whether securities plaintiffs needed to plead a corrective disclosure at all. Id.* at 342-346. It answered the question yes, but held that all a plaintiff needed to provide was "some indication of the [economic] loss and the causal connection that the plaintiff has in mind" and that it "should not prove burdensome." *Id.* at 346-347.

**B.      The Stock's Recovery Over Time Does Not Refute the Inference of Loss Causation**

The SAC has pled additional facts based on economic analysis by Dr. Werner showing that the drop of Visa's stock was not sufficiently "modest" and the recovery was not "quick" enough to hold as a matter of law that the SAC does not plead loss causation. Order at 10. The Ninth Circuit allows plaintiffs to plead expert analysis in securities cases. *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 942 (9th Cir. 2023) (proper for plaintiff to plead expert market analysis where complaint stated what expert relied on); *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1233-1234 (9th Cir. 2004) (considering allegations from multiple expert witnesses). One of the cases Defendants cite, *Daniels Fam. 2001 Revocable Tr. v. Las Vegas Sands Corp.*, 709 F. Supp. 3d 1217, 1238 (D. Nev. 2024), states that "expert analysis may shed much clearer light on whether the alleged instances of loss causation are statistically significant."

The argument for accepting expert allegations here is especially strong — Dr. Werner simply applied accepted economic analysis to undisputed facts. Plaintiff did not ask him to opine on loss causation (MTD at 11) because he was not providing a legal opinion. This is not like *In re Intel Corp. Sec. Litig.*, 792 F. Supp. 3d 1008, 1019 (N.D. Cal. 2025), where an expert speculated that an audit could not be relied on because "it is impossible to know what [the auditor] knew."

The drop in Visa's stock price on September 24, 2024, was significant when viewed in the context of the stock's low volatility — the decline was (1) statistically significant at the 99%

OPP. TO DEFS' MTD SAC                                          CASE NO. 5:24-cv-08220-NW

confidence level, (2) more than 7 times greater than the typical daily movement during the Class Period, and (3) the largest daily movement during the Class Period. ¶197. Comparing Visa's drop to the one in *Tesla* shows how important the volatility of a stock is to understanding whether a drop was modest. Because of Tesla's greater volatility, Visa's September 24, 2024 drop was four times as impactful as the drop in *Tesla* and the equivalent drop in *Tesla* would have been more than 15%. ¶¶199-200. The actual 3.9% drop in *Tesla* was not even statistically significant and was only the 13th largest movement during that case's Class Period. ¶201. *Ramos v. Comerica Inc.*, 2024 WL 2104398, at *4 (C.D. Cal. Apr. 12, 2024), which Defendants cite, held that the stock drops at issue were not significant enough for loss causation because the stock had a high level of volatility during the class period. Here, the inverse is true and it is highly relevant to the analysis.

Based on economic literature and efficient market theory, one may properly measure the impact of a corrective disclosure over two trading days, but there is generally no basis to extend it further. ¶203. Thus, the measurement period for a stock's recovery should be days, not weeks. *See also Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 349 (C.D. Cal. 2015) (efficient markets react quickly). This is consistent with the caselaw: in *Tesla*, 985 F.3d at 1198, the stock recovered almost entirely the very next trading day and in *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1059 (9th Cir. 2008), it rebounded completely within three trading days.[2] In contrast, courts have held that it does not defeat loss causation when recovery takes longer. *See Hable v. Godenzi*, 2023 WL 8653185, at *8 (D. Nev. Dec. 12, 2023) (one month to recover); *Pujo v. EHang Holdings Ltd.*, 2025 WL 1242324, at *14 (C.D. Cal. Mar. 26, 2025) (even one week was not fast enough). Here it took more than three weeks for Visa's stock to come close to rebounding completely. ¶202.

Finally, the SAC pleads that Dr. Werner conducted an event study that showed the only statistically significant increase (October 16, 2024) during the Visa stock's recovery period was due to news unrelated to the DOJ Complaint and that smaller increases earlier in the period were

---

[2] *Metzler*, 540 F.3d at 1063, is also distinguishable because the corrective disclosure concerned only one of Defendant's 88 colleges. In *Bajjuri v. Raytheon Techs. Corp.*, 641 F. Supp. 3d 735, 770 (D. Ariz. 2022)*,* the "stock rebounded the day after it dropped, recovered entirely within four trading days" and in *Jedrzejczyk v. Skillz Inc.*, the stock rebounded from the two disclosures in three and two days, *see* 2022 WL 19298577 (N.D. Cal. Sept. 19, 2022).

- 16 -

due to random volatility. ¶¶204-206. This is significant because, "it is improper to offset gains that the plaintiff recovers after the fraud becomes known against losses caused by the revelation of the fraud if the stock recovers value for completely unrelated reasons." *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 41 (2d Cir. 2012). Despite the recovery, the aggregate damages to Visa shareholders was approximately $423.4 million. ¶¶207-210.

## II.    PLAINTIFF ALLEGES ACTIONABLE MISSTATEMENTS

"A statement or omission is misleading in the securities fraud context if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011).

### A.    Defendants' Misstatements Are Not Inactionable Puffery

"'Puffery' is not actionable…because the law deems such statements so amorphous as to be immaterial," but determining materiality "entail[s] delicate, fact-intensive assessments that are more properly left to the jury." *In re SVB Fin. Grp. Sec. Litig.*, 2025 WL 1676800, at *11 (N.D. Cal. June 13, 2025). To dismiss a statement as puffery, "courts must exercise great caution" and "conclude that the statement is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Id.* Contrary to Defendants contention (MTD at 13-14), the alleged misstatements do not meet this stringent standard.

Defendants base their argument on *Apollo*, 774 at 606, where the Ninth Circuit held that no investor would have relied on a series of generally optimistic, essentially boilerplate, statements about the future prospects of the company. This case is distinguishable from *Apollo* because of, *inter alia*, the context of the statements. As explained by the Ninth Circuit in the more recent case of *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023), even "general statements of optimism, when taken in context, may form a basis for a securities fraud claim." Thus, *Forescout* held that phrases such as "tracking very well" and "very large pipeline" were misleading because they "contravened the unflattering facts in [Forescout's possession]" and were made in response to specific questions asked by analysts. *Id.* at 770-771.

Here, like *Forescout*, most of the alleged misstatements were made in response to specific questions from analysts. Analysts specifically asked Defendants repeatedly about the impact the

Regulation II Clarification had on merchant routing choice and Defendants' answers gave the objective impression that (1) the Regulation II Clarification was having little or no effect on Visa's debit volume and (2) the reason was that, *even though other networks cost less*, merchants continued to choose Visa because of its network's superior features. ¶¶130-165. This gave investors an impression of a state of affairs that differed in a material way from what actually existed because, in reality, a key part of Visa's strategic response to the Regulation II Clarification *was to use exclusive contracts, Cliff Pricing and related tactics to make it so that merchants would have higher overall network fee costs* if they routed Visa-eligible transactions to other networks, even if the other networks were cheaper for individual transactions. ¶¶79-108.

Defendants highlight some portions of statements they claim are puffery. MTD at 14. This divorces the statements from their overall context. There are also many instances where Defendants concretely stated that the Regulation II Clarification was having little impact because the features of Visa's network outweighed the lower cost of other networks. For example:

- There are certain things *we do that other networks don't that cause merchants today to use us, even though some may think we're more expensive* …So the merchant can look at it objectively and say, yes, I mean, *the price they charge may be different, but the value is still greater* here. ¶137 (Prabhu);

- *[I]t's not just a cost-based decision*. And we bring a lot to merchants in terms of the way we help them with managed risk. ¶141 (McInerney);

- *People think cost is the predominant*, but there are other factors. There's actual sort of functionality, there's security…*there's a big difference between what we do and what sort of the pin-based debit networks can do*. ¶154 (Suh);

- [M]erchants, ultimately, will have a choice under Reg II. *And that choice comes down to not only cost, but to capabilities and liability*. ¶156 (Suh);

- *[M]erchants have choices. Cost is one of them. But they also understand capability differences* between us and what is historically a pin-based debit network. ¶158 (Suh).

Also, Defendants highlight Suh saying "Visa's value prop is very good" (¶149), but he is misleadingly saying that Visa's "value prop" is good despite its greater cost.

Accordingly, Defendants' statements concerning the Regulation II Clarification (¶¶130-165) were not so obviously unimportant that they can be dismissed as puffery. *See, e.g. Karinski v. Stamps.com, Inc.*, 472 F. Supp. 3d 747, 752 (C.D. Cal. 2020) (statements such as "I think it was

- 18 -

really meant to highlight the win-win nature of the partnership and how both sides are succeeding" were actionable). Defendants' other statements are also not puffery: Prabhu and McInerney both gave detailed answers to specific analyst questions about the risks that Visa faced from fintech companies. ¶¶166-169. The statement: "our financial institution clients and merchants can reassess their commitments to us at any time…" was clearly a concrete (and false) statement. ¶¶170-178.

**B.    Defendants' Statements Were Misleading**

Even if disclosure is not otherwise required, once defendants speak about an issue, they must do so in a way that is not misleading. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("[O]nce defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of."); *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 702, 707-708 (9th Cir. 2016) (mention of requirement to conduct preclinical animal studies put results at issue); *Azar*, 2018 WL 6182756, at *13 (statement that local ad sales were "a fairly proven model that we feel we're pretty good at operating" was misleading because of the omission of the churn of advertisers in the program).

For each Regulation II Clarification statement, a Defendant was asked about the Clarification's impact and answered by explaining that Visa was successfully responding to the Clarification by selling merchants on the added value of the greater capabilities of Visa's network. ¶¶130-165. In many of the statements, Defendants state that the greater capabilities of Visa's network ***outweighs the higher cost of its network***. *See* ¶¶133, 137, 141, 149, 154, 156, 158, 160. It was misleading for Visa to tout its successful response to the Regulation II Clarification while omitting that a key part of that response was to ***make it so that the total cost of using alternative networks was higher*** by using exclusive contracts, Cliff Pricing, and related tactics. ¶¶79-108.

For both Fintech Misstatements, an analyst asked about the risk to Visa from technology companies. ¶¶166, 168. Prabhu stated that Apple was "riding [Visa's] network" because of the difficulty of building an alternative and because Visa could "help them achieve their objective" ¶166. Prabhu's omission of the material fact that Visa was paying Apple hundreds of millions of dollars a year not to develop a competing product misled investors about what was driving Apple's behavior. ¶¶123-124, 167. In his statement, McInerney mentioned a narrative that "[fintech]

- 19 -

companies were going to disintermediate Visa[,]" but said Visa prevented this by "putting [its] network to work in service of them" and "help[ing] them achieve their objectives." ¶168. McInerney omitted the material fact that a key part of Visa's response to disintermediation risk was to threaten high fees for the transactions that the fintechs needed Visa to process. ¶¶109-126.

Defendants' repeated statement that "[o]ur financial institution clients and merchants can reassess their commitments to us at any time" (¶¶170-178) gave a misleading impression since Visa used Cliff pricing and related tactics to push merchants, Acquirers and Issuers into contracts that made it difficult, if not financially impossible, for them to reassess their commitment to Visa.

*Brody v. Transitional Hosps. Corp.*, 280 F.3d 997 (9th Cir. 2002) and *Metzler*, are not applicable — the relationship between the statements and allegedly omitted facts was vastly more attenuated. *See Brody*, 280 F.3d at 1006 (plaintiffs did not explain how press release about a stock repurchase program was misleading when it did not disclose company's possible takeover); *Metzler*, 540 F.3d at 1070 (plaintiffs alleged that "virtually every Class Period statement discussing Corinthian's financial status was false" based on general allegations of fraudulent practices and failure to disclose regulatory investigations). Defendants try to analogize *Metzler* to this case because of the number of misstatements concerning the Regulation II Clarification, but, in contrast to *Metzler*, they are all detailed statements about a specific topic that are false for specific reasons. The large number of similar false statements just shows the extent of Defendants' fraud.

*Kang v. PayPal Holdings, Inc.*, 620 F. Supp. 3d 884, 897 (N.D. Cal. 2022) and *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 806 (N.D. Cal. 2019), hold only that defendants do not have a free-floating obligation to confess to wrongdoing. They do not state that defendants can make detailed statements about their response to a government regulation and leave out a material part of their response. Also, Defendants only had to disclose that a significant part of their strategy was pricing and contract structures that incentivized merchants to continue to route through Visa to make their statements not misleading. They did not need to portray their strategy as wrongdoing.

Finally, Defendants argue that some of their statements are inactionable because they are opinions, but concede that the statements in Paragraphs 149, 152, 154, 166, and 171 are not opinions. MTD at 15. Defendants also ignore that some parts of the statement they identify are not

OPP. TO DEFS' MTD SAC    CASE NO. 5:24-cv-08220-NW

opinions. *See, e.g.* ¶133 ("So the ability to save a couple of basis points in cost have to be weighed against the risk that comes from the liability of fraud in the e-commerce space."); ¶137 (*see* excerpt on page 18); ¶141 ("[W]hen they're making decisions, it's not just a cost-based decision"); ¶147 (explaining Visa's strategy was to talk to clients and partners about "the benefits of a Visa transaction, especially…fraud liability"); ¶156 ("[M]erchants, ultimately, will have a choice under Reg II. And that choice comes down to not only cost, but to capabilities and liability"); ¶158 ("[M]erchants have choices. Cost is one of them."); ¶168 ("we've been able to help [fintechs] achieve their objectives for their user base"). In fact, even if a sentence starts with "I believe" or something similar, "embedded statements of fact" are still treated as non-opinion statements. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185 (2015) ("we use a patented technology to which our competitors do not have access" would be a fact statement even if prefaced by "I believe our TVs have the highest resolution available because…").

Even if a statement is an opinion, it is still actionable when a plaintiff identifies "particular (and material) facts going to the basis for the…opinion…whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194. As discussed above, Plaintiff has identified omitted material facts going to the basis. Contrary to Defendants' contention, they did not fail to disclose random facts "cutting the other way." Instead, the exclusive contracts and Cliff Practicing tactics they omitted were the cornerstone of Visa's response to Regulation II. ¶¶103-104. *See Forescout*, 63 F.4th at 778–79 ("[T]he statements include phrases [that] might render the statements *opinions*…, but it does not follow that the statements do not create [a misleading impression]" (emphasis in original)); *Donley v. Live Nation Ent., Inc.*, 2024 WL 794641, at *8 (C.D. Cal. Feb. 23, 2024) (opinion statement misleading where company misrepresented reasons for success).

III. **PLAINTIFF ALLEGES SCIENTER**

For scienter, Plaintiff may plead "knowledge of the falsity as well as 'deliberate or conscious recklessness.'" *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1013 (N.D. Cal. 2020) (quoting *America West*, 320 F.3d at 937). One acts with deliberate recklessness "if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless

- 21 -

failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014), *overruled by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). An inference of scienter is strong "if a reasonable person would deem the inference…cogent and at least as compelling as any opposing inference…from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Thus, a tie goes to the plaintiff. *Id.* The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference." *Id.* at 322-23 (emphasis in original). A motive is not required, but can be a consideration. *Id.* at 325.

The SAC alleges, at minimum, recklessness: (1) Defendants specifically addressed Visa's strategy for responding to the Regulation II Clarification repeatedly; (2) using pricing to lock merchants, Acquires, and Issuers into *de facto* exclusive contracts was a company-wide strategy; (3) Defendants were put on notice to review their practices by the DOJ Investigation; and (4) debit was a Visa core operation. Also, Defendants were motivated to hide the truth because of the DOJ's investigation and they sold tens of millions of dollars in stock while making their misstatements.

### A.    Defendants Acted Knowingly or Recklessly

*First,* it strongly supports scienter when defendants make specific statements that show knowledge of the misstatements' subject area. *See Reese*, 747 F.3d at 572 (that defendant "addressed corrosion rate data specifically, render[ed] it unlikely that she was not aware of it[,]" and it "bridge[d] the [scienter] gap."); *NVIDIA*, 81 F.4th at 939-40 (repeated statements during earnings calls contributed to scienter); *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1100 (N.D. Cal. 2017) (defendant "spoke extensively" about subject area of misstatements, the company's "success" in that area, and its "purported value" to customers).

Defendants McInerney, Suh, Prabhu, Jenkyn, and Forestell's statements on earnings calls and investor conferences show that they were knowledgeable about the Regulation II Clarification and were involved in and closely monitoring Visa's response to it. ***McInerney***, Visa's CEO, made six specific misstatements. ¶¶133, 141, 143, 147, 152, 164. He repeatedly explained the Regulation II Clarification and said it was having little impact on merchants' routing choice due to the superior features of Visa's network. McInerney stepped in to answer a question about the Regulation II

- 22 -

Clarification when it was directed at his CFO. *See* ¶141. He also described discussions Visa had with Merchants about the Clarification. *See* ¶143 ("Regular[]" conversation with merchants "tend to gravitate to a couple things."); ¶147 ("our sales teams are in with merchant clients and acquire clients day-in and day-out, explaining the value of our products"); ¶152 (addressing "results client by client"). McInerney also described Visa as having "conversations at more senior levels in the organization about the details of our products than we've ever had before." ¶152. McInerny's Fintech Misstatement also shows he has great knowledge of the history of Visa's relationships with such companies. ¶168.

*Suh*, Visa's CFO, made five similar misstatements about the Regulation II Clarification in a little more than six months. ¶¶149, 154, 156, 158, 160. Suh repeatedly explained how the Regulation II Clarification worked, *see, e.g.* ¶149, and described how Visa's sales team was engaging with merchants about the features of Visa's network, *see, e.g.* ¶160 ("Since…Reg II, we've…engage [with] many of our clients…and really articulate…the value proposition, the differentiation of the Visa network relative to alternative pin-based debit network"); ¶¶154, 156.

An analyst asked *Prabhu*, when he was CFO, "why a merchant prefers Visa for routing" and he specifically explained that Visa was differentiating itself based on network services even though "we're more expensive." ¶137. Regarding his Fintech Misstatement, Prabhu specifically brought up Apple and gave a long explanation of its relationship with Visa. ¶166.

*Defendant Jenkyn* was knowledgeable, stating "[o]bviously, one of the topics that I get a lot of questions on U.S. regulation is Reg II"( ¶217) and that "we spend all our time talking to these merchants…and acquirers," and that the "capabilities and the functionality of [Visa's] network" was the differentiating factor (¶130). He also served as Visa's President of North America starting in 2011, giving him U.S. debit knowledge ¶¶36, 217. *Defendant Forestell* gave a similarly detailed response regarding the Regulation II Clarification. ¶¶135, 218.

*Second*, Visa's use of Cliff Pricing tactics to lock merchants and Acquirers into *de facto* exclusive contracts was a company-wide strategy in response to the Durbin Amendment and Regulation II Clarification. ¶¶102-104; 219-222. *See Forescout*, 63 F.4th at 772 ("Plaintiffs' allegations of a company-wide pressure campaign, on their own, are sufficient to raise a strong

- 23 -

inference of scienter."). By the end of 2022, such contracts covered **75% of Visa's debit volume (including 80% of card-not-present volume) and at least 45% of total U.S. debit volume.** ¶103. Visa told its Board that the contracts "stabilize[d] [its] volume" and the DOJ quoted a Visa executive and employee discussing how routing deals made it unreasonable for merchants to use other networks. ¶¶90-91, 103. FE-1 said Cliff Pricing contracts were standard at Visa. ¶¶105-108.

*Third*, Visa received Civil Investigative Demands ("CIDs") for DOJ's debit investigation on March 26, 2021, June 11, 2021, January 4, 2023, and May 2, 2023. ¶240. This contributes to scienter. *See Reese*, 747 F.3d at 571 (government investigation into an earlier oil spill gave defendant "every reason" to review data that would have shown her that her statement was false).

*Fourth*, the core operations inference bolsters the other scienter allegations. Payment volume is the "primary driver for [Visa's] service revenue" and U.S. debit made up over 23% of that volume. ¶232. Visa also earns more from U.S. Debit than from U.S. credit and more from U.S. debit than from any other region. ¶233. Annual reports signed by McInerny, Suh, Andreski, Kelly, and Prabhu state that debit is a "core product[]" of Visa. ¶¶234-237. *See In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *9 (N.D. Cal. Nov. 4, 2020) (core operations supported scienter because China was Apple's third-latest market and accounted for nearly 20% of Apple's revenue).

## B. Defendants Had Motive

Although not required, the SAC pleads that Defendants had motives that add to the inference of scienter. *First*, the SAC pleads each of the Defendants were motivated not to discuss Visa's use of exclusive contracts, Cliff pricing, and related tactics because of DOJ's pending investigation. ¶¶240-241; *see Donley,* 2024 WL 794641, at *10 (pending antitrust investigation supported scienter because defendants were motivated "not to disclose the full picture[,]" since "[they] understood the[] likely effect on the investigations into alleged anticompetitive conduct").

*Second*, Kelly (sales of $13 million (26% of holdings) and $9.4 million (22%)), Prabhu ($16.8 million, (50%)), McInerney ($29.5 million), and Andreski (35% of holdings), sold large amounts of stock during the Class Period. ¶¶243-248; *see Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (sales of 20% percent of shares for $6.3 million was suspicious). The sales do not need to be made when the stock is highest. *In re Questcor*

*Sec. Litig.*, 2013 WL 5486762, at *17 (C.D. Cal. Oct. 1, 2013). The SAC does pleads that the timing of the sales was suspicious — they were Kelly's largest sales since 2019, Prabhu's only sales in more than two years, and McInerney sold $5.8 million shortly after the Regulation II Clarification went into effect. ¶¶244, 246-247. Defendants do not provide enough information about McInerney's 10b5-1 plan for the Court to make any determination about it.

### C. The Balance of Inferences Supports Scienter

Defendants ignore the recklessness standard, *see In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("turning a "'blind eye' is equally culpable…under Rule 10(b)-5"), and that the allegations must be taken collectively. Defendants made multiple specific statements about Visa's response to the Regulation II Clarification, showing knowledge of the subject and about specific conversations with merchants. They portrayed Visa's Regulation II Clarification response as based on convincing merchants to use Visa's network, *despite its greater cost*, because of the network's superior features, omitting that they were engaging in a company-wide strategy to use exclusive contracts and Cliff Pricing to make it uneconomical for merchants to route transactions over other networks. Defendants were also put on notice to review their practices by the DOJ's CIDs and that debit was core to Visa's business.

Defendants erroneously rely on *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020). *Endologix* held that it was illogical for the defendants to say the FDA would approve a drug they knew would not be approved. *Id.* at 415. This case is nothing like that. Defendants had strong incentive to portray Visa's business practices positively and to omit practices that could be considered anti-competitive given DOJ's scrutiny. Furthermore, similar statements by multiple Defendants indicate a coordinated effort to misleadingly portray Visa's business practices.[3]

### CONCLUSION

The Motion should be denied. If the Court grants it, Plaintiff respectfully requests leave to amend. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

---

[3] *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000-01 (9th Cir. 2009), *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062-63 (9th Cir. 2014), *Metzler*, 540 F.3d at 1068, and *Apollo*, 774 F.3d at 608, did not concern the type of repeated specific misstatements by defendants that are at issue here.

- 25 -

DATED: February 6, 2026                  **THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

By: /s/*Brian B. Alexander*
Brian B. Alexander, Esq. (*pro hac vice*)
Michael Cohen (*pro hac vice* forthcoming)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: balexander@rosenlegal.com
          mcohen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and Class*

- 26 -

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2026, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 6, 2026                              /s/ *Brian B. Alexander*
                                                     Brian B. Alexander

CERTIFICATE OF SERVICE                                    CASE NO. 5:24-cv-08220-NW